

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| PREFERRED TAX SERVICE, INC. : <br> a Delaware corporation : <br> Plaintiff, : <br> v. : <br> THE TAX AUTHORITY, INC. : <br> a New Jersey corporation : <br> and : <br> KENNETH M. LEESE : <br> and : <br> ROBERT A. PIANE : <br> and : <br> ROBERT A. PIANE, JR. : <br> and : <br> PIANE CATERERS, INC. : <br> a Delaware corporation : <br> Defendants. : | Civil Action No. _____ <br><br> **JURY TRIAL DEMANDED** |

## VERIFIED COMPLAINT

Plaintiff Preferred Tax Service Inc., a Delaware corporation with its principal place of business at 2201-A North Market Street, Wilmington, DE 19802 by its attorney, J.R. Julian, brings this action pursuant to 28 U.S.C. §1332 to obtain injunctive and other relief against Defendants The Tax Authority, a New Jersey corporation, Kenneth Leese, Robert A. Piane, Robert A. Piane, Jr. and Piane Caterers, Inc., a Delaware corporation, alleges as follows:

## JURISDICTION

Jurisdiction in this matter is conferred on the Court by 28 U.S.C. §1332, diversity of citizenship. Jurisdiction also is conferred by 28 U.S.C. §1331.

## THE PARTIES

1. Preferred Tax Service, Inc., ("Preferred Tax") is a Delaware corporation that is in the business of preparing Federal and State tax returns for individuals and business. Edwin Swan ("Swan") is the president and owner of Preferred Tax.

2. Defendant The Tax Authority, Inc. is a New Jersey corporation ("The Tax Authority") with its principal place of business at 1000 Maplewood Dr., Suite 110, Maple Shade, NJ 08052.

3. The Tax Authority is in the business of preparing federal and state tax returns for individuals.

4. The Tax Authority operates under the name Jackson Hewitt® Tax Service as a franchisee of Jackson Hewitt Tax Service Inc., a Delaware corporation ("Jackson Hewitt").

5. The registered agent in Delaware for The Tax Authority is Janice E. Clifton who is located at 7 Hayes Court, Wilmington, DE 19808.

6. Defendant Kenneth M. Leese ("Leese") is an individual and a New Jersey resident. Leese is the president and an owner of The Tax Authority.

7. Defendant Robert A. Piane ("Piane") is an individual and a Delaware resident. On information and belief Piane is the owner of the building located directly across the street from Preferred Tax at 2132 N. Market St., Wilmington, DE 19802 (the "Building").

8. Defendant Robert A. Piane, Jr. ("Piane Jr.") is an individual and a Delaware resident. Piane Jr. manages the day to day affairs related to the Building.

9. Defendant Piane Caterers, Inc. is a Delaware corporation with its principal place of business at 2130 North Market Street, Wilmington, DE 19802. The registered agent for Piane Caterers, Inc. in Delaware is Richard E. Franta who is located at Suite 102, The Dorset, 1301 N. Harrison Street, Wilmington, DE 19806.

10. On information and belief Piane is an officer and the majority stockholder of Piane Caterers, Inc.

11. On information and belief Piane Jr. is an officer of Piane Caterers, Inc.

12. On information and belief Piane Caterers, Inc. has an equity interest in the Building.

## FACTS COMMON TO ALL CAUSES OF ACTION

13. The Tax Authority is in direct competition with Preferred Tax.

14. E. Calvin Harmon, Jr., ("Harmon") at various times represented Swan as his business advisor.

15. In June 2005, Swan received a letter from Jackson Hewitt that solicited the sale of Preferred Tax to Jackson Hewitt (Exhibit "A").

16. On June 16, 2005, Swan began negotiations with Leese for the purchase of Preferred Tax by The Tax Authority (the "Negotiations").

17. Present at the June 16, 2005 meeting were Swan, Harmon, Leese and another owner of The Tax Authority.

18. During the Negotiations, Leese requested from Swan the Preferred Tax customer list, pricing strategy, marketing methods, operational systems and other information about Preferred Tax, which Swan provided in confidence.

19. During the Negotiations, the renting of Preferred Tax's current office space at 2201A N. Market Street was discussed and Leese commented that it might be too small.

20. In order to promote the sale by removing office space as an obstacle, Swan, unknown to Leese, contacted Piane Jr., a long-time friend, to discuss the possibility of converting a corner of the Building from a storage area to office space.

