1995 Del. Ch. LEXIS 88, *

LEXSEE 1995 DEL.CH.LEXIS 88

**DENNIS DIONISI and DIONISI STUDIOS, INC., a Delaware corporation, Plaintiffs, v. DENIS DeCAMPLI and DENIS DeCAMPLI DESIGN, INC., a Delaware corporation, Defendants. DENIS C. DeCAMPLI and DENIS DeCAMPLI DESIGN, INC., a Delaware corporation, Plaintiffs, v. DENNIS A. DIONISI and DIONISI ENTERPRISES, INC. T/A DIONISI STUDIOS, INC., a Delaware corporation, Defendants.**

**C.A. No. 9425 CONSOLIDATED**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1995 Del. Ch. LEXIS 88*

**February 22, 1995, Submitted
June 28, 1995, Decided**

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court August 6, 1995.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** A graphic designer and a competitor each sought damages from the other in an action to dissolve a joint venture. The graphic designer alleged trade secret violations of *Del. Code Ann. tit. 6, § 2001(2)*, and confusion to customers under the Deceptive Trade Practices Act (DTPA), *Del. Code Ann. tit. 6, § 2531* et seq.

**OVERVIEW:** A graphic designer and a competitor dissolved a joint venture. The competitor took with him his list of client telephone numbers, as well as samples of work done by both parties, and a van that the graphic designer was still paying for. The court found (1) that *Del. Code Ann. tit. 8, § 273(b)* could be used to find that each party was entitled to one-half of the corporation's book value as of February 1, 1987, (2) that the parties mutually terminated their joint venture on January 5, 1987, due to the explicit words and actions by the competitor in resigning, (3) that the competitor could not be liable for any breach of fiduciary duty after that date, (4) that the competitor did not misappropriate trade secrets under *Del. Code Ann. tit. 6, § 2001(2)* by removing the client telephone list, which contained generally public information, (5) that the competitor caused confusion to customers under the DTPA by showing samples of work without identifying those that he did not create, (6) that the graphic designer could

prove no damages from the deception, (7) that the conversion of the van was actionable, and (8) that the graphic designer owed the competitor pension benefits.

**OUTCOME:** The court found in favor of the graphic designer on his claims of the deceptive trade practice of confusion in the marketplace as to source, awarding nominal damages, and on his claim of conversion of a van. The court found in favor of the competitor on his claim for one-half of the joint venture's value and for pension benefits.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jury Trials > Province of Court & Jury*
[HN1] Trial courts apply the customary Delaware standard to trial testimony. The court must judge the believability of each witness and determine the weight given to all trial testimony. The court must consider each witness's means of knowledge; strength of memory and opportunity for observation; the reasonableness or unreasonableness of the testimony; the motives actuating the witness; the fact, if it was a fact the testimony was contradicted; any bias, prejudice, or interest, manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the believability of the testimony.

*Business & Corporate Entities > Joint Ventures*
[HN2] A joint venture exists when the parties agree to join together in a common enterprise for a single business

1995 Del. Ch. LEXIS 88, *

purpose, each contributing money, personal skills or property to the enterprise.

*Civil Procedure > Jurisdiction > Equity Jurisdiction*
[HN3] A court of equity will not ignore the practicalities of a situation.

*Civil Procedure > Jurisdiction > Equity Jurisdiction*
[HN4] Equity regards as done that which in good conscience the parties should have done.

*Business & Corporate Entities > Corporations > Directors & Officers > Compensation & Qualifications*
[HN5] See *Del. Code Ann. tit. 8, § 141(b)*.

*Business & Corporate Entities > Corporations > Directors & Officers > Compensation & Qualifications*
[HN6] See *Del. Code Ann. tit. 8, § 142(b)*.

*Business & Corporate Entities > Corporations > Directors & Officers > Compensation & Qualifications*
[HN7] Determining whether a director or officer has resigned is a question of fact determined by the circumstances of each case. Loose and ambiguous language will not be regarded as sufficient to prove the resignation of a corporate officer, at least where the subsequent acts and declarations of the officer are inconsistent with any such contention.

*Business & Corporate Entities > Corporations > Directors & Officers > Compensation & Qualifications*
[HN8] The statutory language of *Del. Code Ann. tit. 8, § 141(b)* can be construed as permissive rather than mandatory.

*Business & Corporate Entities > Joint Ventures*
[HN9] While joint venturers in fact owe each other and the enterprise a fiduciary duty of utmost good faith, fairness and honesty, that duty ends with the death of the joint venture.

*Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities*
[HN10] A director or officer is permitted to engage in business activities which are in competition with the corporation after the director or officer leaves a corporation, absent an agreement to the contrary. The former fiduciary may escape liability even if the individual begins competitive activity prior to the employee's separation date, barring the misuse of confidential information or some other inequitable circumstance.

*Labor & Employment Law > Trade Secrets & Unfair Competition > Trade Secrets*
*Torts > Business & Employment Torts > Unfair Business Practices*
*Trade Secrets Law > Factors > Definitions*
[HN11] See *Del. Code Ann. tit. 6, § 2001(4)*.

*Labor & Employment Law > Trade Secrets & Unfair Competition > Trade Secrets*
*Torts > Business & Employment Torts > Unfair Business Practices*
[HN12] See *Del. Code Ann. tit. 6, § 2001(2)*.

*Labor & Employment Law > Trade Secrets & Unfair Competition > Trade Secrets*
*Torts > Business & Employment Torts > Unfair Business Practices*
[HN13] A plaintiff alleging misappropriation of a trade secret has the burden of proving the existence of the trade secret. The misappropriation of a trade secret action has four separate inquiries: (1) Does a trade secret exist; i.e., have the statutory elements -- commercial utility arising from secrecy and reasonable steps to maintain secrecy been shown; (2) Has the secret been communicated by plaintiff to the defendant; (3) Was such communication pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) Has the secret information been improperly (e.g., in breach of that understanding) used or disclosed by the defendant to the injury of the plaintiff.

*Labor & Employment Law > Trade Secrets & Unfair Competition > Trade Secrets*
*Torts > Business & Employment Torts > Unfair Business Practices*
[HN14] The market of the product or service involved is the main factor in determining whether a client list constitutes a compilation deriving independent economic value from not being generally known by other persons who can obtain economic value from its disclosure or use. If the buyers are easily identified, it is unlikely that their identities will hold independent economic value

1995 Del. Ch. LEXIS 88, *

even when the identities are considered confidential.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Waiver & Preservation*
[HN15] A waiver is a voluntary and intentional relinquishment of known right.

*Torts > Business & Employment Torts > Interference With Prospective Advantage*
[HN16] The elements of a tortious interference with a prospective contractual relationship are: (1) The existence of a valid business relationship or expectancy; (2) Knowledge of the relationship or expectancy on the part of the interferer; (3) Intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) Resulting damages to the party whose relationship or expectancy has been disrupted.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
*Torts > Business & Employment Torts > Unfair Business Practices*
[HN17] See *Del. Code Ann. tit. 6, § 2532.*

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
*Torts > Business & Employment Torts > Unfair Business Practices*
[HN18] Delaware's Deceptive Trade Practices Act, *Del. Code Ann. tit. 6, § 2531* et seq., is not a platform for an independent common law damage suit. The act was not intended to create a new cause of action distinct from the common law protections designed to secure businesses against the deceptive trade practices of others. The act does not provide for damages, treble or otherwise, or attorney fees in the absence of a claim for injunctive relief.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
*Torts > Business & Employment Torts > Unfair Business Practices*
[HN19] Where a defendant uses art samples, originally acquired with plaintiff's approval, merely to demonstrate the type of work defendant could accomplish for other customers, these actions do not establish a violation of *Del. Code Ann. tit. 6, § 2532(a)(1).*

*Torts > Intentional Torts > Conversion*
[HN20] Conversion consists of the exertion of dominion over a chattel without lawful justification, denying the person rightfully entitled to the chattel his rights.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices*
*Torts > Business & Employment Torts > Unfair Business Practices*
[HN21] In order to recover damages at common law, a plaintiff must prove injury directly resulting from the unfair competition or unfair trade practices. The court has discretion to assess the amount of damages. When damages actually occur as a result of unfair competition, they are difficult to calculate because the injury only affects intangible qualities; for example, the goodwill of the firm or the firm's reputation. Plaintiff may prove damages based on circumstantial evidence, but the court will not award damages based on speculation or conjecture. Once the plaintiff produces circumstantial evidence providing a reasonable basis for damages, defendant has the burden to prove causes unrelated to the unfair competition caused the plaintiff's decline in profits or other injury.

*Torts > Intentional Torts > Conversion*
[HN22] The proper measure of damages for a conversion of property is the value of the property at the time of the conversion, plus interest.

**COUNSEL:**

P. Clarkson Collins, Jr. and Neal C. Belgam of MORRIS, JAMES, HITCHENS & WILLIAMS, Wilmington, Delaware. Attorneys for Denis C. DeCampli and Denis DeCampli Design, Inc.

Charles Gruver, III of TAYLOR & GRUVER, P.A., Wilmington, Delaware. Attorney for Dennis Dionisi and Dionisi Studios, Inc.

**JUDGES:** Myron T. Steele, Vice-Chancellor

**OPINIONBY:** Myron T. Steele

**OPINION:**

   *MEMORANDUM OPINION*

STEELE, Vice-Chancellor

This is a consolidated action resolving conflicts arising from the break up of a graphic design business. Dennis Dionisi ("Dionisi") and Denis DeCampli

A 27

1995 Del. Ch. LEXIS 88, *

("DeCampli") were officers and directors of Denis & Dennis, Inc. ("D & D"), a small graphics design firm. Each held 50% of the outstanding shares of the corporation. Dionisi left the firm in January of 1987. DeCampli filed suit against Dionisi alleging a breach of Dionisi's duty of loyalty, misappropriation of trade secrets, tortious interference with potential contractual relationships, unfair trade practices and conversion. Dionisi filed suit against DeCampli alleging DeCampli reneged on a promise to buy Dionisi's D & D shares, refused to spin-off D & D's pension [*2] benefits and declined to pay Dionisi for work done after he left D & D. This is the decision after trial and post-trial briefing.

## I. FINDINGS OF FACT

I find the facts that follow to be determinative in this case. In doing so, [HN1] I apply the customary Delaware standard to the trial testimony. I must judge the believability of each witness and determine the weight given to all trial testimony. I considered each witness's means of knowledge; strength of memory and opportunity for observation; the reasonableness or unreasonableness of the testimony; the motives actuating the witness; the fact, if it was a fact the testimony was contradicted; any bias, prejudice, or interest, manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the believability of the testimony.

After finding some testimony conflicting by reason of inconsistencies, I have reconciled the testimony, as reasonably as possible, so as to make one harmonious story of it all. To the extent I could not do this, I gave credit to that portion of the testimony which, in my judgment was most worthy of credit and disregarded any portion of testimony which, in my judgment, [*3] was unworthy of credit.

### A. The Graphic Design Business

The graphic design business in New Castle County is highly competitive. The process of developing clients and client contacts takes years. There are several methods of business development including cold calls. The most effective methods of developing a client base, however, are networking and referrals from existing clients. Once a graphic arts firm establishes a business relationship with a client, the client may generate additional projects.

It is common knowledge in the industry that large corporate and institutional clients provide substantial potential client opportunities. For example, information concerning the identity of individuals purchasing graphic arts services, their particular needs, pricing of past graphics services and the nature of their business is

critically important to form and maintain the business relationship.

### B. DeCampli Starts His Own Business

DeCampli and Dionisi were co-workers at E.I. du Pont de Nemours & Co. ("DuPont"). In 1980, DeCampli left DuPont to begin a graphic design business -- Denis DeCampli Design. He organized Denis DeCampli Design as a sole proprietorship. DeCampli ran [*4] Denis DeCampli Design for the first year developing the business's clientele by making cold calls, designing mock projects and displaying his work using a portfolio he created while in school. As most sole proprietorships do, Denis DeCampli Design struggled in its infancy. In 1981 and 1982, the business had gross receipts of $ 35,000 and $ 37,000, respectively. In 1983, the business finally began to grow with gross receipts of $ 115,000.

### C. Dionisi Joins the Business

Because the business was rapidly growing, DeCampli invited Dionisi to join him in business. Dionisi accepted. In January 1984 they formed Denis & Dennis, Inc. ("D & D"). DeCampli served as the corporation's President and Treasurer. Dionisi held the positions of Secretary and Chief Executive Officer. DeCampli and Dionisi were D & D's only directors and each owned fifty percent of the corporation's shares.

At the formation of D & D, Inc., both parties contributed to the business. DeCampli contributed the assets of the sole proprietorship, which included 24 clients and $ 27,000 of income on gross receipts of $ 115,000. Dionisi contributed $ 19,000 cash and a car valued at $ 4000.

DeCampli and Dionisi also entered [*5] into a Shareholders Agreement. The Shareholders Agreement included a "put/call" provision allowing D & D to "call" or Dionisi to "put" Dionisi's shares of stock for $ 25,000 beginning on February 1, 1986. n1

n1 The Shareholders Agreement includes a drafting error which allows the corporation or Dionisi to exercise the "Put/Call" provision after January 31, 1986 but does not include an end date. The parties agree the Shareholders Agreement should have contained a thirty day window for the exercise of the option beginning on January 31, 1986.

### D. Denis & Dennis, Inc. Flourishes

In 1984 and 1985, D & D continued to grow with gross receipts of $ 290,000 and $ 510,000, respectively.

1995 Del. Ch. LEXIS 88, *

Clients originally cultivated by DeCampli generated the lion's share of D & D's revenue. DeCampli and Dionisi split the Corporation's profits equally. In 1984, they paid themselves salaries of $ 29,068. In 1985, DeCampli's and Dionisi's salaries increased to $ 62,417.

During this time period at DeCampli's request, Dionisi began [*6] to service many of D & D's most valuable clients. As a result, Dionisi dealt with most of D & D's client representatives. DeCampli retained primary responsibility for the corporation's art direction and creative design.

In 1985, Dionisi became concerned D & D would call his shares for $ 25,000 as provided by the "put/call" provision in the Shareholders Agreement. Without DeCampli's knowledge, Dionisi consulted D & D's accountant, Harvey Strauss ("Strauss"), to determine the value of his shares. Strauss valued the corporation at $ 97,890.62 using a three year multiple of earnings and valued Dionisi's 50% ownership at $ 45,346.43, approximately twenty thousand dollars above the $ 25,000 provided by the "put/call" provision. Dionisi approached DeCampli and requested the deletion of the "put/call" provision. DeCampli agreed.

### E. Dionisi Proposes Increased Compensation

Throughout 1986, DeCampli had personal problems which affected his work at D & D. DeCampli withdrew from dealings with clients and he began doing below average work. DeCampli's relative inactivity affected Dionisi and D & D employees, causing them to question DeCampli's ability to continue in the business.

As a result [*7] of DeCampli's withdrawal, clients "originated" by Dionisi produced more revenue than DeCampli's clients. On August 29, 1986, Dionisi proposed a commission plan which provided him with a larger portion of D & D's profits and a reduction in officer salaries. Dionisi's proposal included corporate enabling documents including a Waiver of Notice and Minutes of Special Meeting dated August 29, 1986. DeCampli reluctantly agreed to a commission plan "in principal" but refused to execute the corporate documents.