21. Swan told Piane Jr. in confidence that he was negotiating the sale of Preferred Tax and that, if purchased, the buyer might need a larger office space.

22. Piane Jr. recognized, acknowledged and understood that Swan would not assist with the opening of a competing tax preparation service directly across the street from his own business.

23. Recognizing that Swan would not assist with the opening of a competing tax preparation service directly across the street from his own tax preparation business, Piane Jr. acknowledged, understood and agreed with Swan to rent part of the Building to the prospective buyer only if the prospective buyer purchased Preferred Tax.

24. Acting in reliance on this agreement, Swan provided Piane Jr. with the name of the prospective buyer, The Tax Authority.

25. Prior to the discussion with Swan, neither Piane nor Piane Jr. was aware of The Tax Authority's potential interest in renting the Building.

26. Swan and Leese agreed that knowing in advance that adequate office space would be available to The Tax Authority upon purchasing Preferred Tax was vital to the Negotiations and that such office space would not be needed by The Tax Authority if it did not purchase Preferred Tax.

27. In reliance upon the aforesaid agreement with Piane Jr., Swan shared with Leese that the owner of the Building agreed to rent part of the Building to The Tax Authority but only if The Tax Authority purchased Preferred Tax.

28. On June 30, 2005, Leese requested information about employees, Harmon's role in the tax business and the Building (Exhibit "B").

29. On July 7, 2005, in reliance on his agreement with Leese, Swan provided Leese with the contact information for Piane Jr. and other information about the Building and the other information Leese requested (Exhibit "C").

30. Prior to his discussion with Swan, Leese did not know that the Building had office space available to rent.

31. Between July 7, 2005 and August 8, 2005, Swan received no further communication from Leese regarding the Negotiations or the Building.

32. Between July 7, 2005 and August 8, 2005, Swan received no further communication from Piane regarding the Negotiations or the Building.

33. Between July 7, 2005 and August 8, 2005, Swan received no further communication from Piane Jr. regarding the Negotiations or the Building.

34. At 4:50 pm on August 8, 2005, Leese emailed to Swan an offer (the "First Offer") to purchase Preferred Tax (Exhibit "D").

35. On August 10, 2005, Swan learned from Piane Jr. that Piane and The Tax Authority already had signed a lease (the "Lease") for office space (the "Office Space") in the Building on August 8, 2005. Swan obtained this information from a comment that Piane Jr. made to third parties at a meeting in an unrelated matter. After the meeting, Swan informed Piane Jr. that the Negotiations were ongoing, that the Lease was unacceptable and that it was signed before Swan even received the First Offer.

36. On August 11, 2005, Swan called Piane to discuss the Lease. In that discussion, (a) Piane informed Swan that Leese represented to Piane that the deal was done; (b) Piane asked Swan what the two of them could do about Leese's misrepresentation and (c) Piane mentioned that he expected to receive a check from The Tax Authority.

37. In the aforesaid August 11 discussion between Piane and Swan, (a) Piane did not mention that he expected the aforesaid check to be in the amount of $14,100.00 in full prepayment of the first year's rent, (b) Piane did not mention that Piane had agreed to use the prepayment to convert the storage space into office space for The Tax Authority and (c) Piane offered no explanation for why he did not confirm the status of the Negotiations with his long-time friend Swan before proceeding.

38. Piane received the $14,100.00 prepayment after August 11, 2005.

39. Neither Swan nor Harmon knew about the $14,100.00 prepayment until they learned of it in early October 2005.

40. Shortly after August 11, 2005, Harmon discussed the Lease with Leese. In that discussion, Harmon informed Leese that it was unacceptable to Swan that the Lease had been executed and that Swan would not negotiate under such circumstances. Leese agreed that if the Negotiations were not successful The Tax Authority would not need the Office Space and that The Tax Authority would release Piane from the Lease, if Piane, in turn, released The Tax Authority from the Lease. Leese did not mention to Harmon that he sent $14,100.00 to Piane in prepayment of the first year's rent, that Piane agreed to spend the $14,100.00 to convert the storage space and that the conversion would take place while the Negotiations were ongoing.

41. Harmon informed Swan that The Tax Authority agreed to release Piane if Piane agreed to release The Tax Authority from the Lease, that is, if the deal was not done.

42. Swan called Piane and confirmed that Piane would release The Tax Authority, if the deal was not done. Piane did not mention to Swan that Piane expected to receive and spend the $14,100.00 prepayment while the Negotiations were ongoing.