On November 5, 1986 DeCampli and Dionisi met with Strauss to perform a third quarter review of D & D's performance. At this meeting, DeCampli and Dionisi agreed to reduce officer salaries from $ 62,417 in 1986 to $ 45,000 in 1987 as part of a trial run of Dionisi's commission plan. Dionisi also requested a retroactive bonus for 1986 of approximately 8% of the gross receipts from Dionisi's clients. In response, DeCampli agreed to let Dionisi take a 5% commission. Before any agreement regarding the retroactive bonus, Dionisi wrote a check to

himself for $ 7,450 contemplating such a bonus.

### F. Dionisi Creates New Corporation

In late 1986, Dionisi concluded he could no longer work [*8] with DeCampli. He contacted Strauss about setting up a new graphic design business. Strauss recommended Dionisi incorporate before December 31 because of pending modifications to the tax code even if operations would not begin until 1987. On December 31, 1986, Strauss incorporated Dionisi Enterprises, Inc. t/a Dionisi Studios, Inc. ("Studios") at Dionisi's request. Neither Strauss nor Dionisi told DeCampli about the new corporation.

### G. Dionisi Leaves D & D

On January 5, 1987, Dionisi told DeCampli he was leaving D & D, but wanted to remain active for thirty days to finish projects already in progress. Dionisi believed he needed to stay and finish work to avoid harming the parties' reputation in the industry. DeCampli petulantly demanded Dionisi leave immediately. Dionisi refused and DeCampli acquiesced.

DeCampli requested a meeting between DeCampli, Dionisi and Strauss to determine how to structure Dionisi's departure. The meeting took place on January 6, 1987 at Strauss's office. Strauss gave DeCampli and Dionisi only two options: (1) one of the two shareholders could buy the other shareholder's stock; or (2) the corporation could be liquidated. DeCampli, wanting to protect [*9] the business he started, agreed the parties should elect the shareholder buyout option and that he should purchase Dionisi's stock.

During the meeting, Strauss did a rough calculation of the purchase price, resulting in an estimated purchase price of $ 10,710.90. However, the parties never formally agreed to details for DeCampli's purchase of Dionisi's stock. Dionisi never transferred his original 250 shares of the corporation's stock and even now retains the share certificates.

Dionisi went on vacation from January 7 until January 13. On January 7, DeCampli told D & D's employees Dionisi had resigned. After Dionisi returned from his vacation, he appeared at D & D for about one hour per day to wrap up the work in progress.

At DeCampli's request, Strauss drafted an Amendment to the Certificate of Incorporation changing the name of D & D to Denis DeCampli Design, Inc. Dionisi would not sign the document unless it reflected an effective date of February 1, 1987. He wished to finish work in progress and needed access to the D & D premises. DeCampli agreed. Dionisi and DeCampli signed the Amendment on January 15, 1987. Dionisi

1995 Del. Ch. LEXIS 88, *

signed the document as Corporation secretary.

In their only [*10] discussion of how they were going to notify clients of Dionisi's departure, DeCampli told Dionisi he should notify his clients his way, and DeCampli would notify his clients his own way.

In the middle of January, Dionisi took a rolodex which included D & D clients and addresses, in the belief the rolodex belonged to him. n2 Dionisi used the rolodex to make a computer list of clients he would send a letter informing them of the opening of Dionisi Studios.

> n2 While at DuPont, Dionisi began compiling a rolodex. When he left DuPont, he brought the cards in the DuPont rolodex with him to D & D. DeCampli updated this rolodex during Dionisi's tenure with D & D.

Dionisi announced his intention to take D & D documents and artwork. DeCampli sought advice from Strauss. Strauss asserted Dionisi was entitled to the corporate records as a result of his status as an officer and director of the corporation. Strauss never disclosed to DeCampli that he acted for Dionisi's new enterprise contemporaneously. n3 Relying on Strauss's [*11] advice, DeCampli wrote the following memorandum to Dionisi dated January 23, 1987 which stated, in pertinent part:

> Please make xerox copies of any and all company documents and records which you require to proceed with current and future work for your clients. All original documents and records should remain in the company files without exception

> Please submit a written request for any and all original art and slides which you will require for future work with your clients, so that they may be extracted from the storage files . . . .

> Also, please acquire whichever portfolio samples you deem as appropriate and necessary for future work with your clients.

(Dionisi Ex. 21). In response, Dionisi took job log sheets and job envelopes which contained the identity of D & D's present clients, the nature of the work done for these

clients, the prices D & D charged for the work and the identity of D & D's prospective clients. Dionisi also took a number of boxes of D & D's original artwork, design samples, slide programs, "grid" artwork boards and a DuPont internal phone directory. Dionisi informed DeCampli he had the original artwork through a written memo dated [*12] January 26, 1987.

> n3 Throughout the scenario Strauss appeared willing, if not able, to offer legal advice as well as public accounting assistance. Apparently public accountants had no rules governing conflicts of interest or if they did Strauss ignored them.

Dionisi also took D & D's 1984 Toyota van. When DeCampli requested that Dionisi return the van, Dionisi refused. DeCampli then sent the van's payment book to Dionisi. Dionisi returned it. Faced with damage to its credit rating and potential liability for the van, D & D paid the van payments for thirteen months in the amount of $ 4,445.35 and the insurance on the van totalling approximately $ 1,000.

Dionisi severed his final tie with D & D on February 1, 1987. He finished the "work in progress," as he had planned to do. He received no additional compensation after January 31, 1987. Dionisi billed the Corporation $ 1,485 for the completed work.

**H. Dionisi Studios**

In mid-January, Dionisi created a list of potential clients using the rolodex taken [*13] from D & D. By January 20, Dionisi sent a form letter to approximately one half of the clients on his list. The letter stated, in pertinent part:

> . . . 1987 begins with a major business development: the establishment of DIONISI STUDIOS, a creative communications firm. . . .

> After the dust of remodeling has settled, I will be inviting you to view the changes that have been made. You'll see a dramatic expansion in floorspace to accommodate a wider range of communications services . . . . At the same time, you can be assured that I will offer the same quality craftsmanship, personal attention to detail, and timely deliveries that you've come to expect from me.

> Once DIONISI STUDIOS has officially opened, I hope that you will visit to

1995 Del. Ch. LEXIS 88, *

discuss how we can continue to develop
innovative solutions to your
communications problems. In the
meantime, until February 1, I can be
reached at (302) 656-0460.

(DeCampli Ex. 22). The telephone number included in
the letter was D & D's telephone number. Studios opened
on February 2, 1987.

During the first year of Studios' operation, Dionisi
and two account executives, Larry Weiner n4 and Loni
Lehman n5, met with potential clients [*14] and brought
an agency portfolio of graphic design work to the
meetings. The portfolio demonstrated the type of work
Studios could do and illustrated different ways to solve
client problems by using different formats. The portfolio
contained artwork done by D & D. When showing the
artwork to prospective clients Dionisi, Weiner and
Lehman rarely differentiated between designers. When
Weiner was unsure of a particular piece of artwork's
history, he represented the piece as the type of work that
Studios could do. If Lehman knew Dionisi did the piece,
Lehman would state Dionsi did the work while at D & D.
After Studios acquired enough of its own work, the D &
D pieces were removed from the agency portfolio.


n4 Studios hired Weiner in September 1987.


n5 Lehman, an ex-employee of D & D,
started her career at Studios as a production
coordinator. Lehman began to meet with potential
clients in summer of 1987.


In late 1987 Larry Weiner drafted for dissemination
a letter stating:

Some of our clients are [*15] DuPont,
Hercules, A.I. dupont Institute, Conoco,
Chrysler and various other corporations
and non-profit organizations.

(DeCampli Ex. 28). In reality, at the time of the letter,
A.I. dupont Institute and Conoco were clients of D & D,
not Studios. This letter also states Studios was currently
involved in the production of annual reports. *Id.* At that
time, Studios was not currently involved in producing
annual reports; D & D had done annual reports during
Dionisi's employment. Nonetheless, DeCampli produced

no evidence showing how widely the letter may have
been disseminated, to whom or with what result.

In its first fiscal year, Studios billed $ 402,463.00. In
Studios' first two months of operations, sixty-five out of
seventy-four jobs were for past D & D clients.

### I. The Fate of D & D

On February 1, 1987, D & D changed its name to
Denis DeCampli Design, Inc. Several key employees
decided to leave D & D because of Dionisi's departure.
DeCampli named his father, Alfred, Secretary of the
Corporation.

DeCampli opted to transform the corporation into an
"S" corporation and filed an IRS Schedule K-1 indicating
he owned one hundred percent of D & D's shares, as of
March [*16] 7, 1988. In 1988, DeCampli's Schedule K-1
also indicated he owned one hundred percent of D & D
shares. In 1990, DeCampli filed D & D's tax return with
an attachment declaring the original election in 1987
invalid. DeCampli filed amended returns for D & D in
1987 and 1988.

Dionisi's departure impacted D & D dramatically. In
1987, D & D's gross receipts fell to $ 108,364 from
1986's high of $ 497,983. D & D's net earnings fell from
$ 116,262 in 1986 to $ 27,446 in 1987.

### J. D & D Conveys Stock to DeCampli

Between 1987 and 1990, the two corporations
continued to compete for clients. It became apparent
through papers filed in this action that Dionisi sought to
force a dissolution of D & D. Fearing dissolution and
attempting to protect himself from the consequences of a
deadlocked corporation, DeCampli wanted D & D to
issue additional shares to him to dilute Dionisi's
ownership interest and make himself majority
shareholder. At the request of DeCampli, Christopher
Fortugno, D & D's new accountant, calculated a per share
value of $ 53.74. On March 12, 1990, DeCampli
unilaterally caused D & D to issue five shares of stock to
him, increasing his holding to 255 shares, a majority of
[*17] the issued and outstanding shares.

### II. CONTENTIONS OF THE PARTIES

The parties assert numerous claims against each
other. DeCampli asserts, in order:

(1) Dionisi breached his duty of loyalty to
the D & D;

(2) Dionisi misappropriated D & D
"Trade Secrets;"

A 31

1995 Del. Ch. LEXIS 88, *

(3) Dionisi tortiously interfered with D & D contractual relationships;

(4) Dionisi engaged in deceptive trade practices; and

(5) Dionisi converted D & D property.

DeCampli argues, as a result of Dionisi's conduct, D & D is entitled to recover its lost profits and damages, as measured by applying D & D's historical profit margin to Studio's gross receipts.

Dionisi lodges numerous counter-claims against DeCampli:

(1) DeCampli breached a promise to purchase Dionisi's shares of the corporation;

(2) Dionisi is entitled to a pension spin-off from D & D to Studios;

(3) DeCampli breached *his* fiduciary duties by unilaterally causing D & D to issue him five shares of D & D stock;

(4) Dionisi seeks dissolution of Denis Decampli Design, Inc.; and

(5) D & D never paid Dionisi for his work done during January 1987.

I will attempt to deal with each argument [*18] in turn.

## III. THIS JOINT VENTURE CORPORATION WILL BE DISSOLVED

[HN2] A joint venture exists when the parties agree to join together in a common enterprise for a single business purpose, each contributing money, personal skills or property to the enterprise. *Vilone & Grossi, Inc. v. Kipp,* Del. Ch., C.A. No. 9362, Hartnett, V.C. (Sep. 18, 1991) Letter Op. at 4. Here, both individuals contributed to the initial enterprise. DeCampli contributed his sole proprietorship's assets. Dionisi contributed cash and $ 4000 in property. Dionisi and DeCampli shared the profits and losses of the corporation for three years, working toward the common goal of making D & D profitable. There is no doubt in my mind Dionisi and DeCampli pooled their individual resources

to carry out their single enterprise -- a graphic arts services business. D & D was clearly a joint venture when formed until the time Dionisi announced he was disassociating himself from the corporation.

Section 273 of the Delaware Corporation law provides an expeditious procedure for dissolving a joint corporation having two 50% shareholders. *8 Del. C. § 273; Short v. McNatt,* Del. Ch., C.A. No. 10077, Allen, [*19] C. (May 17, 1991) Mem. Op. at 8. This section embodies the public policy that joint venture corporations with two 50% shareholders should follow the procedures established by legislative enactment when the joint venture has come to an end. For indeterminable reasons, neither shareholder chose to do so.

Now, recognizing the realities of the situation, the question is how to end this venture in the most equitable, efficient and inexpensive manner possible. [HN3] A court of equity will not ignore the practicalities of a situation. *Pelmar v. Morgas, Inc.,* Del. Ch., C.A. No. 7519. Brown. C. (Apr. 16, 1991) Letter Op. at 10. This matter has continued far longer than necessary. The parties should have availed themselves of *8 Del. C. § 273* when they knew the joint venture had ended. Eight years after the fact, the parties now ask the Court to resolve their differences, with their *ex post facto* actions and rationalizations.

The legislature's pronouncement of how joint ventures should be dissolved, with its incorporated public policy, will be the tool I use to bring this matter to a fair and expeditious end. I will not overlook this integral section of our corporate law merely [*20] because neither party filed a petition. [HN4] Equity regards as done that which in good conscience the parties should have done. *See, e.g., Monroe Park v. Metropolitan Life Ins. Co.,* Del. Supr., 457 A.2d 734, 737 (1983). Dionisi and DeCampli both wanted to discontinue the joint venture, as evidenced by Dionisi's resignation and DeCampli's demand Dionisi remove himself from the corporation. DeCampli and Dionisi discussed dissolution and the option of one shareholder purchasing the other shareholder's shares. However, they never formally agreed how this joint venture would conclude its affairs. The parties, who were deadlocked concerning the operation of the joint venture should have filed for dissolution under *8 Del. C. § 273* as of February 1, 1987. n6 The mere fact they did not initiate the process as contemplated by the statute and filed suit against each other does not prevent me from seizing the initiative and doing what they should have done.

n6 No doubt consulting a public accountant

A 32

for advice rather than an attorney caused the tempestuous teapot to burst.

[*21]

Section 273(b) grants the Court of Chancery the power to dissolve the corporation. *8 Del. C. § 273(b)*. Exercising my discretion, the equitable power of the court and the authority vested in *8 Del. C. § 273(b)*, I find the corporation should be dissolved, with each party receiving one-half, in relation to each party's proportion of ownership, of the net book value of the corporation as of February 1, 1987.

This ruling moots discussion of the following issues raised by the parties: Dionisi's promissory estoppel argument; Dionisi's unjust enrichment argument; Dionisi's challenge of D & D issuing five additional shares to DeCampli; and Dionisi's request for dissolution of D & D. Therefore, now I turn to each of the parties' arguments that remain in the case.

### IV. BREACH OF FIDUCIARY DUTY

DeCampli argues Dionisi breached his duty of loyalty to D & D by taking steps to start a competing business while a D & D officer, director or employee.

#### A. Dionisi was no longer a Director and Officer of D & D After January 5, 1987

It is undisputed Dionisi was D & D's CEO, Secretary and a D & D director until January 5, 1987. DeCampli argues Dionisi was an officer and director [*22] until he left the corporation on February 1, 1987. Dionisi argues his announcement that he was leaving D & D constituted an effective resignation on January 5, 1987.

*8 Del. C. § 141(b)* and *8 Del. C. § 142(b)* deal with the resignation of an officer or director of a corporation. [HN5] *8 Del. C. § 141(b)* states, in pertinent part:

> Each director shall hold office until his successor is elected and qualified or until his earlier resignation or removal. Any director may resign at any time upon written notice to the corporation.

[HN6] *8 Del. C. § 142(b)* contains the same language as *8 Del. C. § 141(b)* and states, in pertinent part:

> (b) Officers shall be chosen in such manner and shall hold their offices for

such terms as are prescribed by the bylaws or determined by the board of directors or other governing body. Each officer shall hold his office until his successor is elected and qualified or until his earlier resignation or removal. Any officer may resign at any time upon written notice to the corporation.