43. Based upon the respective release agreements of Piane and The Tax Authority, Harmon and Leese discussed the First Offer and later met to continue the Negotiations (the "Leese / Harmon Meeting").

44. Following up on the Leese / Harmon Meeting, on September 19, 2005, The Tax Authority submitted a second offer to purchase Preferred Tax (Exhibit "E").

45. On September 30, 2005, Swan informed Leese by email that Preferred Tax would not be sold at that time but that the sale of Preferred Tax could be revisited after the 2006 tax season if both were still interested (Exhibit "F").

46. On September 30, 2005, Swan informed Piane by letter that Preferred Tax would not be sold to the Tax Authority and attached a proposed draft release to be used by Piane and The Tax Authority to terminate the Lease (Exhibit "G").

47. In early October 2005, after receiving the September 30 letter, Piane Jr. called Swan to discuss the termination of the Lease. Swan was not available but Piane Jr. spoke to Harmon and informed Harmon that The Tax Authority had prepaid $14,100.00 for the first year of the Lease and that Piane already spent the $14,100.00. Piane, Piane Jr. or Leese had never mentioned to Swan or Harmon the $14,100.00 prepayment prior to this conversation.

48. On or about October 11, 2005, a meeting (the "October Meeting") was held among Piane, Piane Jr., Swan and Harmon to discuss the Lease and the unsuccessful termination of the Negotiations.

49. At the October Meeting, (a) Piane again stated that Leese represented that the Preferred Tax sale was a done deal, (b) Piane stated that he spent the $14,100.00 in reliance upon Leese's representation, (c) Piane stated that he was not required to refund the $14,100.00 because Leese misrepresented the status of the deal and (d) Piane had agreed to give The Tax

Authority the option to use the Office Space for something other than a retail tax preparation office or to terminate the Lease and receive a refund to the extent the Office Space was re-leased.

50. Based upon the October Meeting, Harmon drafted the following letter for Piane to send to The Tax Authority:

> I understand that you and Eddie will not be completing your deal for Preferred Tax this fall. We entered into the August 8, 2005 lease based on your representation that the deal for Preferred Tax was already complete. Since that is not the case, it appears that we have two options. One option would be to go forward with the lease so that you can use the office for something other than a retail tax preparation office. The second option would be for us to attempt to re-lease the premises.
>
> If we agreed to the re-lease option, we would not expect you to be liable beyond the first year and we would refund your prepayment to the extent that we found a new tenant during the first year.
>
> Please advise us of how you would like to proceed.

51. Piane sent the aforesaid letter to The Tax Authority on October 11, 2005 (Exhibit "H").

52. At the October Meeting, Piane provided Swan with a copy of the Lease (Exhibit "I").

53. Although Piane and Piane Jr. have their primary place of business right across the street from Preferred Tax, at no time has Piane or Piane Jr. offered any explanation as to why the office space renovation was started or why the entire $14,100.00 prepayment was spent without checking on the status of the Negotiations with their long-time friend Swan.

54. On October 12, 2005, The Tax Authority responded to Piane by letter that Leese did not represent that the Preferred Tax deal was already complete (Exhibit "J"). In that letter, however, The Tax Authority agreed to void the Lease if the $14,100.00 prepayment was refunded by October 24, 2005.

8

55. In conversations occurring between, October 12 and October 18, 2005, Swan offered to loan Piane the $14,100.00 to refund the prepayment and offered that the loan would not have to be repaid unless and until the Office Space was re-leased.

56. Piane rejected Swan's offer.

57. On October 18, 2005, Harmon informed Piane by letter that legal action would follow if the situation was not resolved by the October 24, 2005 date stipulated in The Tax Authority's letter (Exhibit "K").

58. On October 21, 2005, Piane Jr. (on behalf of Piane) informed Swan and Harmon that Piane was not required to take any action to void the Lease because there was no agreement between Swan and Piane not to rent to Mr. Leese if the purchase of Preferred Tax by The Tax Authority was not done (Exhibit "L").

59. The Tax Authority sent workers to prepare the Office Space for The Tax Authority to move in and, as of the filing of this lawsuit, such work is continuing. Furthermore, within the past few days Jackson-Hewitt signs have been installed by the Tax Authority and Leese indicating an intention to open for business.

## COUNT I – BREACH OF AGREEMENT

60. The allegations contained in Paragraphs 1 through 59 are incorporated by reference as though fully set forth herein at length.