[HN7] Determining whether a director or officer has resigned is a question of fact determined by the circumstances of each case. *Bachmann* [*23] *v. Ontell*, Del. Ch., C.A. No. 7805, Brown, C. (Nov. 16, 1984) Letter Op. at 6; *Lasher v. Inter-Continental Biologics, Inc.*, Del. Ch., C.A. No. 950, Brown, C. (June 14, 1984) at 19-20. "Loose and ambiguous language will not be regarded as sufficient to prove the resignation of a corporate officer, at least where the subsequent acts and declarations of the officer are inconsistent with any such contention. *Bachmann, supra*, at 6 (quoting 2 William Fletcher, *Fletcher Cyclopedia Corporations § 350* (Perm. Ed.); *Lasher, supra*, at 20 (quoting 2 William Fletcher, *Fletcher Cyclopedia Corporations § 350* (Perm. Ed.); *see also* 2 William Fletcher, *Fletcher Cyclopedia Corporations § 350* (Perm. Ed. 990 Rev. Vol.); 1 Ernest Folk et al., *Folk on the Delaware General Corporation Law § 141.5.2* (3d ed. 1994).

The question is whether § 141(b) or § 142(b) requires written notice to the corporation. As Chancellor Brown stated:

> Were I required to rule on the point in order to decide this case, my inclination would be to hold against the plaintiffs [and not require a director must offer his resignation in a written document]. This [*24] is because [HN8] the statutory language [of § 141(b)] can be construed as permissive rather than mandatory (it is said that the purpose of this language is to provide a means for a director's resignation to become effective at his election as opposed to requiring acceptance by he corporation, which was the former status of our law) and because *I can conceive of circumstances where a completely illogical result would follow from the refusal of the law to recognize an oral resignation clearly given.*

1995 Del. Ch. LEXIS 88, *

*Bachmann, supra,* at 4 (emphasis added). Although Chancellor Brown in *Bachmann* never actually decided this point, n7 I agree with his analysis.

> n7 Chancellor Brown assumed, for the purposes of his decision, that a director can resign orally.

Both Dionisi and DeCampli understood Dionisi's announcement on January 5, 1987 meant he was effectively resigning all of his positions in the company including CEO, Secretary and Director, effective immediately. Dionisi made it clear he could and would [*25] no longer work with DeCampli, who had abdicated responsibility for D & D clients and business. Dionisi did not participate in the management of the corporation during January 1987. He occupied the D & D offices one hour a day to wrap up work in progress. Dionisi agrees he wanted Dionisi out immediately, but Dionisi refused based on his reasonable belief he should finish the work he undertook before he moved to his own corporation. DeCampli even informed his employees Dionisi had resigned from the corporation. The only logical and rational interpretation of the evidence is that Dionisi and DeCampli, the only two shareholders and officers of the corporation, understood that Dionisi was resigning from the corporation and that he abdicated all authority of office in the corporation upon his clear and equivocal announcement. All of the parties acted consistently with this conclusion. Therefore, I find Dionisi resigned a D & D's CEO, Secretary and director as of January 5, 1987. The individual parties themselves caused the joint venture to self-destruct on this date.

**B. No Fiduciary Duty of Loyalty Existed After January 5, 1987**

The joint venture ended January 5, 1987. Neither individual [*26] retained any rational expectation it would or could continue after Dionisi resigned. DeCampli ordered him to leave and the D & D employees were told Dionisi had resigned. I will not entertain a legal fiction and create abstract duties and speculate about breaches and consequential damages where the parties knew then and must know now their business relationship terminated on that fateful day. The relationship continued simply to wind up the affairs of the venture in a manner serving the best interests of DeCampli and Dionisi under the admittedly strained circumstances confronting them. Neither intended to maintain a formal relationship. They inartfully attempted to wind up their affairs -- as one would suspect when their only guidance was their passion and the legal advice of a public accountant. [HN9] While joint venturers in

fact owe each other and the enterprise a fiduciary duty of utmost good faith, fairness and honesty, that duty ends with the death of the joint venture. *See, e.g., In re Arthur Treacher's Fish & Chips of Ft. Lauderdale, Inc., Del. Ch., 386 A.2d 1162, 1166 (1978);* 3 Beth Buday & Gail O'Gradney, *Fletcher Cyclopedia Corporations §* 860, at 275 (Perm Ed. [*27] 1994 Rev. Vol.). The mere fact D & D paid an officer's salary to Dionisi the last month of the fiscal year, Dionisi helped finish work in progress and a paper resignation did not get signed until February 1, 1987 does not force me to ignore reality and conclude the joint venture continued.

[HN10] A director or officer is permitted to engage in business activities which are in competition with the corporation after the director or officer leaves a corporation, absent an agreement to the contrary. *Wilmington Trust Co. v. Consistent Asset Mgt. Co.,* Del. Ch., C.A. No. 8867, Allen, C. (Mar. 25, 1987) Mem. Op. at 201; R. Franklin Balotti & Jesse A. Finkeltein, *The Delaware Law of Corporations and Business Organizations §* 4.10, at 4-226 (1995 Supp.); *see Maryland Metals, Inc. v. Metzner, Md. App., 282 Md. 31, 382 A.2d 564, 568 (1978);* cf. *Science Accessories Corp. v. Summagraphics Corp., Del. Supr., 425 A.2d 957, 965 (1980); Craig v. Graphic Arts Studio, Inc., Del. Ch., 39 Del. Ch. 447, 166 A.2d 444, 446 (1960).* This privilege has as its foundation the policy of free competition, a policy fundamental to the individual rights of employees and basic [*28] to the country's national development. *Maryland Metals, 382 A.2d at 568; see Science Accessories, 425 A.2d at 965* (citing *Maryland Metals, 382 A.2d at 569).* The former fiduciary may escape liability even if the individual begins competitive activity prior to the employee's separation date, barring the misuse of confidential information or some other inequitable circumstance. 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations §* 4.10, at 4-226 (1995 Supp.). All of the acts DeCampli suggests were a breach of loyalty occurred after the venture concluded and cannot be used to support a claim of breach of fiduciary duty.

All breach of fiduciary duty claims are dismissed.

The real gravamen of DeCampli's complaints should be focused on the conduct alleged that constitutes unfair or deceptive trade practices.

**V.  MISAPPROPRIATION OF TRADE SECRETS**

DeCampli argues Dionisi misappropriated corporate trade secrets and used them in his competing business. DeCampli asserts the rolodex, job log sheets, job envelopes and in internal DuPont telephone directory

taken by Dionisi contained trade secrets. [*29] DeCampli argues Dionisi took the trade secrets and used them to establish Studios.

Title 6, Chapter 20 of the Delaware Code contains the Delaware version of the Uniform Trade Secrets Act. *See 6 Del. C. §* 2001-09. [HN11] Section 2001(4) defines trade secret a follows:

> (4) "Trade secret" shall mean information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
>> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; **and**
>>
>> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*6 Del. C. § 2001(4)* (emphasis added). [HN12] The statutory definition of "misappropriation" is found in *6 Del. C. § 2001(2)*, which states, in pertinent part:

> (2)" Misappropriation" shall mean:
>
>> a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

Information must meet all the requirements of section 2001(4) to qualify [*30] for "Trade secret" status. [HN13] A plaintiff alleging misappropriation of a trade secret has the burden of proving the existence of the trade secret. *Miles Inc. v. Cookson Am., Inc.,* Del. Ch., C.A. No. 12310, Hartnett, J. (Nov. 7 1994) at 23.

Chancellor Allen has broken down the misappropriation of a trade secret action into four separate inquiries:

> 1) Does a trade secret exist; i.e., have the statutory elements -- commerial utility arising from secrecy and reasonable steps to maintain secrecy been shown;
>
> 2) Has the secret been communicated by plaintiff to the defendant;
>
> 3) Was such communication pursuant to an express or implied understanding that the secrecy of the matter would be respected; and
>
> 4) Has the secret information been improperly (e.g., in breach of that understanding) used or disclosed by the defendant to the injury of the plaintiff.

*Wilmington Trust Co. v. Consistent Asset Mgt. Co.,* Del. Ch., C.A. No. 8867, Allen C. (Mar. 25, 1987) Mem. Op. at 8.

In mid-January, Dionisi took the rolodex containing clients' names and addresses. [HN14] The market of the product or service involved is the main factor in determining whether a client [*31] list constitutes a compilation deriving independent economic value from not being generally known by other persons who can obtain economic value from its disclosure or use. *Id.* at 19. If the buyers are easily identified, it is unlikely that their identities will hold independent economic value even when the identities are considered confidential. *Id.*

The majority of D & D's work came from DuPont. DuPont worked with several graphic art competitors in the local community, including D & D. The identities of DuPont individuals were well known in the community. DuPont had several directories including a general phone book, a book listing individuals at the purchasing branch for graphic art design services and a directory for the Marketing Communication Department. These phone books were available to the general public. D & D even submitted projects to the Advertising Club of Delaware and consequently publicly identified the client and the client's representative as required by the rules of the Advertising Club of Delaware. While Dionisi was associated with D & D, D & D submitted approximately sixty works, disclosing the sixty clients. Furthermore, the majority of the names on the [*32] rolodex were generally known throughout the graphic arts services market as purchasers or suppliers of graphic arts services.

A 35

1995 Del. Ch. LEXIS 88, *

Therefore, the rolodex does not hold independent economic value, and falls outside the statutory definition of "trade secret".

A separate and independent ground for finding the rolodex does not contain a statutory trade secret is a lack of effort on the part of the corporation to maintain secrecy concerning the rolodex's contents. D & D actually had four rolodexes: one in Dionisi's office (the one Dionisi took), one in DeCampli's office, one in the art room and another one in the reception area. All of the rolodexes contained information concerning clients, prospective clients, vendors and suppliers. DeCampli held the responsibility of managing the rolodexes. Employees did not have access to the two officers' rolodexes; however, they had unrestricted access to the other rolodexes. More telling is that independent contractors, contract employees and temporary employees also had unrestricted access to these rolodexes. They would, at times, supplement the rolodexes. D & D never told the employees or the freelancers the rolodexes contained confidential information. [*33] D & D never had their employees or freelancers sign confidentiality agreements regarding the rolodex information. D & D never created standard guidelines or procedures to protect the information. It would not be reasonable to do so in the highly competitive graphic arts services market. Therefore, the information in the rolodex cannot constitute a trade secret as defined by § 2001(4).

Regarding the job log sheets, job envelopes and the internal DuPont telephone directory, all acquired after January 23, 1987, the focus of the inquiry must be whether DeCampli gave Dionisi access to the alleged "trade secret" with an expectation Dionisi would respect the "secrecy" of the information. Again, DeCampli's January 23, 1987 memo giving Dionisi access to the corporate documents, stated in relevant part:

> Please make xerox copies of any and all company documents and records which you require to proceed with current and future work for your clients.

(Dionisi Ex. 21). The memorandum speaks for itself. The language of the memorandum demonstrates DeCampli clearly knew Dionisi was going to use the information included in the corporate records for his clients. n8 In any market, [*34] much less one as highly competitive as graphic arts services, taking a client from one firm to another is the result of competition. DeCampli knew Dionisi was going to use the information to compete with

D & D. DeCampli has failed to prove the communication of alleged "trade secrets" contained in the corporate records were pursuant to an express or implied understanding that Dionisi would respect the secrecy of the documents. Dionisi did not know or have reason to know the trade secret was acquired in a manner DeCampli deemed improper. In fact, Dionisi procured the information pursuant to DeCampli's directions. Consequently, I find Dionisi did not misappropriate D & D trade secrets.

> n8 The fact that DeCampli relied on Strauss's advice concerning Dionisi's rights to the corporate documents is irrelevant. DeCampli, while confused and emotionally overwrought, sought advice from Strauss, D & D's accountant. Strauss gave bad advice, and DeCampli mistakenly relied upon it. This lawsuit is not between D & D and Strauss, but D & D and Dionisi. While I understand DeCampli feels betrayed, I cannot provide him with relief in the absence of unauthorized or improper conduct by a party to this action.

[*35]

DeCampli argues, nonetheless, even if the Court rules DeCampli intended to permit Dionisi to use the information to compete against D & D, the Court should not find DeCampli waived D & D's right to have its trade secrets protected. [HN15] A waiver is a voluntary and intentional relinquishment of known right. *Realty Growth Investors v. Council of Unit Owners, Del. Supr., 453 A.2d 450, 456 (1982)*. Waiver does not apply here because D & D does not have a right to protect trade secrets that have been acquired by proper means. *See, e.g., 6 Del. C. § 2002, 2003*. D & D never acquired a right to injunctive relief or damages because Dionisi lawfully acquired the information contained in the corporate records. DeCampli could not waive a right that never existed. There has been no misappropriation of trade secrets.

## VI.  TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL EMPLOYMENT

[HN16] The elements of a tortious interference with a prospective contractual relationship are:

> 1. The existence of a valid business relationship or expectancy;
>
> 2. Knowledge of the relationship or expectancy on the part of the interferer;

3. Intentional interference which induces or [*36] causes a breach or termination of the relationship or expectancy; and

4. Resulting damages to the party whose relationship or expectancy has been disrupted.

*Bowl-Mor Co. Inc. v. Brunswick Corp., Del. Ch., 297 A.2d 61, 64, appeal dismissed, Del. Supr., 297 A.2d 67 (1972); see Irwin & Leighton, Inc. v. W. M. Anderson Co., Del. Ch., 532 A.2d 983, 992 (1987).*

The testimony clearly demonstrates the graphics design market does not lend itself to fixed business relationships. The largest purchasers of graphic arts services are large, institutional businesses. When a need develops for graphic arts services, these corporations divide the work by creating projects themselves and farming out the remaining work on a piecemeal basis. Generally, there is no exclusivity contract between the institutional clients and the graphic arts firms. Once the project is finished, the business relationship ceases. The institutional clients may use some firms more than others based on familiarity. Different decision making personnel within the large institutions may exercise a wide range of discretion in contracting for outside services. However, that does not create a formalized [*37] business expectation.

One only has to look to D & D to recognize this market reality. D & D's primary client was DuPont, an institutional business that has a need for graphic design services. Individuals inside DuPont farmed out the work to many independent firms on an as-needed basis. D & D was one of several small independent firms. Once D & D completed a project, the relationship between DuPont and D & D ceased. D & D's expectancy was only the hope that the individual would hire D & D again when needed. D & D never signed an exclusivity contract with DuPont or anyone else. A perception that D & D would receive work from DuPont, without more, is insufficient to form the basis of a *bona fide* expectancy. Therefore, I find DeCampli has failed to prove D & D had either an actual contractual relationship entitling D & D to additional work with its clients or a realistic expectancy that its clients would hire D & D again. The claim for tortious interference with prospective contractual relationships is dismissed.

## VII. UNFAIR TRADE PRACTICES

The parties assume Delaware's Deceptive Trade Practices Act applies to this case. *See 6 Del. C. §  2531*

*et seq.* ("DTPA"). The [*38] Act attempts to codify the common law and eliminate restrictive provisions inherent at common law. [HN17] Section 2532 sets forth the acts that constitute a deceptive trade practice, stating in pertinent part:

(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another; . .