61. Defendants agreed not to enter into a lease for office space in the Building unless The Tax Authority purchased Preferred Tax which purchase was a condition precedent.

62. Preferred Tax has been placed at an unfair disadvantage in the Negotiations due to the Lease and is in imminent danger of losing customers and revenue to The Tax Authority as a result of Defendants violation of their agreement.

63. Unless enjoined by this Court, The Tax Authority may solicit and do business with Preferred Tax's customers in violation of their agreement. The customer information was provided to Leese by Swan in good faith as part of the Negotiations.

64. An Order enjoining the Lease is reasonably necessary to protect the legitimate interest of Preferred Tax in preserving its goodwill and existing customer relationships.

### COUNT II – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

65. The allegations contained in Paragraphs 1 through 64 are incorporated by reference as though fully set forth herein at length.

66. Defendants were aware that Preferred Tax's ability to negotiate with The Tax Authority would be unfairly and seriously impaired by signing the Lease in contravention to their agreement to wait until the sale of Preferred Tax to The Tax Authority was complete.

67. Preferred Tax already has been injured by the Lease and is in imminent danger of losing customers and revenue as a result of Defendants' improper use of Preferred Tax's confidential, proprietary and trade secret information that was provided in good faith and under restrictive conditions.

68. Unless enjoined by this Court, The Tax Authority may continue to engage in other intentional and malicious actions interfering with Preferred Tax's present and prospective business relationships.

69. The disturbance of Preferred Tax's existing customer relationships cannot be adequately remedied by compensatory damages; accordingly, Preferred Tax does not have an adequate remedy at law.

70. An Order enjoining the Lease and enjoining Defendants from engaging in any further tortious interference with Preferred Tax's business opportunities is necessary to protect the legitimate interests of Preferred Tax in preserving its goodwill and existing customer relationships and to prevent Defendants from gaining an improper competitive advantage.

### COUNT III – TORT, INTENTIONAL TORT AND TORTIOUS INTERFERENCE WITH CONTRACT

71. The allegations contained in Paragraphs 1 through 70 are incorporated by reference as though fully set forth herein at length.

72. The signing of the Lease by Defendants constitutes a tort, an intentional tort and tortious interference by Defendants with each other's agreement with Preferred Tax.

73. Piane, Leese and The Tax Authority signed the Lease with the knowledge that they and the other Defendants had an agreement with Preferred Tax not to sign the Lease at that time.

74. Preferred Tax has been disadvantaged in the Negotiations and is in imminent danger of losing customers and revenue as a result of the Lease. Unless the Lease is enjoined by this Court, The Tax Authority may and/or will solicit and do business with Preferred Tax's customers in violation of their agreement not to sign the Lease until the purchase of Preferred Tax by The Tax Authority has been completed.

75. An Order from this Court enjoining the Lease is necessary to protect Preferred Tax's legitimate interest in preserving its goodwill and customer relationships and to prevent Defendants from being unjustly enriched by the improper conduct of Defendants.

## COUNT IV – UNFAIR TRADE PRACTICES

76. The allegations contained in Paragraphs 1 through 75 are incorporated by reference as though fully set forth herein at length.

77. Defendants have utilized Preferred Tax's confidential, proprietary and trade secret information for the purpose of gaining an unfair competitive advantage over Preferred Tax and to have the customers of Preferred Tax cease doing business with Preferred Tax and commence doing business with The Tax Authority.

78. In addition, Defendants have misappropriated, converted and utilized Preferred Tax's confidential, proprietary and trade secret information to unfairly compete with Preferred Tax.

79. The loss of Preferred Tax's customer goodwill and relationships cannot be remedied adequately by compensatory damages; accordingly, Preferred Tax has no adequate remedy at law.

80. An Order from this Court enjoining the Lease and otherwise enjoining Defendants from misappropriating Preferred Tax's confidential, proprietary and trade secret information is necessary to protect Preferred Tax's legitimate interest in preserving its goodwill and customer relationships and to prevent Defendants from being unjustly enriched by the improper conduct of Defendants.

## COUNT V – MISAPPROPRIATION OF TRADE SECRETS

81. The allegations contained in Paragraphs 1 through 80 are incorporated by reference as though fully set forth herein at length.

82. Preferred Tax's confidential, proprietary and trade secret information is a valuable commodity that derives independent economic value generally known to and not being readily ascertainable except by improper means. ("derives independent economic value,

actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" 6 Del. C. §2001 (4)(A)).