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

A party seeking to recover under this Act must have a basis for injunctive relief. The Act is designed to encourage immediate or at least timely enforcement of its provisions to halt unfair or deceptive trade practices between businesses with "horizontal relationships." The public policy underlying the Act benefits both the businesses involved and presumably, at least inferentially, the public [*39] in general. Injunctive relief coupled with the possibility of treble damages and counsel fees looms as a powerful deterrent against wrongdoers and an incentive to litigate for the wronged. It is not a vehicle for damages long after the immediacy of the grievance dissipates. When the press for instant action eases, so does the basis for possible concomitant damages. [HN18] The DTPA is not a platform for an independent common law damage suit. "The Act was not

1995 Del. Ch. LEXIS 88, *

intended to create a new cause of action distinct from the common law protections designed to secure businesses against the deceptive trade practices of others." *Grand Ventures, Inc. v. Whaley, Del. Supr., 632 A.2d 63, 68 (1993).* The Act does not provide for damages, treble or otherwise, or attorney fees in the absence of a claim for injunctive relief. *Wald v. Wilmington Trust Co., Del. Super., 552 A.2d 853, 855 (1988); see Grand Ventures v. Whaley, Del. Super., 622 A.2d 655, 661 (1992), aff'd, Del. Supr., 632 A.2d 63 (1993).*

DeCampli did not bring on his claim for injunctive relief in a timely manner. Laches bars assertion of the injunctive provisions of the DTPA (eight) years after the acts about which [*40] he now complains. Although the remedies of *6 Del. C. § 2533* cannot apply here for the reasons explained above, a factual analysis of the case remains necessary to determine whether the common law principles codified by the DTPA have been violated and a cause of action for simple damages made out at common law.

### A. Studios Did Not Violate 6 *Del. C.* 2532(a)(1)

DeCampli argues Studios used D & D art samples in portfolio visits made by Dionisi and account executives Larry Weiner and Loni Lehman. DeCampli says this amounts to a violation of § 2532(a)(1) because Studios was passing off the work of D & D as work of its own.

Section 2532(a)(1) of the DTPA is shorthand for an individual attempting to sell "his goods as those of another." Unif. Deceptive Trade Practices (1964 Act) § 2 cmt., 7A U.L.A. 305-06 (1985). Courts have extended this section to include a seller's substitution of a brand of good for the brand originally purchased by the buyer. *Id.* Dionisi did not attempt to sell the art samples. Dionisi did not attempt to sell Studios' services as those of D & D. DeCampli did not produce any actual evidence Studios represented D & D art work as work done by Studios. [HN19] [*41] Studios used the art samples, originally acquired with DeCampli's approval, merely to demonstrate the type of work Studios could accomplish. These actions do not establish a violation of *6 Del. C. § 2532(a)(1).*

### B. Studios Created A Likelihood of Confusion In the Marketplace

DeCampli argues Studios engaged in several acts which created confusion in the marketplace concerning D & D and Studios, resulting in violations of *6 Del. C. § 2532(a)(2)* (causing likelihood of confusion as to source of services); (3) (causing likelihood of confusion as to an affiliation, connection, or association with another); and

(12) (engaging in any other conduct creating confusion in the marketplace). Dionisi announced the opening of Studios stating, in pertinent part:

> After the dust of remodeling has settled, I will be inviting you to view the changes that have been made. You'll see a dramatic expansion in floorspace to accommodate a wider range of communications services . . . . At the same time, you can be assured that I will offer the same quality craftsmanship, personal attention to detail, and timely deliveries that you've come to expect from me.
>
> . . . I hope that [*42] you will visit to discuss how we can continue to develop innovative solutions to your communications problems. In the meantime, until February 1, I can be reached at (302) 656-0460.

(DeCampli Ex. 22) (emphasis added). The language "the changes," "a dramatic expansion," "a wider range of communication services" and "the same quality craftsmanship" all relate to a comparison of Studios with D & D. This language implies Studios is a continuation and expansion of D & D. The memo explicitly refers to a continuation of a client relationship in the letter, also implying a connection to D & D. Finally, the memo even gives the D & D office number as the number where Dionisi may be reached. The statements in Dionisi's letter confuse the relationship clients had with D & D with Dionisi's solicitation for business.

Weiner's form letter presumably sent to prospective clients contains assertions confusing the work D & D had done with Studios' work. (DeCampli Ex. 28). Weiner's letter states, in pertinent part:

> Some of our clients are DuPont, Hercules, A.I. duPont Institute, Conoco, Chrysler and various other corporations and non-profit organizations.

(DeCampli Ex. 28). The [*43] A.I. duPont Institute, Hercules and Conoco were clients of D & D, not Studios. The letter also states Studios was currently involved in the production of annual reports. *Id.* At that time, Studios was not involved in producing annual reports; D & D had

done annual reports during Dionisi's employment. The statements in Weiner's letter confuse the work D & D had done with work of Studios. Therefore, based on the statements in Dionisi's and Weiner's letters, I find Studios engaged in a series of acts which created a likelihood of confusion as to the source of services between Studios and D & D and a likelihood of a misunderstanding about Dionisi's connection with D & D. *6 Del. C. 2532(2)(3)(12).* Even so, DeCampli produced no evidence that the confusion resulted in D & D losing even one then current client or project to Studios.

## VIII. CONVERSION

DeCampli argues Dionisi took and converted D & D's 1984 Toyota van to his own use when he left D & D. [HN20] Conversion consists of the exertion of dominion over a chattel without lawful justification, denying the person rightfully entitled to the chattel his rights. *VanDyke v. Penn R. Co., Del. Supr., 46 Del. 529, 86 A.2d 346, 352 (1952);* [*44] *Drug v. Hunt, Del. Supr., 35 Del. 339, 168 A. 87, 93 (1933).* D & D owned the Toyota van. Dionisi took the van without D & D's consent and used the van for his own purposes. DeCampli demanded Dionisi return the van. Dionisi refused. DeCampli sent Dionisi the van's payment book, and Dionisi returned it to DeCampli.

Dionisi claims he took the van because DeCampli agreed to purchase Dionisi's shares in D & D and DeCampli agreed to use the van as a downpayment. Dionisi argues, therefore, DeCampli is estopped from asserting his conversion claim.

At the January 6 meeting, Strauss informed DeCampli and Dionisi only two options existed for ending their relationship in D & D: (1) one of the two shareholders could buy the other shareholders stock; or (2) the corporation could be liquidated. DeCampli agreed the option most to his liking was to purchase Dionisi's stock. This initial agreement could hardly be considered the "real promise" required for a claim of estoppel. *See Metropolitan Convoy v. Chrysler Corp., Del. Supr., 58 Del. 286, 208 A.2d 519, 521 (1965); Chrysler v. Quimby, Del. Supr., 51 Del. 264, 144 A.2d 123, 128 (1958).* Although Strauss calculated a rough [*45] estimate of the price DeCampli would have to pay Dionisi, the structure and actual price of the deal was not agreed upon. DeCampli simply wanted to explore his preferred option. Dionisi has failed to prove DeCampli made a promise to purchase Dionisi's shares and use the van as a downpayment. Dionisi's refusal to assume the van insurance payments supports this conclusion. If Dionisi really believed he received ownership of the van as a downpayment, he would have willingly assumed the insurance payments. Instead, Dionisi refused. Therefore,

DeCampli is not estopped from asserting D & D's claim for conversion.

DeCampli proved Dionisi took D & D's Toyota van before consummation of a dissolution plan or buyout and without justification. Therefore, I find DeCampli proved his conversion claim.

## IX. PENSION SPIN-OFF

In January 1986, DeCampli and Dionisi created a pension plan for all D & D employees. D & D retained National Actuarial Consultants to administer the plan. The plan contains the following provision:

> 13.2 Employer Dissolution, Merger, Consolidation or Reorganization: In the event of the dissolution, merger, consolidation or reorganization of the Employer, provision [*46] may be made by which the Plan will be continued by the successor, and, in that event, such successor shall be substituted for the Employer under the Plan. The continuation of this Plan by the successor shall constitute an assumption of the Plan liabilities by the successor and the successor shall have all of the powers, duties and responsibilities of the Employer under this Plan.

(DeCampli Ex. 36.)

In October of 1986, D & D desired to make a contribution to the plan, but D & D did not have enough cash to make the desired contribution. Instead, D & D used approximately $ 11,000 in receivables, a cash loan from DeCampli of approximately $ 10,000, and a credit line of $ 5,000 to place $ 26,482.78 into the pension plan. These actions caused D & D to become cash poor. To improve D & D's position, both DeCampli and Dionisi took $ 10,000 loans from the pension plan and loaned the aggregate $ 20,000 to D & D. The loans' interest rate was 10.5% and the loans matured in October of 1991. At the end of 1987, D & D reduced the amount of Dionisi's loan to reflect officer benefits. On D & D's general ledger balance sheets of January 31, 1987, Strauss reduced the loan to $ 7,739.27.

During [*47] the meeting between Strauss, DeCampli and Dionisi on January 6, 1987, the parties discussed the effect of Dionisi leaving D & D. Because of the pension plan's technical nature, the parties agreed to meet with National Actuarial Consultants to determine

how to "equitably distribute" the pension plan's benefits.

Dionisi and DeCampli met with National Actuarial Consultants on February 3, 1987. DeCampli, Dionisi, Strauss and National Actuarial Consultants' employees Jeff Brown and Bernie Bender were present. National Actuarial Consultants' principal and enrolled actuary Steve Patrylak ("Patrylak") was present by phone for a portion of the meeting. The meeting was focused, as it should have been, on how National Actuarial Consultants would split the pension assets in an equitable way. Patrylak, who was expecting the typical bloodbath when "partners" go their separate ways, was surprised by the amicability of the situation. His recollection of the meeting was that "there weren't going to be any problems". (Trial Tr. at 686.) The parties verbally agreed the plan would split into two parts, with each participant getting his fair share of the pension benefits. This, not surprisingly, reflects [*48] the provision in the pension plan dealing with employer dissolution. Technically, this is referred to as a "spin-off". National Actuarial Consultants moved $ 14,286.20, Dionisi's portion of the pension benefits, onto the books of Studio's pension plan. However, Denis DeCampli Design, Inc. refused to pay Dionisi's share to the Studios pension plan. Denis DeCampli Design, Inc's refusal to pay the spin-off amount is wrongful. Consequently, I find Studios is entitled to the spin-off amount for the benefit of Dionisi's pension plan.

## X. DIONISI'S PAYMENT FOR WORK DONE IN JANUARY OF 1987

Dionisi seeks payment for work done on two projects in February and March of 1987. Dionisi seeks $ 495.00 for an Emergency Preparedness Pamphlet and $ 990.00 for Petrochemical overhead transparencies. D & D billed and DuPont paid the entire amount for the pamphlet but refused to pay $ 1000.00 of the transparencies bill because it was not satisfied with the final product. On June 30, 1987, over four months after Dionisi terminated his relationship with D & D, Dionisi sent D & D an invoice requesting payment, asserting the work was completed in February and March of 1987. D & D refuses to pay the requested [*49] amount.

Without objection, Dionisi continued to work for D & D until February 1, 1987 completing "work in progress." He received a salary during this last month of the fiscal year of the corporation as they wound up its affairs. Dionisi wanted to completely disassociate himself from D & D after February 1. Invoices for work done in *February and March* of 1987 are inconsistent with Dionisi completing all of D & D's outstanding work by February 1. Although the work should have completed by February 1, 1987 and D & D benefitted from work

completed by Dionisi he was paid a salary during the time earmarked for the work and cannot collect twice. Dionisi's claim is dismissed.

## XI. DAMAGES

In this section, I will discuss the parties' entitlements as a result of this decision.

### A. Dissolution

D & D will be considered dissolved as of January 5, 1987. Because D & D is no longer a going concern, the parties will receive their proportionate share (50%) of D & D's net book value as of that date. Strauss calculated a D & D's net book value as of February 1, 1987 (the end of the fiscal year) of $ 1,214.00. (Dionisi Ex. 26). Dionisi is entitled to one-half of that amount totalling [*50] $ 607.00.

### B. Unfair Competition

DeCampli proved Studios engaged in common law unfair competition and deceptive trade practices as defined and codified in the DTPA. The DTPA remedies in § 2533 simply do not apply for the reasons stated above.

The DTPA remedies are predicated upon a right to injunctive relief, although dicta in one case suggests the Court may award damages for conduct which could result in injunctive relief based on the common law. *Grand Ventures, Inc. v. Whaley, Del. Supr., 632 A.2d 63, 68 (1993).*

Studios' deceptive trade practices which resulted in the likelihood of confusion between D & D and Studios occurred some eight years ago. There is no evidence D & D currently engages in deceptive trade practices or has at any time after 1988.

[HN21] In order to recover damages at common law, DeCampli must prove injury directly resulting from the unfair competition or unfair trade practices. The court has discretion to assess the amount of damages. When damages actually occur as a result of unfair competition, they are difficult to calculate because the injury only affects intangible qualities; for example, the goodwill of the firm or the firm's reputation. 4 [*51] Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* 22.51, at 265 (4th ed. 1994). Plaintiff may prove damages based on circumstantial evidence, but the court will not award damages based on speculation or conjecture. *Id.* at 266-67. Once the plaintiff produces circumstantial evidence providing a reasonable basis for damages, defendant has the burden to prove causes unrelated to the unfair competition caused the plaintiff's decline in profits or other injury. *Id.*

1995 Del. Ch. LEXIS 88, *

at § 22.51, at 193 (Fall 1994 Cum. Supp.).

DeCampli uses circumstantial evidence to suggest a comparison of D & D's historical profit margin to the gross receipts of Studios constitutes a basis for damages and evidence to support calculation of an award. Several facts, however, demonstrate DeCampli's profits declined for causes other than Dionisi's conduct.

First, DeCampli's own conduct led to lower profits. DeCampli declined to deal with clients for almost a year. When DeCampli worked, the work done was below average. In the highly competitive market of graphic design, dissatisfied clients would naturally turn to other firms in the market.

Second, after Dionisi left, D & D barely [*52] resembled the entity existing before Dionisi's departure. Dionisi left the firm taking his energetic personality, graphic design abilities and rapport he had with clients. After DeCampli announced Dionisi's resignation, several key employees left the corporation, taking their creative talents elsewhere. For an industry based upon the chemistry between the provider and purchaser of the services, the departure of key talent would impact on the gross profits of the corporation. This is especially true in an industry where there is no binding contractual relationship beyond a single project. No other reasonable inference can be drawn from the facts.

DeCampli's suggested calculation of damages is based purely on speculation and conjecture. DeCampli presented no evidence a single client left D & D because of Dionisi's unfair trade practices. DeCampli offered no evidence of the experience of comparable businesses during the relevant period or expert opinion. While some may argue public policy requires the wrongdoer bear the risk of uncertainty of damages where they cannot be proved with mathematical certainty, here ample evidence suggests credible reasons other than Dionisi's or Studio's [*53] actions caused D & D's reduced revenues after January 5, 1987. *See* 4 Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies § 22.51, at 266 (4th* ed. 1994). Therefore, I find no evidence of damage related to the proved wrongdoing and no adequate basis to assess damages. n9 However, because Dionisi did engage in deceptive trade practices, I will award nominal damages in the amount of $ 1.00.

n9 The facts of this case illustrate clearly the wisdom of immediate action for injunctive relief under the DTPA which can bring offensive conduct to a standstill contemporaneously with ongoing measurable events. Reconstructing speculative scenarios years later in retrospect

brings no benefit to the parties or the public.