83. Defendants have violated the Uniform Trade Secrets Act, 6 Del. C. sec. 2001 et seq., by willfully, maliciously and deliberately misappropriating Preferred Tax's confidential, proprietary and trade secret information for the benefit and advantage of Defendants in direct competition with Preferred Tax.

84. As a result of Defendant's misappropriation and improper utilization of Preferred Tax's confidential, proprietary and trade secret information, Preferred Tax has been disadvantaged in the Negotiations. Unless enjoined by this Court, Defendants may continue to improperly use Preferred Tax's confidential, proprietary and trade secret information.

85. The losses sustained by Preferred Tax as a result of Defendant's misappropriation and improper utilization of Preferred Tax's confidential, proprietary and trade secret information cannot be remedied adequately by compensatory damages; accordingly, Preferred Tax does not have an adequate remedy at law.

86. Preferred Tax is entitled to injunctive relief pursuant to 6 Del. C. 2002. An order enjoining the Lease and enjoining Defendant's further use of Preferred Tax's confidential, proprietary and trade secret information is necessary to protect the legitimate interest of Preferred Tax in preserving its goodwill, assets and its existing customer relationships and to prevent any further violations of the Uniform Trade Secrets Act.

## COUNT VI – CIVIL CONSPIRACY

87. The allegations contained in Paragraphs 1 through 86 are incorporated by reference as though fully set forth herein at length.

88. By their actions as outlined above, Defendants have combined and conspired to violate the confidentiality agreements among Defendants and Preferred Tax and Preferred Tax's statutory and common law right to be free from intentional interference with its business opportunities.

89. Preferred Tax is in imminent danger of losing additional customers and revenue, as a result of Defendants' wrongful activities. Unless enjoined by this Court, Defendant's may solicit and do business with Preferred Tax's customers. The disturbance of Preferred Tax's existing customer relationships cannot be remedied adequately by compensatory damages; accordingly, Preferred Tax does not have an adequate remedy at law.

90. An order enjoining the Lease and enjoining Defendants from engaging in any further solicitation of and from doing business with Preferred Tax's customers is necessary to protect the legitimate interests of Preferred Tax in preserving its goodwill and its existing customer relationships and to prevent Defendants from benefiting from their unlawful and improper actions.

## COUNT VII
## COMMON LAW FRAUD, MAIL FRAUD AND WIRE FRAUD

91. The allegations contained in Paragraphs 1 through 90 are incorporated by reference as though fully set forth herein at length.

92. The defendants' actions as described in this Complaint constitute common law fraud, a violation of 18 U.S.C.A. §1962, the Racketeer Influenced and Corrupt Organizations Act (RICO) mail fraud (18 U.S.C.A. §1341) and wire fraud (18 U.S.C.A. §1343).

## COUNT VIII
## BAD FAITH

93. The allegations contained in Paragraphs 1 through 92 are incorporated by reference as though fully set forth herein at length.

94. The Defendants' actions, taken as a whole, constitute bad faith.

WHEREFORE, Preferred Tax respectfully requests that the Court grant the following relief:

A. A temporary restraining order and eventually a preliminary and permanent injunction in the form of the Order submitted with this Complaint;

B. Order an accounting of all sales made by Defendants to Preferred Tax's customers, and enter a judgment in Preferred Tax's favor in the amount of Preferred Tax's lost profits on such sales, pre and post judgment interest;

C. Enter an award in favor of Preferred Tax and against Defendants, jointly and severally, for the actual and consequential damages sustained by Preferred Tax, including costs and attorney fees necessitated by the filing of this action, and for punitive damages;

D. Award to Preferred Tax such other and further relief as this Court deems just and proper.

Dated: December 16, 2005

*/s/ J. R. Julian*
J. R. Julian No. 488
J. R. JULIAN, P.A.
824 North Market Street
Suite 1001
P.O. Box 2171
Wilmington, DE 19899-2171
(302) 658-6700
Attorneys for Plaintiff

## VERIFICATION

State of Delaware        :
                         :
County of New Castle:

I, Edwin Swan, President of Preferred Tax Service, Inc., verify that the allegations of the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

*[signature: Edwin Swan]*
EDWIN SWAN, President
Preferred Tax Service, Inc.


SWORN TO AND SUBSCRIBED before me a Notary Public for the State and County aforesaid, on this 16th day of December 2005, the affiant being known to me.

*[signature: Maxine M. Grano]*
Notary Public

My Commission Expires:

_____

MAXINE M. GRANO
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires April 11, 2008