## C. Conversion

[HN22] The proper measure of damages for a conversion of property is the value of the property at the time of the conversion, plus interest. *Fintak v. Ridenour,* Del. Super., C.A. No. 88C-AP-7, 88C-OC-18, Steele, J. (May 29, 1991) Mem. Op. at 5; *Wyndham,* [*54] *Inc. v. Wilmington Trust Co., Del. Super., 44 Del. 324, 59 A.2d 456, 459 (1948);.* D & D, faced with a damaged credit rating paid the vehicle payments for twelve months in the amount of $ 4,444.35. D & D also paid the van's insurance premiums for twelve months in the amount of $ 1,000. I order Dionisi to pay D & D $ 5,444.35 plus the legal rate of interest from the date of the last payment.

## D. Pension Spin-Off

Studio's pension plan was entitled to $ 14,286.20 on February 1, 1987. $ 10,000 of the $ 14,286.20 constituted the loan the D & D pension plan made to Dionisi. $ 306.25 of the $ 14,286.20 constitutes the accrued interest on the $ 14,286.20 as of February 1, 1987. The remaining amount, $ 3,979.95, constitutes Dionisi's portion of the balance in the pension plan. On February 1, 1987, the D & D pension plan should have paid $ 3,979.95 to the Studios pension plan and transferred D & D pension plan's right of payment concerning Dionisi's loan to Studios' pension plan. National Actuarial Consultants made this change on the books.

In October 1991, when the pension plan's loan to Dionisi became due, Dionisi repaid the plan loan plus accrued interest in the amount of $ 16,530.85. [*55] However, Dionisi paid his loan payment to the Studios pension plan. Dionisi fulfilled his obligation, and the full amount due Dionisi of $ 14,286.20 will be set off against the amount of the loan. Therefore, I find the D & D pension plan owes Studio's pension plan $ 3,979.95 in principal plus interest at the legal rate from February 1, 1987.

D & D's books record the Dionisi loan amount to it as of February 1, 1987 as $ 7,739.27. This amount has not been paid. According to the facts presented at trial, D & D became obligated to pay the officers the amount of the loan, plus interest, on the date they had to repay the pension fund. Dionisi repaid his loan to the pension fund on October 21, 1991. Therefore, I find D & D should pay Dionisi the full amount of the loan in the amount of $ 7,730.27 plus interest at the legal rate from October 21, 1991.

## XII. CONCLUSION

1995 Del. Ch. LEXIS 88, *

The parties mutually terminated their joint venture on January 5, 1987. D & D is dissolved as of that date. Dionisi is entitled to one-half of the net book value of the corporation as of February 1, 1987, the day after the close of the corporation's last fiscal year of operation.

Dionisi engaged in Deceptive Trade Practices [*56] and converted D & D property. DeCampli wrongfully withheld Dionisi's pension benefits. Relief is ordered as described above. An Order, agreed as to form, will be signed upon presentation. DeCampli's counsel will initiate the Order. The parties' cross-motions for attorneys' fees, if still pending, will be heard after the above Order is signed.

**IT IS SO ORDERED.**

Myron T. Steele

Vice-Chancellor

1987 Del. Ch. LEXIS 468, *

LEXSEE 1987 DEL.CH.LEXIS 468

**N. Joseph Hunter, Ann M. Hunter, John Borden, Raymond J. Stone, Dorothy L. Stone, Larry Biddle, Linda Biddle, Francis S. Coyle, III, Mary Coyle, Frank Rosenacker, Elizabeth Rosenacker, Daniel C. Rossetti, Jr., Delores M. Rossetti, William J. O'Leary, Patricia Ann O'Leary, James E. Grill, Jeanne L. Grill, Harry G. Farrow, Jr., Gregory S. Kramedas, Avelina Kramedas, paul J. Kuphily, Joan T. Duphily, James Peel, Joan Peel, Kenneth Reilly, Thomasine Whitehurst, Kathryn Lamb, Michael H. Radebach, Mary Ann P. Radebach, Alan F. Robinson, Jr., Sandra S. Robinson, Mary Tuttle, Michael McFadd, Sarah Lewis and Grace H. Rezac, Plaintiffs, v. Diocese of Wilmington, an unincorporated association of the State of Delaware, Robert E. Mulvee, Bishop of the Diocese of Wilmington, Church of the Holy Cross, Dover, Delaware, a religious corporation of the State of Delaware, and Thomas J. Peterman, President of Church of the Holy Cross, Dover, Delaware, Defendants**

Civil Action NO. 961-Kent

Court of Chancery of Delaware, Kent

*1987 Del. Ch. LEXIS 468*

**Submitted July 23, 1987**
**August 4, 1987, Decided**

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** [*1]

For the foregoing reasons, the application for a preliminary mandatory injunction shall be denied. IT IS SO ORDERED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, parents of students who had attended catholic high school, sought a preliminary injunction that would compel defendants, roman catholic diocese and roman catholic church, to continue operation of a catholic high school for coming academic year.

**OVERVIEW:** Plaintiffs were unable to convince defendants to continue operation of the catholic high school that their children had attended, so they filed an action that sought specific performance of an alleged contract between themselves and defendants relative the continued operation of the school. Thereafter, they applied for a preliminary injunction. To obtain the desired injunction, plaintiffs had to demonstrate a reasonable probability that they would succeed on the merits of their claims at trial. In assessing the probability of plaintiffs' ultimate success, the court evaluated whether an enforceable contract existed between plaintiffs and defendants that obligated defendants to continue operation of the school. The court in turn found that the statements and actions of the defendants relative the operation of the school did not constitute an enforceable contract and plaintiffs could not establish the predicates for promissory estoppel. The court thus concluded that there was no contractual obligation owed by defendants, so plaintiffs could not obtain the desired specific performance at trial. Accordingly, plaintiffs' application for injunctive relief was denied.

**OUTCOME:** Plaintiffs' application for a preliminary injunction was denied, as they had not shown a reasonable likelihood that they could obtain the requested specific performance at trial. Plaintiffs had not established the likely existence of a contractual obligation on the part of the defendants to operate the catholic high school for the relevant academic year, and such a contractual obligation was a predicate for the issuance of specific performance.

1987 Del. Ch. LEXIS 468, *

**LexisNexis(R) Headnotes**

*Civil Procedure > Injunctions > Preliminary & Temporary Injunctions*
*Civil Procedure > Injunctions > Elements*
[HN1] The tests for the issuance of a preliminary injunction are well known. First, plaintiff must establish a reasonable probability of ultimate success on the merits upon final hearing. Second, plaintiff must establish an imminent threat of irreparable injury, that is, injury that would not be adequately compensated by money damages or equitable relief shaped at a later time. Third, plaintiff must demonstrate that the injury threatened to plaintiff outweighs the injury to defendant that might arise if the remedy is improvidently granted. Finally, any public interest implicated by the application will be considered.

*Contracts Law > Formation*
[HN2] For the characterization, "contract," to be placed properly upon behavior, under conventional legal learning, there should be (1) a promise on the part of one party to act or refrain from acting in a given way; (2) offered to another, in a manner in which a reasonable observer would conclude the first party intended to be bound by acceptance, in exchange for; (3) some consideration flowing to the first party or to another; (4) which is unconditionally accepted by the second party in the terms of the offer, which may include (a) a verbal act of acceptance; and (b) performance of the sought-after act.

*Contracts Law > Formation > Detrimental Reliance*
[HN3] In some circumstances detrimental reliance by the second party upon the act or statement constituting the offer, which reliance is reasonable in the circumstances and which ought to have been anticipated by the offeror, may be effective to act as acceptance to form a contract.

*Contracts Law > Consideration > Enforcement of Promises*
[HN4] Gratuitous promises that lack consideration are typically not enforceable.

*Contracts Law > Consideration > Promissory Estoppel*
[HN5] In order to prevail on a promissory estoppel theory, plaintiffs must show (1) that a promise was made,

(2) that it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee, (3) that the promisee relied on the promise and took action to his detriment, and (4) that such promise is binding because injustice can be avoided only by enforcement of the promise. The plaintiffs must be able to prove these necessary elements of promissory estoppel by clear and convincing evidence.

*Contracts Law > Remedies > Specific Performance*
[HN6] A valid contract is not necessarily a specifically enforceable contract.

*Contracts Law > Remedies > Specific Performance*
[HN7] Specific performance is an equitable remedy which may be awarded when the court finds that money damages are insufficient to make the plaintiff whole and that, in order to do complete justice, specific performance is necessary.

*Contracts Law > Remedies > Specific Performance*
[HN8] Distinctively equitable remedies such as specific performance are not matters of right but always require a court of equity to evaluate the impact of its order in the light of all of the circumstances present.

*Contracts Law > Remedies > Specific Performance*
[HN9] Although courts will not examine the adequacy of consideration in determining whether a contract exists, equity does examine adequacy of consideration and may refuse specific performance on this ground when such inadequacy makes the bargain harsh or unfair.

**COUNSEL:**

Gary R. Dodge, Esquire, DODGE & O'BRIEN, P. A., Attorneys for Plaintiffs

James P. Collins, Sr., Esquire, HEALY & COLLINS, Attorneys for Diocese of Wilmington and Bishop Robert E. Mulvee

Joseph W. Maybee, Esquire, Attorneys for Church of the Holy Cross, Dover, Delaware and Father Thomas J. Peterman

**JUDGES:**

Before ALLEN, Chancellor

**OPINIONBY:**

ALLEN

1987 Del. Ch. LEXIS 468, *

OPINION:

MEMORANDUM OPINION

ALLEN, Chancellor

This suit presents the question whether the Holy Cross Roman Catholic Church of Dover, Delaware is legally required by contract to continue to operate the Holy Cross High School, even though the Parish Council -- a representative body of the congregation -- has decided that, given alternative demands for limited financial resources of the church, it is no longer in the parish's best interest to continue to operate the school.

Plaintiffs, parents of students who have attended Holy Cross High School, having failed to convince the Parish Council or the Bishop of the Roman Catholic Diocese of Wilmington that continued operation of the school is appropriate, now turn to this Court [*2] and assert legal rights to require that result. They seek specific performance of an alleged contract between themselves and the Roman Catholic Diocese of Wilmington and the Roman Catholic Church of the Holy Cross to continue in operation Holy Cross High School for the coming academic year.

Pending is an application for a preliminary injunction. [HN1] The tests for the issuance of such a remedy are well known. First, plaintiff must establish a reasonable probability of ultimate success on the merits upon final hearing. Second, plaintiff must establish an imminent threat of irreparable injury, that is, injury that would not be adequately compensated by money damages or equitable relief shaped at a later time. Third, plaintiff must demonstrate that the injury threatened to plaintiff outweighs the injury to defendant that might arise if the remedy is improvidently granted. Finally, any public interest implicated by the application will be considered. *Shields v. Shields, Del. Ch., 498 A.2d 161, 166 (1985); Gimbel v. Signal Companies, Inc., Del. Ch., 316 A.2d 599 (1974)*, aff'd , *Del. Supr., 316 A.2d 619 (1974).*

For the reasons that follow, I hold that plaintiffs have not shown a [*3] reasonable likelihood that the remedy of specific performance which they seek will be granted upon final hearing of this matter. So concluding, I need not address the other elements of the test for the granting of preliminary injunctive relief and will decline to issue the preliminary injunction sought. n1

n1 Concluding as I do, I need not attempt to apply a more rigorous test for the issuance of a

preliminary injunction when, as here, a preliminary mandatory injunction is sought. Compare *Steiner v. Simmons, Del. Ch., 111 A.2d 574, 575 (1955).*

In assessing the probability of ultimate success of the claims asserted, two basic questions are presented: Was an enforceable contract formed which obligated defendants to operate Holy Cross High School for the academic year 1987-88 and, if so, is that contract one that is specifically enforceable in equity in the circumstances presented. Before turning to a discussion of each of these issues, it will be helpful to sketch the background facts of the dispute as they appear at this time.

I.

Holy Cross High School is the only Catholic secondary school in the State of Delaware located south of the Chesapeake and Delaware Canal. Holy [*4] Cross High School and its companion elementary school are owned, operated and funded by the Church of the Holy Cross, Dover, Delaware ("Holy Cross Church"), a religious corporation (see 27 Del. C. § § 115-118) consisting of the local parish congregation. The governing body of the parish is the Holy Cross Parish Council. Father Thomas J. Peterman was, during the time relevant to this action, pastor of that congregation and president of the incorporated entity.

The parish is located within the Catholic Diocese of Wilmington, which is geographically defined to include the State of Delaware and nine counties on Maryland's eastern shore. The affairs of the Diocese, like those of the parishes of which it is comprised, are administered through a religious corporation. The Ordinary of the Diocese, Bishop Robert Mulvee, has, under Church rules that the parties regard as binding, final and complete authority over all matters within the Diocese, including the administration of parish schools. Thus, under those rules, the Holy Cross Parish Council has, in matters affecting the high school, a consultative role.

The feasibility of continuing to operate Holy Cross High School has [*5] been in question at least since 1982. Enrollment at the school has been declining. During the academic year beginning in 1981, 228 students were enrolled; 214 were enrolled in 1982; 187 in 1983, 153 in 1984; and 107 in 1986-87. The projected enrollment for the coming year (1987-88) is between 63 and 67 students, less than 30 % of the school's 240 student capacity. n2 Moreover, the decline in enrollment has been principally among Catholic students, while the attendance of non-Catholic students has remained nearly constant. The percentage of non-Catholic teachers has

1987 Del. Ch. LEXIS 468, *

risen steadily to now approximately 50 %. These statistics have drawn into question, in the minds of some parishioners, the school's role as a distinctively Catholic, rather than simply a Christian high school.

> n2 Two pre-enrollment figures appear in the record. According to the affidavit of the Episcopal Vicar for Administration and Finance Officer for the Wilmington Diocese, Father J. Thomas Cini, 67 students pre-enrolled plus an additional nine who imposed major conditions on their enrollments. Sister Marie Kelly, Superintendent of Schools of the Catholic Diocese of Wilmington, in her affidavit relies on William Weaver's survey of enrollment dated May 8, 1987 to fix the number at 63 plus an additional 7 with major conditions.

[*6]

In addition, as enrollment declined, the operating deficits for Holy Cross High School increased and remain, in recent years, at a substantial level. For the 1984-85 academic year, the deficit was $ 108,030 and for 1985-86, it was $ 94,243. Annual contributions of $ 30,000 from the Holy Cross Educational Foundation in each of those two years reduced by that amount the subsidy that Holy Cross Church provided from its offertory collection. No contribution from the Holy Cross Educational Foundation, however, is available for the upcoming year to reduce the projected deficit of $ 80,000 to $ 90,000.

In addition to enrollment and financial problems, limitations in the dated physical facility as well as the lack of co-curricular activities such as athletics and band, and questions about the quality of education at the high school all contributed to loss of support for the high school in the parish.

The issue of the viability of the high school has created a division in the parish concerning the parish's mission and priorities. While parents of students enrolled in the high school support continuation of the school, other parishioners and Diocesan officials believe that the Holy Cross [*7] Church's subsidy has diverted funds from other missions.

In December, 1986, the Parish Council commenced discussions regarding the viability of continued operation of the high school. Father Peterman at that time informed Father Cini, Episcopal Vicar for the Wilmington Diocese, that in fairness to parents and to teachers, whose contracts would be negotiated in March, a decision had to be made as to whether the school would be open in 1987-88. In response, Father Peterman was told that the

Diocese had commissioned a consultant, Catholic School Management, to conduct a viability study, the results of which would be reported in April. Upon learning of this, Father Peterman, on January 14, 1987, wrote to Father Cini to inquire if the relatively late time frame of the viability study implied that the school would remain open for the coming year. On February 12, 1987, Sister Marie Kelly, Superintendent of Schools, replied via letter addressed to Father Peterman. It reads in pertinent part:

> In your letter of January 14 to Father Cini you asked that [sic] if the time limits (February-May) of the study . . . implies that the high school will remain open. If so, something from the diocese [*8] to that effect would be appreciated so that administrators and instructors can prepare accordingly.

> The response to your question is yes.

> It is the policy of the diocese that a definite procedure be followed where there is some question of the continued viability of a school. The outline of these procedures were distributed to schools and parishes in 1986. The required procedure has not been followed.

> Included in the requirements outlined in the official policy is that parents and other persons affected . . . be given sufficient and adequate notice. That notice should be given no later than February of the year the change or close is expected.

> Holy Cross is in the midst of a process and cannot meet the deadlines. Therefore, the diocese would not agree to allow the school to close in June, 1987.

A notation on the letter indicates that a copy was sent to Father Cini. Father Peterman replied on February 16, accepting the letter as an explanation of policy to pass on to administrators. There is no indication that the letter was shown to others.

The Parent-Teachers Guild ("PTG") of Holy Cross High School met on February 12, 1987, the same day that Father Peterman received Sister [*9] Kelly's reply. At that meeting, Father Peterman, on instructions from the Episcopal Vicar, announced that Holy Cross High School would remain open for the 1987-1988 school year. Father Peterman characterizes his announcement to that effect as "unequivocal."

Sister Marie Kelly also addressed those present at the February 12 PTG meeting. She advised that a long-term viability study would be conducted in March and expressed her opinion that the Diocese would not agree to allow the school to close as early as June of 1987. She assumed, in making the statement, that the results of the study would be positive, that at least 107 students would

1987 Del. Ch. LEXIS 468, *

be enrolled and that, if necessary, parents would commit themselves to pay increased tuition.

After the meeting, the principal of Holy Cross High School undertook pre-registration for returning students. The letter, dated February 23, 1987 and addressed to "parents," reads in pertinent part as follows:

To facilitate the planning process for the 1987-88 school year, it is important that we ascertain the number of current students who plan to return to Holy Cross in September. This information will be used to determine course offerings, the number [*10] of sections needed, faculty assignments, etc.

This year the Diocese has mandated that a prepaid deposit must be made at the time of pre-registration for all secondary schools. To comply with Diocesan policy, a $ 50.00 non-refundable deposit must accompany this form for each student who will be returning in the fall. (emphasis in original)

Everyone proceeded on the basis that the school would be open for the following year as Father Peterman had announced. The school issued letters of acceptance to students who had applied for enrollment as freshman and registration was scheduled for March 25, 1987. Moreover, while the school had suffered a blow on February 17th when its respected principal had resigned effective June 1987, a search committee was formed to locate a replacement for him. But another disappointment then occurred when fewer than 70 students pre-enrolled without conditions pursuant to the registration drive conducted by the high school.

The study of the school's long-term viability conducted by Catholic School Management became available in April. Its conclusion was yet another blow to those who hoped for a bright future for the school. Citing an inability of [*11] the school to broaden its academic program and a lack of extra-curricular activities, declining enrollment and mounting financial problems, the study concluded that the high school suffers overwhelmingly from a lack of support to continue as a parish owned and operated school.

In light of the report's conclusions, the modest pre-enrollment figures, the resignation of the principal and other factors, the Parish Council, on May 12, voted to close the high school at the conclusion of the academic year. Bishop Mulvee, acting for the Diocese of Wilmington, declined to overturn the Parish Council's decision.

Implementation of that decision began promptly. A counselling session was held at which representatives from other Wilmington Diocese high schools explained their schools' programs. The Diocese agreed to provide transportation to those schools and the Parish Council agreed to allot a $ 500 tuition subsidy to any high school age child of active parishioners, for attendance at a Catholic high school of their choice.

In early June, letters were sent to the Middle States Association of Colleges and Schools, the National Catholic Education Association, and the Delaware Division of Public [*12] Instruction informing those bodies that Holy Cross High School would close on June 15, 1987.

II.

Plaintiffs seek in this lawsuit an order requiring the specific performance of an alleged contract made between themselves and defendants to provide a Catholic high school education to their children at Holy Cross High School. There is no written contract so providing, all concede, but it is contended that statements made by authorized representatives of the parish constitute a promise to that effect and, in the circumstances, those statements and plaintiffs' reliance upon them form a contract.

Accordingly, the first subject to be addressed in assessing the probability of ultimate success in this suit is the question whether a contract has been formed. If a contract was formed, we will have to address the separate issue whether it is a contract that a court of equity will, in these circumstances, specifically enforce.

III.

Was a Valid Contract Formed that Obligates Defendants to Operate the High School For at Least an Additional Year?

To call a series of acts or words a contract is to conclude that the parties acted as if they intended to create, and did succeed in creating, rights [*13] and duties in themselves that a court will recognize and enforce. Thus, in its most fundamental sense, the term contract is conclusory. [HN2] For this characterization, "contract," to be placed properly upon behavior, under conventional legal learning, there should be (1) a promise on the part of one party to act or refrain from acting in a given way; (2) offered to another, in a manner in which a reasonable observer would conclude the first party intended to be bound by acceptance, in exchange for; (3) some consideration flowing to the first party or to another; (4) which is unconditionally accepted by the second party in the terms of the offer, which may include (a) a verbal act of acceptance; and (b) performance of the sought-after act. n3 [HN3] In some circumstances detrimental reliance by the second party upon the act or

A 47

statement constituting the offer, which reliance is reasonable in the circumstances and which ought to have been anticipated by the offeror, may be effective to act as acceptance to form a contract. Compare *Baird v. Gimbel Brothers, 64 F.2d 344 (2d Cir. 1933)* (L. Hand, J.) with *Drennan v. Star Paving Co., Cal. Supr., 333 P.2d 757 (1958)* (Traynor, C. J.). See *Restatement* [*14] *(Second) of Contracts § 87(2)* (1981). This alternative concept -- promissory estoppel -- is described later in this opinion.

n3 I call this conventional learning. It could also be called rudimentary. Some behaviors that are definitely part of a contractual process do not fit easily into this segmented and pure model. I am thinking particularly of the complex, multifaceted large commercial negotiation. See *Leeds v. First Allied Connecticut Corp., Del. Ch., 521 A.2d 1095 (1986)*, see generally E. A. Farnsworth, Contracts § 3.5 (1982).

Each of the elements of the formation of a contract presents issues in this case. Did defendants "offer" a "promise" to plaintiffs that the high school would remain open, in exchange for some consideration by plaintiffs and, if so, was any such offer accepted or was there such reasonable, foreseeable, detrimental reliance upon such offer as to form a contract?

Broadly speaking, plaintiffs offer two theories of contract formation in support of their position that defendants are now bound by contract to operate the high school for an additional year. The first is predicated upon the statements of Father Peterman at the February 12 meeting [*15] and the follow-up letter of February 23rd. The second is predicated upon a number of verbal assurances allegedly given over the years to various plaintiffs to the effect that the high school would remain open.

A.

I conclude that Father Peterman's "unequivocal" statement that the school would be open in 1987-88 did constitute a "promise" as that term is understood in the law. A promise may be defined as "a manifestation of intention to act . . . in a specific way so made as to justify . . . [an] understanding that a commitment has been made." *Restatement (Second) of Contracts § 2.* That promise, however, did not in my opinion constitute an offer of a contract. It was not offered in exchange for anything; it did not purport to seek acceptance by seeking any performance by anyone. It was gratuitous. [HN4] Promises of this kind, that lack consideration, are typically not enforceable. *Stonestreet v. Southern Oil Co., 37 S.E.2d 676 (N.C. 1946); Coleman v. Garrison, Del. Supr., 349 A.2d 8, 11 (1975).*

Defendants did, however, ask for consideration from plaintiffs on February 23 when the school sought a $ 50 deposit for each student to be enrolled during the following year. May that [*16] communication be reasonably construed as an offer to become legally bound to keep the high school open? I do not believe so. While it is clear that the February 23rd letter is predicated upon the assumption that the school would be open for the forthcoming year, it cannot reasonably be interpreted as the offer of a promise to do so. The offer that was contained in that letter which offer sought acceptance through the payment of $ 50 was an offer to reserve a place in the high school for the following year if, as expected, the school was operating. The payment of fifty dollars, which the February 23rd letter states as a diocese-wide requirement, cannot reasonably be interpreted as consideration sought by defendants in exchange for an undertaking to keep the high school open. Such an undertaking could not easily be inferred from the request for the payment of such a modest consideration. It would, in my opinion, require an express articulation before a second party would be reasonable in concluding that such a commitment was offered for such a consideration.

I conclude that defendants did not intend the February 23 letter to constitute an offer to keep the school open, but rather intended [*17] as an offer to reserve a place if, as everyone then understood, the school was open. Moreover, in my view, a reasonable person (had he or she had an occasion to focus finely on the meaning of that letter) could only so interpret it. Thus, I cannot regard the payment of the asked for consideration -- $50 -- as forming a contract to keep the school open. That the assumption upon which that offer was made -- that the school would be open -- proved false does give plaintiffs a legal right to rescind the transaction and receive back their fifty dollars. See *Sheehan v. Hepburn, Del. Ch., 138 A.2d 810, 812 (1958).* But plaintiffs do not, in my opinion, have the legal right to force defendants to make that assumption come true even though it is within defendants power to do so, for defendants never contracted so to do. n4

n4 Nor do I find any basis in the diocesan policy of affording 24 months notice of a school closing to make out a contract. First, the policy is expressly limited to elementary schools. Secondly, there is no showing in this case that even that policy was communicated to plaintiffs in circumstances that would make it reasonable

for them to regard it as a commitment.
[*18]

B.

Plaintiffs proffer a second theory of contract formation -- one that relies upon various statements over the years to the effect that the school would remain open. This theory depends less on the existence of an offer and acceptance than on existence of a promise and detrimental reliance by plaintiffs. See supra p. 12.

[HN5] In order to prevail on a promissory estoppel theory, plaintiffs must show (1) that a promise was made, (2) that it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee, (3) that the promisee relied on the promise and took action to his detriment, and (4) that such promise is binding because injustice can be avoided only by enforcement of the promise. *Restatement (Second) of Contracts § 90, Chrysler v. Quimby, Del. Supr., 144 A.2d 123 (1958); Metropolitan Convoy Corp. v. Chrysler Corp., Del. Supr., 208 A.2d 519 (1965).* The plaintiffs must be able to prove these necessary elements of promissory estoppel by clear and convincing evidence. *Reeder v. Sanford School, Inc., Del. Super., 397 A.2d 139 (1979).*

This theory of recovery has not been shown to be likely of success for at least two reasons. [*19] First, plaintiffs have not demonstrated that they will be able to prove the existence of a promise of the kind alleged -- other than the unequivocal statement of Father Peterman discussed above. Although all fourteen of the plaintiffs listed in Count II of the complaint allege a promise, they allege different promises made by different people. Some of the plaintiffs testify to representations that the school would remain open until June, 1990, while others testify to a promise to remain open "for a minimum of five years." In other affidavits, the affiants describe general representations that the school would remain open indefinitely or that the school would be open throughout "their child's high school years." Defendant Peterman flatly denies making any such statement of promise or assurance. Mr. Weaver admits that in responding to parents' inquiries he explained that the Holy Cross Parish Council made a commitment in 1985 that the school would remain open for five years, but qualified all statements by further explaining "he had no authority to control the future or continued operation of the high school, and that the only guarantee of its future operation was the commitment of the [*20] Holy Cross Parish Council." (Weaver Aff. paras. 2, 3.)

The record contains only vague and varied descriptions of statements which are denied by defendant

Peterman and qualified by Mr. Weaver as being only statements of assumption since he was not in any position to make such a promise concerning the future of the School. On a motion of this kind, plaintiffs must go further in establishing the factual basis of their legal claim.

Second, assuming such statements were authoritatively made and relied upon in enrolling students, I cannot conclude that injustice can only be avoided by specifically enforcing such a promise. Some of what is said in the next section relating to the relative financial impacts of granting the remedy relate to this point as well. Moreover, the existence of alternative schools -- some of which are close but do not offer a distinctively Catholic education and some of which offer a Catholic education but require a one hour journey to reach -- present alternatives to the Holy Cross High School that go far in mitigating the hardship that plaintiffs face.

Plaintiffs assume a heavy burden when they seek, in a motion for preliminary injunction, to specifically enforce [*21] an unwritten contract. To establish a contract where no writing exists and the testimony is in some conflict is always difficult. This burden is even heavier when plaintiffs seek preliminary relief that will not merely freeze the status quo but will require defendants to act. For the foregoing reasons, I conclude that plaintiffs have not established the likely existence of a contractual obligation on the part of the defendants to operate the high school for at least an additional year.

IV.

Even Assuming that a Promise Was Made and a Contract Thereafter Came into Being, Such a Contract Will Not be Specifically Enforced in These Circumstances.

There is an independent ground for denial of the relief sought. [HN6] A valid contract is not necessarily a specifically enforceable contract. n5 [HN7] Specific performance is an equitable remedy which may be awarded when the court finds that money damages are insufficient to make the plaintiff whole and that, in order to do complete justice, specific performance is necessary. n6 *Equitable Trust Co. v. Gallagher, Del. Ch., 108 A.2d 538 (1954); Cunningham v. Esso Standard Oil Co., Del. Supr., 118 A.2d 611 (1955).* [HN8] Distinctively equitable remedies [*22] such as specific performance are not matters of right but always require a court of equity to evaluate the impact of its order in the light of all of the circumstances present. Thus, for example, only a contract that is entirely fair and equal such that enforcement of it would not be harsh or oppressive is specifically enforceable. *Gray Co. v. Alemite*

1987 Del. Ch. LEXIS 468, *

*Corporation, Del. Ch., 174 A. 136 (1934),* 4 Pomeroy's Equity Jurisprudence § 1405(a) (5th ed. 1941).

n5 It is assumed for this portion of the opinion that plaintiffs will be able to prove a valid contract was formed.

n6 The first prerequisite to any equitable relief, including specific performance, is that plaintiff has no adequate remedy at law -- money damages will not make plaintiffs whole because of the uniqueness of the subject matter. Plaintiffs allege they have no adequate remedy at law because an education at Holy Cross is unique and they will be unable to find this anywhere else. Because I deny the grant of preliminary relief on other bases, I leave the issue of adequacy of money damages unresolved and assume for the purpose of this decision regarding preliminary relief only, that plaintiffs have no adequate remedy at law.

[*23]

Plaintiffs have asked this court to specifically enforce a contractual obligation of defendants to open and operate a school for one year at an approximate operating cost of $ 300,000 at a financial loss roughly estimated at between $ 50,000 and $ 100,000, the financial consideration for the promise being a $ 50.00 non-refundable pre-registration payment. Moreover, no obligation on the part of plaintiffs is posited. Surely if the school is open and if they enroll their children, plaintiffs then will have a legal obligation to pay tuition and fees. But if the Court were to require the defendants to operate the school next year, I see no basis to hold that the plaintiffs (by the terms of the contracts they allege) would be obligated to enroll their children. They would have an option to do so and have at risk, should they elect not to do so, only the $ 50 deposit.

Assuming for present purpose that any such contract exists, it does not appear to be one that would be specifically enforced. [HN9] Although courts will not

examine the adequacy of consideration in determining whether a contract exists, equity does examine adequacy of consideration and may refuse specific performance [*24] on this ground when such inadequacy makes the bargain harsh or unfair. *Glenn v. Tidewater Associated, Del. Ch., 101 A.2d 339 (1953).* This principle has, in my opinion, application to the facts as they here appear.

Plaintiffs' request to the court amounts to the following: Defendants should be required to open the doors of Holy Cross, curriculum in place, teachers and principal available and ready, and all the other efforts necessary to open the doors of a school completed for a total of 67 students. Defendants should be required to operate the high school at whatever that cost may be and at whatever deficit that may entail. The only consideration of the plaintiffs is the payment of $ 50.00 non-refundable pre-registration deposit. That is the contract contended and, as it stands, it is "far too unequal in its mutuality ever to warrant a court of equity in riveting its chains upon [defendants]." *Gray Co. v. Alemite Corp., 174 A. at 141.*

Beyond that, the decision to close the high school was based on more than financial considerations. Consideration of the lack of facilities and the inability to provide a broad and sufficient education including extracurricular activities [*25] led the defendants to conclude that it was no longer in the best interest of the parish or the students to maintain the high school. A court of equity should exercise restraint in reviewing such a decision that involves not only claimed legal rights of plaintiffs, but also questions of sound educational policy and expenditures of limited funds of a religious organization. Of course, religious corporations, like others, are bound by the contracts that they do make. But when the question is whether such a contract should be specifically enforced or whether the plaintiffs should be relegated to their legal remedy of damages, all of the circumstances including the nature of the defendants and the subject -- in this instance education -- with which the contract deals, may, under well developed equitable principles, be considered.

1999 Del. Ch. LEXIS 119, *

LEXSEE 1999 DEL. CH. LEXIS 119

**HUNTINGTON HOMEOWNERS ASSOCIATION, INC., et al., Plaintiffs, v. 706 INVESTMENTS, et al., Defendants, v. OLDE PIKE TAVERN, L.L.C., Intervening Defendant.**

**C.A. No. 16633**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1999 Del. Ch. LEXIS 119*

**April 21, 1999, Date Submitted**
**May 28, 1999, Date Decided**

**SUBSEQUENT HISTORY: [*1]**

Released for Publication by the Court June 25, 1999.

**DISPOSITION:**

The intervening defendant's motion for judgment on the pleadings GRANTED and its motion for attorneys' fees and expenses DENIED.

**COUNSEL:** Joseph J. Rhoades, Esquire and W. Christopher Componovo, Esquire, of the LAW OFFICE OF JOSEPH J. RHOADES, Wilmington, Delaware, Attorneys for Plaintiffs.

John J. O'Brien, Esquire, Wilmington, Delaware, Attorney for Defendants.

Thomas D. Whittington, Jr., Esquire and Dennis M. McBride, Esquire, of WHITTINGTON & AULGUR, Wilmington, Delaware, Attorneys for the Intervening Defendant.

**JUDGES:** Stephen P. Lamb, Vice Chancellor.

**OPINIONBY:** Stephen P. Lamb

**OPINION:**

MEMORANDUM OPINION

LAMB, Vice Chancellor

I. INTRODUCTION

This action is alleged to arise out of oral representations made by defendant, Anthony C. Vari ("Vari"), in 1996, during the course of public proceedings regarding Vari's plan to develop a shopping center on real property located adjacent to the neighborhoods of Huntington and Westover Woods in Newark, Delaware. Pending are motions of the intervening defendant, Old Pike Tavern, L.L.C. ("Tavern"), for judgment on the pleadings and for attorneys' fees. For the reasons stated herein, [*2] the motion for judgment on the pleadings (joined in by the other defendants) is granted, but the motion for attorneys' fees and expenses is denied.

A. Procedural History n1

n1 The facts outlined in this opinion, for the most part, are undisputed, and have been taken from the pleadings. Where disputed, the facts are assumed to be true as alleged in the complaint.

On September 9, 1998, plaintiffs, Huntington Homeowner's Association, Inc., Westover Woods Maintenance Association, the Honorable William A. Oberle, Jr., the Honorable Karen Venezky, and Dave Rush, Kent Eagle, Robin Denstin and Jeanette Lawson, n2 filed a complaint seeking a temporary restraining order, and preliminary and permanent injunctive relief, against defendants Vari, his wife, Joan M. Vari, and their company, 706 Investments, to prevent the opening of an establishment selling alcoholic beverages in a shopping center being developed by the Varis.

n2 I note the existence of questions concerning the standing of certain named plaintiffs to pursue this action. For instance, the certificate of incorporation of Huntington Homeowners Association appears to have been revoked for non-payment of franchise taxes. Moreover, the two public officials joined as parties plaintiff are not alleged to reside in either Huntington or Westover Woods and do not, merely by virtue of their office, have an interest in this action sufficient to support their standing as plaintiffs.

1999 Del. Ch. LEXIS 119, *

[*3]

Plaintiffs allege that, on two occasions in 1996, Vari made representations to government officials and members of the communities surrounding the shopping center that none of the businesses in the shopping center would sell alcoholic beverages; representations that plaintiffs contend they relied on in not opposing the development of the shopping center, and which were breached when the Varis entered into a lease agreement with Tavern contemplating the opening of bar in the shopping center. Plaintiffs claim that this breach threatens them with imminent and irreparable harm, because "the operation of a liquor establishment would expose the community to vagrancy, loitering, increased traffic, noise pollution and other ill effects associated with establishments purveying alcoholic beverages."

On September 21, 1998, Tavern filed a motion to intervene on the basis that it had an interest in the outcome of the litigation. While noting that they had no grievance with the Tavern, plaintiffs opposed this motion, arguing that the Vari defendants "should not be permitted to benefit from any equitable and/or legal considerations which may run to [Tavern]." In urging denial of the motion, [*4] plaintiffs pointed to the fact that if Tavern "had a recoverable loss, it could file a claim for monetary damages in Superior Court if plaintiffs were successful in enjoining the Vari defendants from allowing the business in question to open." I rejected plaintiffs' arguments and granted Tavern's motion to intervene on October 13, 1998, finding that Tavern was, at the very least, a party whose joinder is described in Rule 19(a)(2). There was no other activity in this matter until Tavern filed its motion for judgment on the pleadings.

B. Factual History

The property underlying the dispute in this matter, 796 Old Baltimore Pike, Newark, Delaware, was purchased by the Varis sometime prior to February 20, 1996. This property is adjacent to the developments of Huntington and Westover Woods.

On February 20, 1996, the New Castle County Department of Planning Subdivision Advisory Committee held a public meeting (the "February 26 meeting") to review preliminary plans for the development of a shopping center on the property. At this meeting, residents of Huntington and Westover Woods and others expressed concerns about the proposed shopping center development, specifically raising issues [*5] such as loitering, noise, the operation of gasoline filling stations, and the creation of establishments maintaining extended hours of operation or selling alcoholic beverages. According to the complaint, Mr. Vari represented, among other things, that none of the businesses operating in the shopping center would sell alcoholic beverages.

On March 25, 1996, the Huntington Homeowners Association held a meeting to discuss the pending plan to develop the property as a shopping center. The meeting was attended by plaintiffs, residents of the surrounding neighborhoods, Mr. Vari and his attorney. Once again, participants expressed concerns about the effect of a shopping center on the community and about the types of establishments that they believed to be unacceptable uses of the shopping center, including adult bookstores, video game venues, and establishments selling alcoholic beverages. Allegedly, Mr. Vari again assuaged these concerns by representing to the attendees that no such "unacceptable" establishments would operate in the shopping center, and is alleged to have agreed specifically that no establishment in the shopping center would sell alcoholic beverages.

Plaintiffs claim that [*6] these representations formed an oral contract between Vari and one or more of the attendees of the meetings, and that such agreement was breached on or about April 23, 1998, when the Varis entered into an agreement with David R. Whittington and James Brady, the principals of Tavern, for the construction of a bar in the shopping center. A lease agreement memorializing this agreement was executed on May 25, 1998, and Tavern filed an application for a liquor license with the Delaware Alcoholic Beverage Control Commission ("ABCC") on May 26, 1998. Tavern was issued a liquor license and on October 23, 1998, it opened a bar, now known as Breakers, in the shopping center. Plaintiffs filed their complaint shortly thereafter.

II. DISCUSSION

A. Motion for Judgment on the Pleadings

1. Standard

Although styled as a motion for judgment on the pleadings pursuant to Court of Chancery Rule 12(c), this motion will be treated as one for summary judgment, since all parties have presented and asked me to consider affidavits supporting their respective positions. See Ch. Ct. R. 12(c).

Summary judgment should be granted where the moving party demonstrates that no genuine issue of material [*7] fact exists and that the moving party is entitled to judgment as a matter of law. Ch. Ct. R. 56(c). The facts must be viewed in the light most favorable to the non-moving party and the moving party has the burden of demonstrating that no material question of fact exists. Goodwin v. Live Entertainment, Inc., 1999 Del. Ch. LEXIS 5, *14, Del. Ch., C.A. No. 15765, Strine, V.C., (Jan. 22, 1999) (citing Tanzer v. Int'l Gen. Indus., Inc., Del. Ch., 402 A.2d 382, 385 (1979)).

2. Analysis

The facts of this case present insurmountable obstacles to plaintiffs' claim for relief. Essentially, the complaint alleges that oral representations made by Mr. Vari in the presence of certain public officials and neighboring landowners impose legally enforceable contractual limitations on otherwise lawful uses of the Vari defendants' land. These representations were never reduced to writing nor were they made part of the public record in the process of planning approval. Indeed, there is no allegation that plaintiffs ever sought to incorporate these representations into any written instrument, either as a part of county government's approval of the project or otherwise.

In limited circumstances, courts **[*8]** will enforce oral promises concerning the use of land, as an exception to the requirement of the Statute of Frauds that every contract creating an interest in land be in writing. n3 The holdings in these cases are generally premised on *Sections 522 and 524 of the Restatement of Property*, and provide, in pertinent parts, as follows:

> *§* 522. Promises to Use Land
>
> (1) [A] promise that certain land will be used in a particular way is subject to the provisions of the Statute of Frauds requiring promises which create interests in land to be in writing signed by the promissor.
>
> *§ 524.* Promises Enforceable by Estoppel
>
> An oral promise or representation that certain land will be used in a particular way, though otherwise unenforceable, is enforceable to the extent necessary to protect expenditures made in reasonable reliance upon it.

Delaware law has codified the Statute of Frauds in *6 Del. C. § 2714(a)*, which provides that:

> No action shall be brought to charge any person . . . upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them . . . unless the contract is reduced to writing . . . .

**[*9]**

*6 Del. C. § 2714(a)*.

n3 *See Nicol v. Nelson, Colo. Ct. App., 776 P.2d 1144 (1989); Haines v. Minnock Constr. Co., Pa. Supr., 289 Pa. Super. 209, 433 A.2d 30 (1981); Simplex Precast Indus., Inc. v. Biehl, Pa. Supr., 395 Pa. 105, 149 A.2d 121 (1959).*

Plaintiffs concede that the right they seek to enforce is an interest in lands within the meaning of the Delaware Statute of Frauds, but argue that their reliance on Mr. Vari's oral representations, in forbearing from further opposing the Vari defendants' plan of development, is sufficient to support the creation of a promissory estoppel, citing *Nicol v. Nelson, Colo. Ct. App., 776 P.2d 1144 (1989), Haines v. Minnock Construction Co., Pa. Supr., 289 Pa. Super. 209, 433 A.2d 30 (1981)* and *Simplex Precast Industries, Inc. v. Biehl, Pa. Supr., 395 Pa. 105, 149 A.2d 121 (1959).*

After reviewing these cases, I find that they are not helpful to plaintiffs' position. All three cases are distinguishable in that all involved the expenditure **[*10]** of monies in the purchase of land and representations regarding the condition or use of that land made by the seller. *Simplex* is the most easily distinguishable, as the court held that the plaintiffs action was not based on an oral promise, but instead sought enforcement of rights arising from a written instrument. *149 A.2d at 124.*

The other cases cited by plaintiffs are also unhelpful to them. In *Haines*, the court was asked to determine whether the representations of a developer that the area surrounding certain townhouse units would remain wooded were enforceable. Relying on the developer's representations that the area would remain the same, plaintiff purchased a townhouse. Approximately four years later, the developer began preparations to develop the "open space." Plaintiff sued and obtained a permanent injunction. On appeal, the developer argued that any representation that the land behind plaintiffs townhouse would remain "open space" was unenforceable as an oral promise within the Statute of Frauds. Relying on *Restatement of Property. Section 524*, the court affirmed the grant of an injunction, finding the promise to be enforceable by estoppel, stating:

> [Plaintiff] **[*11]** was particularly interested in the townhouse she purchased because of its wooded charm and beauty and she had every reason to expect that it would remain that way. [She] made the substantial expenditure involved in purchasing the townhouse because of her reliance on the promise that the open space would remain in that condition.

*433 A.2d at 35.* The court then held that plaintiff had reasonably relied on the developer's representations and that an enforceable promise was created by her expenditure of monies in reliance thereon.

The issue in *Nicol* was substantially the same as in *Haines*. Plaintiffs purchased subdivision lots bordering an undeveloped tract of land offering a scenic view of an adjacent lake in reliance on the defendants' representation that the tract would remain undeveloped open space. After defendants took steps to develop the tract, plaintiffs sued to enforce the oral promises and obtained an injunction. On appeal, the court found that defendants' oral promises regarding the use of tract of land in question were enforceable both under the *Restatement of Property, section 524* and the *Restatement (Second) of Contracts, section 139(1)*. The more [*12] general provision of *section 139(1) of the Restatement (Second) of Contracts* states:

> A promise which the promisor should reasonably expect to induce action or a forbearance on the part of the promisee or third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

*Nicol, 776 P.2d at 1147.* The court noted that the purpose of the doctrine of promissory estoppel "is to assure fairness in business relationships by protecting one who relies to his detriment on the promise of another." *776 P.2d at 1146.*

My reading of these cases and the principles stated in the *Restatement of Property, sections 522 and 524*, lead me to conclude that plaintiffs' claim fails as a matter of law. Plaintiffs do not claim to have made any expenditure of monies on Mr. Vari's alleged representations. They did not buy property from the Vari defendants on the basis of Mr. Vari's alleged representations and had no business relationship of any kind with the Vari defendants. In the circumstances, [*13] I conclude that, having made no "expenditures" of money in reliance on the alleged promise, they are not entitled to rely on the principles of promissory estoppel embodied in *section 524 of the Restatement of Property* to establish the existence and nature of the servitude they seek to enforce against the Vari defendants. Instead, the representations or promises alleged to give rise to that servitude are within the scope of the Statute of Frauds

and are made unenforceable by its terms. n4

> n4 I also note that, even if plaintiffs could establish the basis of a claim of promissory estoppel against the Vari defendants, they would need to confront the undisputed fact that Tavern entered into its lease arrangement with the Vari defendants and spent money to open its business without actual or constructive notice of the alleged restrictions on use. Tavern argues that its intervening status as a "good faith lessee for value" would make it inequitable to enter any injunction having the effect of preventing Tavern from conducting its business operations. In the circumstances, it is unnecessary to address these issues because plaintiffs' claim is barred by the statute of frauds.

[*14]

This result is not only consistent with the terms of the Restatement of Property and the case law, but is necessitated by the public interest in the proper administration of county governmental functions. The servitude plaintiffs seek to enforce does not arise out of any private commercial relationship between the Vari defendants and plaintiffs. Instead, it is claimed to depend on oral representations made during the course of the public process leading to the approval by the appropriate county governmental body of a plan of subdivision, which was then filed of record in the Office of the Recorder of Deeds in and for New Castle County. In that context, it is important and entirely appropriate that any special limitation on use either agreed to or imposed in the course of approving the plan of subdivision be specified in a writing signed or acknowledged by the landowner and be a matter of public record.

B. Motion for Attorneys' Fees

1. Standard

It is well settled under the American Rule that prevailing litigants must bear their own attorneys' fees and expenses. *Brice v. State of Delaware, Del. Supr., 704 A.2d 1176, 1178 (1998)* (citing *Goodrich v. E.F. Hutton Group,* [*15] *Inc., Del. Supr., 681 A.2d 1039, 1043-44 (1996)*). However, this general rule is subject to several exceptions. *See CM & M Group, Inc. v. Carroll, Del. Supr., 453 A.2d 788, 795 (1982).* Aside from litigation creating a common fund or a non-monetary benefit which inures to the benefit of others, the exceptions are limited to: (1) cases where fees are authorized by statute, (2) cases where the court finds that a party's bad faith conduct increased the costs of litigation, and (c) cases where the pre-litigation conduct of the losing party was so egregious as to justify an

1999 Del. Ch. LEXIS 119, *

award of attorneys' fees as an element of damages. *See Arbitrium (Cayman Islands) Handels AG v. Johnston, 705 A.2d 225, 231 (1997).*

Tavern has moved for an award of fees, arguing that the instant case falls within the second of these exceptions, and that it is entitled to have its attorneys' fees and expenses paid by the plaintiffs, in light of their bad faith conduct prior to and during the litigation in this action. Tavern lists three specific instances of plaintiffs' conduct that it contends to "bring[s] this case within the [second] exception to the American Rule." I do not address the first, as it [*16] pertains to actions irrelevant to my decision in this matter.

The second instance of bad faith listed by Tavern relates to the complaint in this matter. Arguing that the legal authorities and facts cited in the motion for judgment on the pleadings demonstrate that there is no legal basis for the injunctive relief that plaintiffs request, Tavern contends that "plaintiffs' sole purpose in instituting these proceedings was to frustrate and delay [Tavern] in its effort to conduct a legitimate business enterprise." Tavern also contends that plaintiffs misrepresented the extent of opposition to the liquor establishment by naming in the complaint plaintiffs and plaintiff organizations that did not have standing to bring suit. *See supra,* note 1. Finally, Tavern contends that plaintiffs acted in bad faith and significantly increased the expenses faced by the Tavern in this litigation by not joining Tavern as a party defendant when plaintiffs had knowledge of: (1) the existence of the lease agreement between Tavern and the Varis, (2) Tavern's filing of a liquor license application and (3) the substantial financial investment made by Tavern in this venture.

The third instance of bad faith [*17] claimed by Tavern is plaintiffs' opposition to the Tavern's motion to intervene. Tavern contends that plaintiffs' argument against allowing Tavern to intervene demonstrates: (1) "plaintiffs knew that, if [Tavern] was permitted to intervene, their claim against the owners would fail," and (2) "that the plaintiffs came into this court of equity with unclean hands."

2. Analysis

The exception under which plaintiff seeks relief is narrow and is applied "in only the most egregious instances of fraud or overreaching." *Arbitrium, Del. Ch., 705 A.2d at 231; see also Ryan v. Tad's Enterprises, Inc., Del. Ch., 709 A.2d 682, 706 (1996)* (attorneys' fees only awarded where conduct at issue rose to a "high level of egregiousness"). In *Barrows v. Bowen,* Chancellor Allen reviewed this exception, stating:

A few Delaware cases have suggested that a finding of fraudulent behavior

underlying the action may be grounds for awarding attorney's fees. While this court can imagine situations which may be so egregious as to warrant an award of attorney's fees on the basis of fraud, the American Rule would be eviscerated if every decision holding defendants liable for fraud or the like [*18] also awarded attorney's fees. Even more harmful would be to extend this narrow exception to situations involving less than unusually deplorable behaviors. The award of attorney's fees is "unusual" relief.

*1994 Del. Ch. LEXIS 164, *6, Del. Ch., C.A. No. 1454-S, Allen, C., (Sept. 7, 1994)* (citations omitted); *see also Weinberger v. UOP, Inc., Del. Ch., 517 A.2d 653, 656 (1986)* ("To depart from the traditional rules with respect to attorneys' fees, there must be a showing of bad faith, conduct which was totally unjustified, or the like.").

Circumstances giving rise to an award of fees under the bad faith exception include those where "judicial intervention is necessary to secure clearly defined and established rights or where a defendant's actions are designed to force a party to resort to litigation for the purpose of causing unreasonable delay." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 13-3(b), p. 870. However, attorneys' fees will not be awarded "in the absence of intentional misconduct" or where the party has "merely acted pursuant to an incorrect perception of its legal rights." *Id.*

I do not [*19] find plaintiffs' conduct in this action to rise to the egregious level of bad faith necessary to justify an award of fee shifting. In granting Tavern's motion to intervene, I found the decision of plaintiffs' counsel to not join Tavern and to oppose the motion procedurally incorrect. However, these choices of plaintiffs counsel in no way represent the "intentional misconduct" necessary for this Court to make the finding of bad faith necessary for an award of fees. Neither does the naming of Huntington or the two public officials as plaintiffs, which I consider to be mere oversight.

Likewise, while plaintiffs' were not successful in advocating their position that the estoppel exception to the Statute of Frauds applies to make the alleged representation of Vari enforceable as an oral promise, their arguments were not made in bad faith and were merely "incorrect perceptions" of their legal rights. For these reasons, Tavern's motion seeking reimbursement from the plaintiffs for its attorneys' fees and expenses is denied. I will; however, grant it court costs as the prevailing party in this matter.

III. CONCLUSION

1999 Del. Ch. LEXIS 119, *

For the reasons stated herein, the intervening defendant's motion for [*20] judgment on the pleadings is GRANTED and its motion for attorneys' fees and expenses is DENIED. Court costs are to be paid by plaintiffs. An order to this effect has been entered this date.

Stephen P. Lamb

Vice Chancellor

ORDER

For the reasons stated in the Court's memorandum opinion of May 28, 1999, the motion for judgment on the pleadings is GRANTED, the motion for attorneys' fees and expenses is DENIED, and the complaint is hereby DISMISSED as to all parties. Plaintiffs are directed to pay court costs in this matter. IT IS SO ORDERED this 28th day of May 1999.

Stephen P. Lamb

Vice Chancellor

2002 Del. Super. LEXIS 441, *

LEXSEE 2002 DEL.SUPER.LEXIS 441

**International Fidelity Insurance Company, a New Jersey Corporation, v. Mattes Electric, Inc., a Delaware Corporation; Delaware Technical & Community College, an Agency of the State of Delaware; and EDIS Company**

**C.A. No. 99C-10-065 WCC**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*2002 Del. Super. LEXIS 441*

**January 23, 2002, Submitted
June 27, 2002, Decided**

**DISPOSITION:**    [*1]    Defendant EDIS Company's Motion to Dismiss Granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant contract manager filed a motion to dismiss a count in plaintiff surety company's complaint which asserted that the manager had been negligent in its performance of a construction project at a training facility.

**OVERVIEW:** The surety company issued payment and performance bonds for electrical work that was done in connection with a construction project at a training facility. The contract manager was hired by the facility and after the electrical contractor defaulted, a dispute arose concerning the surety's obligation under the bonds. The surety filed a claim against the manager, asserting that it performed its responsibilities negligently by having failed to obtain a contract between the facility and the electrical contractor. This led to claims against the bond by the electrical contractor's suppliers and sub-contractors after the electrical contractor quit. The dismissal motion by the manager alleged that the claim was barred by the economic loss doctrine in that the asserted liability was based solely on a negligence tort action, there being no contractual relationship between the surety and the manager. The court granted the motion, noting that the doctrine had been expanded beyond defective product cases. There were no applicable exceptions, such as negligent misrepresentation or breach of a duty between the parties, that would have avoided the doctrine's bar to recovery.

**OUTCOME:** The motion to dismiss was granted.

**LexisNexis(R) Headnotes**

*Torts > Damages > Damages Generally*
[HN1] The economic loss doctrine prohibits recovery in tort for losses unaccompanied by a bodily harm or a property damage. The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. Economic loss is any monetary loss, costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value. While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to nearly any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against increasing tort claims, which result when contract provisions limit a plaintiff's recovery, or where no contract exists at all.

*Torts > Business & Employment Torts > Negligent Misrepresentation*
*Torts > Damages > Damages Generally*
[HN2] One exception to the economic loss doctrine is that relating to negligent misrepresentation. The plaintiff must show that the defendant supplied information to the plaintiff for use in business transactions with third parties and second, the defendant must be in the business of supplying such information.

*Torts > Damages > Damages Generally*
[HN3] The economic loss doctrine cannot be overcome by a general claim of malpractice when no relationship

2002 Del. Super. LEXIS 441, *

between the parties exists.

**COUNSEL:** Richard L. Abbott, Esquire, Wilmington, DE.

Marc P. Niedzielski, Esquire, Department of Justice, Wilmington, DE.

Dawn C. Stewart, Esquire, Washington, DC.

Donald L. Logan, Esquire, Wilmington, DE.

**JUDGES:** Judge William C. Carpenter, Jr.

**OPINIONBY:** William C. Carpenter, Jr.

**OPINION:**

The Court has before it a Motion to Dismiss filed by EDIS Company (EDIS) relating to the negligence claim included in International Fidelity Insurance Company's (IFIC) amended complaint. In essence, EDIS asserts that Count II of the Complaint is barred by the economic loss doctrine. The Court agrees, and the Motion will be granted.

IFIC is a surety company that issued payment and performance bonds relating to electrical work to be done by Mattes Electric, Inc. (Mattes) in the construction of a training facility at the Delaware Technical and Community College (Del Tech) Wilmington campus. Mattes defaulted, and a dispute has arisen concerning IFIC's obligation under the bonds. EDIS was hired by Del Tech to act as the contract manager of the project, and in an amended complaint filed on August 27, 2001, IFIC asserts that they negligently performed this [*2] responsibility which led to IFIC suffering damages. In particular, IFIC claims that EDIS's failure to obtain an executed contract between Del Tech and Mattes provided the basis for Mattes to quit the project, not pay his suppliers or sub-contractors and has lead to claims being made against the bonds issue by IFIC. There is no contractual relationship between IFIC and EDIS and thus the asserted liability is strictly based on a negligent tort action. EDIS now requests dismissal based upon the economic loss doctrine, and IFIC argues the doctrine is not applicable to the facts of this case or the exceptions of negligent misrepresentation or professional malpractice apply.

On June 13, 2002, this Court issued an extensive decision on the economic loss doctrine and the applicability of the negligent misrepresentation exception in the case of *Christiana Marine Service Corporation v. Texaco Fuel and Marine Marketing Inc. And Texaco,*

*Inc.* n1 While the cases are factually different, the case law and the reasoning in the *Christiana Marine* decision have equal application here and are relied upon in deciding this motion.. [HN1] The economic loss doctrine "prohibits recovery in tort for losses [*3] unaccompanied by a bodily harm or a property damage." n2 The doctrine in its purest form forbids plaintiffs from recovering in tort for losses suffered that are solely economic in nature. n3 Economic loss is "any monetary loss, costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will, and diminution in value." n4 While initially a doctrine related to product liability actions, the courts have expanded the doctrine's application beyond its original scope to nearly any kind of dispute arising from a commercial transaction where the alleged damages do no harm to a person or to property other than the bargained for item. The doctrine has become a significant shield for defendants to protect against increasing tort claims, which result when contract provisions limit a plaintiff's recovery, or where no contract exists at all.

n1 *Christiana Marine Service Corp. V. Texaco Fuel and Marine Marketing Inc., and Texaco, Inc., 2002 Del. Super. LEXIS 305,* Del. Super. C.A. No. 98C-02-217, Carpenter, J. (June 13, 2002) (Mem. Op.).

n2 Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule, 89 Ill. B.J. 406, 406-11 (2001)* (discussing case law dealing with the economic loss doctrine, future developments, and innocent fraud or negligent misrepresentation exclusion).

[*4]

n3 *Danforth v. Acorn Structures, Inc., 608 A.2d 1194, 1195 (Del. 1992)*(citing *Moorman Mfg. Co. v. National Tank Co., 91 Ill. 2d 69, 435 N.E. 2d 443, 448, 61 Ill. Dec. 746 (Ill. Supr. 1982).*

n4 Hon. Sheldon Gardner, Matthew Sheynes, *The Moorman Doctrine Today: A Look at Illinois' Economic-Loss Rule, 89 Ill. B.J. at 406.* See also *Danforth, 608 A.2d at 1196*(quoting *Moorman Mfg. Co. 435 N.E.2d at 449*)(noting that economic loss is defined as "damages for inadequate value, costs of repair, and replacement of the defective product, or consequent loss of profits -- without any claim of personal injury or

2002 Del. Super. LEXIS 441, *

damage to other property.").

As a result of the above, the Court first rejects IFIC's argument that the doctrine of economic loss is only applicable in a "defective product" context. The doctrine, over time, has been expanded to other commercial transactions, and there is no reason to excuse the type of transaction present in this litigation. Secondly, the Court finds that if IFIC suffered any damages relating to [*5] any party in this litigation, it clearly is only economic in nature. If there is an obligation under the bonds, IFIC will be forced to pay money to compensate for Mattes' failure to perform. Thus, if EDIS was in some manner negligent, the only damages that they caused IFIC to suffer were monetary in nature and fit the definition of economic loss. As such, unless EDIS' conduct falls within an exception, the economic loss doctrine would prevent recovery by IFIC.

[HN2] The first exception claimed by IFIC is that relating to negligent misrepresentation. This exception was extensively addressed in the *Christiana Marine* decision and requires the finding of two elements. First, the plaintiff must show that the defendant supplied information to the plaintiff for use in business transactions with third parties and second, the defendant must be in the business of supplying such information. Neither of these requirements have been asserted nor can they be established by the plaintiff under the facts of this case. At best, this case involves the discovery of a lack of an executed contract after a claim under the bonds was made. IFIC never relied upon any information provided by EDIS since there [*6]    was never any such communication. In fact, in their complaint there is no assertion that there was any contact between IFIC or EDIS until this litigation arose. Simply put, by any reasonable interpretation of the facts of this case, even in the light most favorable to IFIC, the negligent misrepresentation exception is not applicable.

In a final desperate attempt to maintain the negligence count, IFIC cites to a footnote in the *Danforth* decision in which the Supreme Court indicated that in that case they were not addressing whether the economic loss doctrine would bar recovery when the claim relates to professional malpractice. Unfortunately what was intended by the statement is not further reflected in the opinion. However, this Court finds that at a minimum some duty by the defendant to the plaintiff would be required consistent with the Supreme Court of Illinois opinion in *2314 Lincoln Park West Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.* n5 This obligation and duty must be one generally recognized by the profession as traditionally owed the client or the group of persons the client intended to benefit. There is no dispute that there was no professional relationship [*7]    or duty between EDIS and IFIC and no relationship between EDIS's client, that is Del Tech, and IFIC to infer an intended benefit. This Court does not believe that [HN3] the economic loss doctrine can be overcome by a general claim of malpractice when no relationship between the parties exists. As such, this Court finds that to the extent an exception is recognized by the Supreme Court, the facts of this case will not support its application here.

n5  See  *2314 Lincoln Park West Condo. Ass'n, Ill., 136 Ill. 2d 302, 555 N.E.2d 346, 144 Ill. Dec. 227 (1990).*

Finding that the economic loss doctrine would generally bar recovery and the exceptions to the doctrine are not applicable, the negligence claims set forth in Count II of IFIC's amended complaint are dismissed.

IT IS SO ORDERED this 27th day of June, 2002.

Judge William C. Carpenter, Jr.