1997 Del. Super. LEXIS 30, *

LEXSEE 1997 DEL.SUPER.LEXIS 30

**Kirkwood Kin Corp. and John O'Connor v. Dunkin' Donuts, Inc., Sean O'Hanlon and O'Hanlon, Inc.**

**C.A. No. 94C-03-189-WTQ**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1997 Del. Super. LEXIS 30*

**December 11, 1996, Submitted
January 29, 1997, Decided**

**SUBSEQUENT HISTORY:**    [*1]    Released for Publication by the Court August 29, 1977.

**DISPOSITION:**

Dunkin's Motions for Summary Judgment GRANTED with respect to Counts I, II, VI, IX, X, XI, XII, XIII, and XIV of the Second Amended Complaint; DENIED with respect to Counts II, IV, V, VII, AND VIII of the Second Amended Complaint; and DENIED with respect to the Counterclaim.

**CASE SUMMARY:**

**PROCEDURAL    POSTURE:**    Plaintiff former franchisees filed an action against defendant franchisor in which they alleged violations of the Franchise Security Law and various derivative contract and tort claims. The franchisor filed a counterclaim for breach of contract based upon purported defaults under the rental and fee agreements. The franchisor filed motions for summary judgment on the former franchisee's claims and on its own counterclaim.

**OVERVIEW:** The court held that the franchisees did not state a cause of action based upon unreasonable or excessive rent because they did not allege threatened, attempted, or actual termination or nonrenewal of the franchise in connection with the rent as required under the Franchise Security Law. The court found that the wrongs alleged in the allegation that the franchisor violated *Del. Code Ann. tit. 6, § 2552(j)* occurred at the contract formation stage and, thus, were brought after the expiration of the three-year statute of limitations. The Franchise Security Law permitted franchisees' allegations that a constructive termination of the franchise occurred. Because any damages would be speculative, the franchisees did not have a cause of action for damages

based on the franchisor's failure to notify them of the possibility of mediation. The franchisees did not state a cause of action for fraudulent misrepresentation because they did not state with particularity the circumstances constituting fraud, negligence, or mistake. The court held that the franchisees did not state a cause of action for either tortious interference with existing contracts or with prospective business opportunities.

**OUTCOME:** The court denied summary judgment on the franchisees' allegations of constructive termination of the franchise under the Franchise Security Act. The court granted summary judgment as to all of the franchisee's other allegations, including other violations of the Franchise Security Act and various contract and tort claims. The court denied summary judgment on the franchisor's counterclaim for breach of contract.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1]  When considering a motion for summary judgment under Del. Super. Ct. R. Civ. P. 56, the court's function is to examine the record to determine whether genuine issues of material fact exist. If, after viewing the record in a light most favorable to the non-moving party, the court finds there are no genuine issues of material fact, summary judgment is appropriate. The court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is "potentially possible." All reasonable inferences must be drawn in favor of the non-moving party. Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts

1997 Del. Super. LEXIS 30, *

in order to clarify the application of law to the circumstances.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*
*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN2] See *Del. Code Ann. tit. 6, § 2552(j)*.

*Business & Corporate Entities > Franchises & Distributorships > Remedies > Compensatory Damages*
*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN3] See *Del. Code Ann. tit. 6, § 2553*.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*
*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN4] *Del. Code Ann. tit. 6, § 2552(j)* is meant to confer protection against the charging of an unreasonable or excessive rent only in the context of an already-existing franchise agreement or an accompanying sublease. That is, it is not at all absurd to suggest that charging excessive rent is illegal if demanded upon renewal of a lease but legal if demanded in the initial term.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*
*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN5] The protections of the Franchise Security Act are intended to protect franchised distributors only from unjust termination of, or failure or refusal to renew their franchises. The General Assembly was concerned with the unjust, inequitable, and coercive practices of franchisors in the context of an already-existing franchise relationship, that is, at a time when the economic balance of power rests with the franchisor.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*
[HN6] Charging excessive and unreasonable rents, alone, may violate some other law, but it does not violate the Franchise Security Act.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*

*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN7] The language of *Del. Code Ann. tit. 6, § § 2552* and *2553*, read in conjunction with the title and preamble of 57 Del. Laws 693 and relevant case law, does not grant a franchisee a cause of action for the charging of unreasonable or excessive rent absent threatened, attempted, or actual termination or nonrenewal of the franchise.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN8] *Del. Code Ann. tit. 10, § 8106* sets forth the general three-year statute of limitations.

*Contracts Law > Types of Contracts*
*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*
[HN9] Except where mortgages are concerned, the simple use of formalities and boilerplate unaccompanied by substantive evidence of the parties' intent to seal it is not enough to turn an ordinary contract into a specialty. Evidence of any intent on the franchisees' part to seal the agreements is insufficient unless they communicated their desire to the franchisors.

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Breach of Contract*
[HN10] Under the "continuing wrong" doctrine, continuing wrong status turns on the substantive nature of the contract and the alleged wrongs.

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Breach of Contract*
*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN11] It is the refusal to renew the franchise, except upon payment of unreasonable or excessive rent, that is a wrongful act. That wrongful act occurs at the time of the alleged refusal to renew, since the franchisee's real complaint concerns what the franchisor allegedly did, that is, demanded, at the time of renewal.

*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN12] The Franchise Security Law does permit a cause of action for constructive or de facto termination.

1997 Del. Super. LEXIS 30, *

be admitted.

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Breach of Contract*
*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN13] The question that the Franchise Security Law really asks is whether the actions alleged are so egregious as to amount to a repudiation of the contract. This will permit a factual review of each claim on its merits, with particular attention paid both to the motivations and the actions of the franchisor.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*
[HN14] See *Del. Code Ann. tit. 6, § 2552(i).*

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*
*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN15] *Del. Code Ann. tit. 6, § 2552(i)* covers a situation where the franchisor has not taken specific action to terminate the franchise but is attempting to purge itself of the relationship simply by refusing to deal with the franchise distributor any longer.

*Business & Corporate Entities > Franchises & Distributorships > Remedies > Compensatory Damages*
[HN16] Only through speculation can damages be awarded on the basis that franchisees lost an opportunity to mediate certain complaints before they filed suit. Specifically, when the mediation process contemplated is non-binding, the fact-finder would have to conclude that franchisees would have succeeded in mediation, franchisors would have accepted the result and would not have exercised its appeal rights, or if franchisors did that such an appeal would have failed. Damage claims cannot rest on such a tenuous foundation.

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Breach of Contract*
*Contracts Law > Contract Interpretation > Parol Evidence Rule*
[HN17] A well-recognized exception to the parol evidence rule is that when a party alleges fraud or misrepresentation, evidence of oral promises or representations made prior to the written agreement will

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Fraud & Misrepresentation*
[HN18] The elements of the common law cause of action for fraudulent misrepresentation are: (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or made with reckless indifference as to the truth; (3) an intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Fraud & Misrepresentation*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN19] Mere expressions of opinion as to probable future events cannot be deemed fraud or misrepresentation. Furthermore, any complaint alleging fraud must as a consequence include the circumstances involved, that is, the time, place, and contents of any misrepresentation made, the identity of the person making the same and the benefit sought to be obtained. This is an extension of the requirement of Del. Super. Ct. R. Civ. P. 9(b) that in all averments of fraud, negligence, or mistake, the circumstances constituting fraud, negligence, or mistake shall be stated with particularity.

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Interference With Business Relations*
[HN20] A specific contract or potential business opportunity allegedly compromised by a franchisor are a prerequisite to proceeding under claims for tortious interference with existing business relationships and prospective business advantage.

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Interference With Business Relations*
[HN21] Interference with an existing contract requires (a) an intent to induce a breach (b) of an existing contract, (c) proximate causation, and (d) damages. A showing of deliberate interference with a prospective business opportunity requires (a) the reasonable

1997 Del. Super. LEXIS 30, *

probability of a business opportunity, (b) the intentional interference by defendant with opportunity, (c) proximate causation, and (d) damages.

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Good Faith & Fair Dealing*
[HN22] An implied covenant of good faith and fair dealing generally exists in every contract. This obligation requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract. It is simply a reflection of the fact that in many respects the purpose of contract law is to attempt to give effect to the reasonable expectations of the parties. One common way of analyzing this covenant is to ask what the parties likely would have done if they had considered the issues involved. However, it is also true that where the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty does not come into play.

*Business & Corporate Entities > Franchises & Distributorships > Terminations*
*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Good Faith & Fair Dealing*
[HN23] The common law implied covenant of "good faith" and "fair dealing" does not state an independent cause of action with respect to the actual, threatened, or attempted failure to renew or termination of a franchise relationship because the General Assembly expressly wrote that covenant into the Franchise Security Law.

*Business & Corporate Entities > Franchises & Distributorships > Terminations*
*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Good Faith & Fair Dealing*
[HN24] The Franchise Security Law expressly prohibits unjust terminations and failures to renew, whether actual, threatened, or attempted, as well as unjust refusals to deal. *Del. Code Ann. tit. 6, § 2552(g)*, (h), (i). It defines "unjust" as being without "good cause" or in "bad faith." *Del. Code Ann. tit. 6, § 2552(a)*, (b). An "unjust refusal to deal" by its very terms cannot be said to be either good faith or fair dealing.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*

*Business & Corporate Entities > Franchises & Distributorships > Causes of Action > Good Faith & Fair Dealing*
[HN25] The mere charging of excessive and unreasonable rent does not violate the covenant of good faith and fair dealing.

*Business & Corporate Entities > Franchises & Distributorships > Franchise Relationships*
[HN26] There is no law or public policy that prevents a potential franchisor from charging whatever rent it wishes to charge, ab initio, that is, as a precursor to entering into the franchise relationship.

*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
[HN27] Unjust enrichment is a quasi-contract theory of recovery meant to remedy the absence of a formal contract. If a contract is the measure of the plaintiffs' right, the parties cannot recover under a theory of unjust enrichment.

*Business & Corporate Entities > Franchises & Distributorships > Terminations*
[HN28] A franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor.

COUNSEL:

James S. Green, Esquire, Duane, Morris & Heckscher, Wilmington, DE.

Edward F. Eaton, Esquire, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

JUDGES: WILLIAM T. QUILLEN, JUDGE

OPINIONBY: WILLIAM T. QUILLEN

OPINION:

Letter Opinion and Order on Defendant Dunkin' Donuts, Inc.'s Motion for Summary Judgment on all Claims against it and on its Counterclaim

This is the Court's opinion on multiple motions by defendant Dunkin' Donuts, Inc., seeking summary judgment, pursuant to Superior Court Civil Rule 56, on all claims brought against it by plaintiffs Kirkwood Kin Corporation and John O'Connor, and on its counterclaim against plaintiffs. For the reasons herein stated, the Motions are GRANTED with respect to Counts I, II, VI,

IX, X, XI, XII, XIII, and XIV of the Complaint, DENIED with respect to Counts III, IV, [*2] V, VII, and VIII, and DENIED with respect to the counterclaim.

*FACTUAL BACKGROUND*

As the Court stated in its opinion of June 30, 1995, this case involves a dispute between plaintiffs Kirkwood Kin Corp. and John O'Connor (collectively "plaintiffs" or "the franchisee"), as the former operators of two donut shop franchises; defendant Dunkin' Donuts, Inc. ("Dunkin'" or "the franchisor"), as the franchisor; and defendants Sean O'Hanlon and O'Hanlon, Inc. (collectively "O'Hanlon"), as a competing franchise.

Plaintiffs purchased a Dunkin' Donuts franchise, located on Kirkwood Highway, from Dunkin' in 1984. In August 1986, plaintiffs renewed their franchise. As part of this renewal, plaintiffs executed an amendment to the sublease which contained provisions for the payment of a percentage rent and what purports to be a general release. The base rent was $ 35,747.64. The percentage rent provision required plaintiffs to pay Dunkin', in addition to the base rent, 7% of gross sales over $ 165,000. In August 1987, plaintiffs again renewed the franchise, executing an amendment to the sublease which maintained the rent terms and contained another purported general release. Plaintiffs estimate [*3] that from 1985 to 1990 the retail sales at their Kirkwood shop grew at an average annual rate of 8%.

In November 1990, a newly-licensed Dunkin' shop in Pike Creek was opened by another franchisee, approximately 1.5 miles from plaintiffs' Kirkwood shop. Plaintiffs claim that Dunkin' made no effort to ascertain the potential impact on plaintiffs' store prior to opening the Pike Creek shop. They also claim that their sales dropped by 13% in the following year. In what plaintiffs assert was an attempt to recover from the "blow" dealt by the opening of the Pike Creek shop and an attempt to get out from under the "oppressive" percentage rent provision, plaintiffs sought and Dunkin' granted a second franchise. This was a satellite shop n1 located on the corner of 9th and Orange Streets in downtown Wilmington and opened in January 1993.

n1 A satellite shop is a store where sales are permitted to be made but preparation and production of the foods is done off premises, i.e., at the Kirkwood shop.

In that same month, [*4] Dunkin' created another Dunkin' franchise on the same side of Kirkwood Highway, about 1.3 miles east of plaintiffs' shop. This franchise was owned by the O'Hanlon defendants. Dunkin' had purchased the Mister Donut chain of donut shops approximately three years prior to this conversion. At that time, the Honolulan defendants had been operating a Mister Donut franchise. In January 1993, pursuant to a nationwide program instituted by Dunkin' to convert as many Mister Donut franchises to Dunkin' Donuts franchises as was possible, Dunkin' converted O'Hanlon's Mister Donut shop to a Dunkin' Donuts shop. Plaintiffs claim that their retail sales after the conversion dropped precipitously and that the O'Hanlon Dunkin' franchise's sales increased dramatically.

By February 1993, plaintiffs were no longer able to meet all of their financial obligations. They stopped paying the percentage rent due under the amended sublease to Dunkin'. By May 1993, plaintiffs had also stopped paying the base rent and franchise and advertising fees which they owed to Dunkin'. On July 16, 1993, Dunkin' issued a notice of default to plaintiffs based on their nonpayment of contractual obligations. These alleged defaults [*5] were not cured by plaintiffs. Dunkin' issued a notice of termination of the franchise agreements on August 24, 1993. However, plaintiffs assert that O'Connor contacted a Dunkin' business consultant to discuss plaintiffs' various financial problems and to solicit assistance in reaching a resolution of these issues. Plaintiffs assert that Dunkin' refused to even discuss the problems with them, although they allegedly were required to address at least the "proximity related problems," unless and until plaintiffs paid the money which they owed to Dunkin'.

Plaintiffs did not turn over the franchises and instead remained in possession of the franchises, operating under the Dunkin' Donuts trademark. In the meantime, Dunkin' had sued plaintiffs in the Court of Chancery seeking to terminate the franchise agreements and in the Justice of the Peace Court seeking to have plaintiffs relinquish possession of the premises. Plaintiffs then instituted this action in Superior Court. Plaintiffs finally settled the Justice of the Peace Court action by turning over possession of the businesses to Dunkin' in October 1994. The Court of Chancery action has been stayed pending the outcome of this action. [*6]

*PROCEDURAL BACKGROUND*

On March 21, 1994, Kirkwood filed a nine count Complaint in Superior Court against Dunkin' alleging violations of Delaware's Franchise Security Law, 6 *Del. C.* ch. 25, and various derivative contract and tort claims. Dunkin' counterclaimed against Kirkwood for breach of contract based on Kirkwood's purported defaults under the rental and fee agreements with Dunkin'. On August 19, 1994, plaintiffs filed an Amended Complaint, adding

1997 Del. Super. LEXIS 30, *

an additional count against Dunkin' and adding the O'Hanlon defendants as a party.

On March 20, 1995, this Court (Judge Silverman) heard Defendants' Motion to Dismiss and for Partial Summary Judgment. In an opinion dated June 30, 1995, the Court, recognizing the early stage of the litigation, attempted to give the parties guidance and help define the scope of the case. In particular, the Court permitted Kirkwood to amend the complaint a second time and to "narrow their claims so that the Court can focus on the essence of their dispute." Plaintiffs did not pay much heed to this request, as they then filed an *eighteen* count Second Amended Complaint on August 31, 1995. Several of the claims are repetitive in that the alleged [*7] basis for liability is the same but the alleged facts specifically giving rise to the liability differ. Plaintiffs alleged that Dunkin' committed the following unlawful acts:

(1) violated *6 Del. C. § 2552* by charging excessive rent in light of Dunkin's interests and purposes (Count I);

(2) violated *6 Del. C. § 2552(j)* by refusing to renew the franchise except upon payment of excessive rent (Count II);

(3) violated *6 Del. C. § § 2552(g)* and *2553(a)* by attempting to unjustly terminate plaintiffs' franchise (Counts III, V, and VII);

(4) violated *6 Del. C. § § 2552(g)* and *2553(a)* by unjustly terminating plaintiffs' franchise (Counts IV, VIII);

(5) violated *6 Del. C. § § 2552(i)* and *2553(b)* by unjustly refusing to deal with plaintiffs (Count VI);

(6) violated a contractual obligation to offer mediation in order to resolve their dispute (Count IX);

(7) engaged in intentional misrepresentations by giving false assurances that it would help plaintiff's promote the business (Count X);

(8) engaged in intentional interference with existing business relationships (Count XI) and with prospective business advantages (Count XII);

(9) [*8] violated an implied covenant of good faith and fair dealing (Count XIII); and

(10) obtained unjust enrichment by charging and collecting unreasonable rent fees (Count XIV).

Plaintiffs alleged that the O'Hanlon defendants committed the following unlawful acts:

(1) engaged in intentional interference with existing business relationships (Count XV) and with prospective business advantages (Count XVI);

(2) engaged in intentional interference with the contractual relationship between plaintiffs and Dunkin' (Count XVII); and

(3) conspired with and knowingly and wilfully aided and abetted Dunkin' in Dunkin's breaches of covenants, representations, and warranties (Count XVIII).

On August 27, 1996, Dunkin' filed a new Motion for Partial Summary Judgment. While the Motion was pending, Dunkin' filed, on November 22, 1996; a Motion for Summary Judgment on all claims against it. On November 25, 1996, Dunkin' filed its Motion for Summary Judgment on its Counterclaim. Oral argument was scheduled for December 11, 1996. Shortly before oral argument, counsel for plaintiffs informed the Court that it had reached a resolution of its dispute with the O'Hanlon defendants [*9] and that a stipulation of dismissal would be forthcoming. n2 This is the Court's decision after oral argument.

n2 The stipulation was filed with the Prothonotary and signed by the Court on January 17, 1997. This dismisses Counts XV through XVIII, those alleged against the O'Hanlon defendants, and the Court will not discuss them further. For obvious reasons, the Court will not discuss the O'Hanlon Defendants' Motion for

1997 Del. Super. LEXIS 30, *

Summary Judgment. (Docket No. 117.)

### STANDARD ON SUMMARY JUDGMENT

[HN1] When considering a motion for summary judgment under Superior Court Civil Rule 56, the Court's function is to examine the record to determine whether genuine issues of material fact exist. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc., Del. Super., 312 A.2d 322, 325 (1973).* It, after viewing the record in a light most favorable to the non-moving party, the Court finds there are no genuine issues of material fact, summary judgment is appropriate. *Id.* The Court's decision must be based only on the record presented, [*10] including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is "potentially possible." *Rochester v. Katalan, Del. Supr., 320 A.2d 704 (1974).* All reasonable inferences must be drawn in favor of the non-moving party. *Sweetman v. Strescon Indus., Del. Super., 389 A.2d 1319 (1978).* Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Ebersole v. Lowengrub, Del. Supr., 54 Del. 463, 180 A.2d 467 (1962).*

### COUNT I

In Count I of the Second Amended Complaint, plaintiffs contend that Dunkin' violated *6 Del. C. § 2552(j)* by charging excessive rent in light of Dunkin's interests and purposes in the property:

[HN2] Notwithstanding any terms of the franchise agreement to the contrary, no franchisor who leases real or personal property to a franchised distributor may charge the franchised distributor a rent or other charge for the use or occupancy of such real or personal property which is unreasonable or excessive in light of the franchisor's interest in such real [*11] or personal property, and the purpose to which the real or personal property is being used. The refusal of the franchisor to renew a lease for real or personal property except upon the payment of a rent or other charge which is unreasonable or excessive in light of the use to which the property has been placed by the franchisor and/or the interest of the franchisor in the real or personal property shall be deemed to be an unjust termination of the franchise.

*Id.* Dunkin' asserts that summary judgment is appropriate with respect to on this count on any of several grounds.

The first ground put forth by Dunkin' is that charging unreasonable and excessive rent alone is not a violation of the Franchise Security Law. Specifically, Dunkin' argues that the remedies" section of the statute does not provide a cause of action based on the charging of unreasonable or excessive rent:

[HN3]
(a) If a franchisor (1) unjustly terminates a franchise, or (2) unjustly fails or refuses to renew a franchise, or (3) threatens, or attempts, or gives notice that it intends to attempt unjustly to terminate a franchise, or (4) threatens, or attempts, or gives notice that it intends to attempt unjustly [*12] to refuse to renew a franchise, then the franchised distributor whose franchise is threatened shall be entitled to recover damages from the franchisor. . . .

(b) [. . .] if a franchisor unjustly refuses to deal with a franchised distributor with whom the franchisor has been dealing for at least 2 years, the franchised distributor shall be entitle to recover damages from the franchisor pursuant to subsection (a) of this section plus all other damages . . . allowed under the law of this State. . . .

*6 Del. C § 2553.* Dunkin' argues that a claim for the payment of unreasonable or excessive rent only accrues when it is charged in conjunction with a refusal or threatened refusal to renew. Plaintiffs argue that Dunkin's reading "totally emasculates" the statute and that it is absurd to suggest that charging excessive rent is illegal if demanded upon renewal of a lease but legal if demanded in the initial term. In other words, the dispute between the parties centers on whether the first sentence of subsection (j) confers an independent cause of action, since plaintiffs in Count I only allege the charging of an excessive and unreasonable rent.

The Court concludes that [HN4] the [*13] statute is meant to confer protection against the charging of an unreasonable or excessive rent only in the context of an already-existing franchise agreement or an accompanying sublease. That is, contrary to plaintiffs' assertions, it is not at all absurd to suggest that charging excessive rent is illegal if demanded upon renewal of a lease but legal if

1997 Del. Super. LEXIS 30, *

demanded in the initial term. The preamble to the Franchise Security Act indicates otherwise.

### AN ACT . . . TO PROTECT FRANCHISED DISTRIBUTORS FROM UNJUST TERMINATION OF, OR FAILURE OR REFUSAL TO RENEW THEIR FRANCHISES.

*WHEREAS*, the relationship between franchised distributors and their suppliers and licensors is marked by economic dependence of the franchised distributor; and

WHEREAS, the suppliers and licensors of franchised distributors have terminated franchises on short notice without just cause, and have threatened and continued to threaten such termination; and

WHEREAS, such unjustified terminations unfairly deprive franchised distributors of their equity and the fruits of their labor after they have created a favorable market for the products, trademarks, and trade names of their suppliers and licensors; and [*14]

WHEREAS, such terminations eliminate jobs, eliminate the productivity of going concerns and otherwise adversely affect the economic stability of this state; and

WHEREAS, such terminations interrupt the free and continuous flow of communication and information to the people of this state when the franchised distributor is a wholesaler of publications, and thereby interfere with the ability of the people to keep informed on public issues; and

WHEREAS, these conditions are detrimental to the public interest and general welfare of this state; and

WHEREAS, these detrimental conditions cannot be remedied through bargaining because of the franchised distributors' lack of bargaining power.

*57 Del. Laws* ch. 693.

As the title and preamble make clear, [HN5] the protections of this statute are intended to protect franchised distributors only from "unjust termination of; or failure or refusal to renew their franchises." The General Assembly was concerned with the unjust, inequitable, and coercive practices of franchisors in the context of an already-existing franchise relationship, that is, at a time when the economic balance of power rests with the franchisor. *See Globe Liquor Co.* [*15] *v. Four Roses Distillers Co., Del. Supr., 281 A.2d 19, 23, cert. denied, 404 U.S. 873, 30 L. Ed. 2d 117, 92 S. Ct. 103 (1971)* (recognizing that the purpose of the Act was to protect a franchisee who is economically dependent upon the sale of the [franchisor's] products and who has used his efforts in promoting them"); *Paradee Oil Co. v. Phillips Petroleum Co., Del. Ch., 320 A.2d 769, 775 (1974), aff'd, Del. Supr., 343 A.2d 610 (1975)* (citing *Globe Liquor* and the preamble to the Act).

Once the franchise is in place, the franchisee presumably goes to great lengths and expends great amounts of time and money to ensure the success of his venture and to create a "favorable market" for the franchisor. It is in this sense that the franchisee builds up the equity" and "fruits of [his] labor" from the franchise relationship. Prior to entering into that relationship, there is no huge inequity in the balance of power. Any potential franchisee from whom an unreasonable and excessive rent is charged as a condition of entering into the franchise relationship is free to walk away from the bargaining table. In fact, the simple laws of economics would suggest that any franchisor who constantly charges unreasonable [*16] and excessive rents as a condition of granting the franchise will quickly discover that it has few takers. [HN6] Charging excessive and unreasonable rents, alone, may violate some other law, but it does not violate the Franchise Security Act.

This reasoning is supported by the language of all of § § 2552 and 2553. First, § 2552 is titled "Unjust termination of, or failure to renew, a franchise." Second, the entire tenor of § 2552 is to speak consistently of either the termination of or the failure to renew a franchise. To attribute to the first sentence of § 2552(j) the independent cause of action which plaintiffs propose would render that sentence out of place with the remainder of the section, especially since the lead-in "Notwithstanding" clause appears to refer to an existing agreement. Third, nowhere in § 2553, the "remedies" portion of the subchapter, is a remedy given for only the charging of unreasonable or excessive rent. See *6 Del. C. § 2553,* quoted *supra.* Rather, the damages recoverable pursuant to this chapter, described in part in subsection (c), employ phrases such as "used with respect to the

terminated or unrenewed franchise" and "loss of profits . . . by virtue [*17] of the terminated franchise." 6 Del. C. § 2553(c)(1), (3).

In the Court's opinion, [HN7] the language of §§ 2552 and 2553, read in conjunction with the title and preamble of 57 Del. Laws ch. 693 and relevant case law, does not grant a franchisee a cause of action for the charging of unreasonable or excessive rent absent threatened, attempted, or actual termination or nonrenewal of the franchise. Since Count I of the Second Amended Complaint does not plead or allege the charging of such rent under any of those circumstances, it fails to state a cause of action under the Franchise Security Law. Summary judgment as to Count I of the Second Amended Complaint is therefore GRANTED. n3

> n3 This ruling makes it unnecessary to consider Dunkin's argument that plaintiffs released any claims against Dunkin' by the signing of a general release in the sublease amendments executed in 1986 and 1987. See Ex. 1C at P 4, Ex. 1D at P 3, Dunkin' Mot. for Summ. J. (Docket No. 115). This applies to Count II as well, in light of the fact that Dunkin' makes this argument with respect to Count II.

[*18]

### COUNT II

In Count II of the Second Amended Complaint, plaintiffs allege that Dunkin' violated 6 Del. C. § 2552(j) by refusing to renew the sublease in 1986 and 1987 except upon payment of unreasonable and excessive rent, which constitutes an unjust termination entitling plaintiffs to damages under 6 Del. C. § 2553. Such a claim clearly states a cause of action under the statute.

Dunkin's first defense on this count is that the claim is time-barred by [HN8] 10 Del. C. § 8106, the general three-year statute of limitations. As Dunkin' argues, the 1986 and 1987 sublease agreements were formed more than three years prior to the institution of this action and, therefore, claims relating to them are time-barred. In response, plaintiffs argue several grounds for the inapplicability of 10 Del C. § 8106. First, they argue that it is "undisputed" that the agreements in question are contracts under seal. This issue was addressed by Judge Silverman in his thoroughly-researched and well written opinion on Dunkin's earlier Motion for Summary Judgment See Kirkwood Kin Corp. v. Dunkin' Donuts, Inc., Del. Super., 1995 Del. Super. LEXIS 297, *14-20, C.A. No. 94C-03-189, Silverman, J. (June 30, 1995) [*19] (Docket No. 63). In that opinion, Judge Silverman

concluded the following:

> [HN9]
> Except where mortgages are concerned, the simple use of formalities and boilerplate unaccompanied by substantive evidence of the parties' intent to seal it is not enough to turn an ordinary contract into a specialty. American Tel. & Tel. [Co. v. Harris Corp., Del. Super., 1993 Del. Super. LEXIS 307, *19-20, C.A. No. 92C-01-27, Jacobs, V.C. (Sept. 9, 1993)] n.6; but see Peninsula Methodist Homes and Hosp., Inc. v. Architect's Studio, Inc., Del. Super., 1985 Del. Super. LEXIS 1461, *3-4, C.A. No. 83C-AU-118, Gebelein, J. (Aug. 28, 1985) (contract bearing testimonium clause and printed "seal" near signatures is under seal even without language in the body or extrinsic evidence of parties' intent). . . . The Court will allow discovery to develop extrinsic evidence of the parties' intent with respect to sealing the documents. . . . Plaintiffs must remember that evidence of any intent on Plaintiffs' part to seal the agreements is insufficient unless they communicated their desire to Dunkin'. American Tel. & Tel., Mem. Op. at 12-13.

Id. at 17-18 (emphasis added). Judge Silverman's statement is the law of the case. [*20]

In a deposition taken July 18, 1996, O'Connor testified that he never discussed sealing the agreements with Dunkin', that he just assumed that the language in the agreements would have the effect of sealing those agreements. See Ex. A at 126-27, Dunkin' Mot. for Partial Summ. J. (Docket No. 97); Ex. C at 126-27, Pl. Resp. to Dunkin' Mot. (Docket No. 120). This apparent lack of communication would appear to foreclose the possibility of the necessary communication of the intent to seal, and with it plaintiffs' argument that the contracts are under seal. Nevertheless, plaintiffs argue that the mere fact that the agreements themselves contain the required seal language and the fact that each party forwarded the agreements to each other satisfies the requirement that they communicate their desire to seal the agreements. See Pl. Resp. to Dunkin' Mot. at 3-4 (Docket No. 120). Stripped to its particulars, plaintiffs' argument is that the seal language in the lease agreements demonstrates the parties' intent to make valid the seal language in the lease agreements. Yet Judge Silverman

1997 Del. Super. LEXIS 30, *

had those documents before him and rejected them as being insufficient. He specifically granted plaintiffs [*21] additional discovery to develop extrinsic evidence of intent. The lease agreements clearly are not *extrinsic* evidence, and plaintiffs have therefore failed to present the evidence which this Court stated was necessary in order to demonstrate the parties' intent to seal the agreements. In view of plaintiffs' complete failure to offer the necessary extrinsic evidence after having been told what was needed, the Court adheres to Judge Silverman's ruling and holds that the lease agreements are not under seal and are therefore not for that reason exempt from *10 Del C. § 8106.*

Plaintiffs' second argument for the inapplicability of the statute of limitations is that Dunkin's charging of an allegedly unreasonable and excessive rent were monthly, "continuing" abuses that toll the statute of limitations. As with the contracts under seal claim, Judge Silverman ably addressed this issue in his opinion on Dunkin's first motion:

> Plaintiffs in the instant case provide no evidence of the chronology underlying their claims. They simply serialize Dunkin' alleged wrongs--calling Dunkin's charging of allegedly excessive rent, and operation of the Pike Creek and O'Hanlon franchises, "monthly" [*22] and "daily" abuses, respectively--demand application of the continuing wrong doctrine. This begs the question, as [HN10] continuing wrong" status turns on the substantive nature of the contract and the alleged wrongs. . . . The Court will allow the parties to provide additional facts directed towards resolving whether Plaintiffs' claims challenge the initial formation of the franchise and lease agreements, or subsequent events (or both). If it turns out that Plaintiffs' claims involve nothing more than complaints regarding the formation of the contracts, they will be considered time-barred, pursuant to *Kahn [v. Seaboard Corp., Del. Ch. 625 A.2d 269 (1993)* n4]. . . .

Mem. op. at 21-22 (Docket No. 63). However, neither party has provided any additional evidence with respect to this count regarding the nature of the 1986 and 1987 lease agreements.

n4 In *Kahn*, the plaintiffs alleged that defendants forced one of the parties into an agreement, and then interfered with the structuring of that agreement such that it was not negotiated at arm's length. In response to a motion to dismiss the claim as being beyond the statute of limitations, plaintiffs argued that the wrongs were not time-barred because they were continuing. The Court rejected this argument and distinguished those wrongs that occur at the contract-formation stage from those that occur later in the contractual relationship, and held that as to the former, the injured party has three years from the date of formation within which to bring the claim.

[*23]

Plaintiffs nonetheless argue (1) that the monthly charging of unreasonable or excessive rent constitutes a continuing wrong sufficient to toll the statute of limitations applicable to its Franchise Security Law claim in Count II, and (2) that the claims involve "the very essence of contracts." Given Judge Silverman's ruling, plaintiffs' argument must be rejected, and the Court does so here. As the Court noted with respect to Count I, charging an unreasonable or excessive rent, without more, is not a violation of the Franchise Security Law and therefore cannot be the substantive basis of these contracts. [HN11] It is, instead, the refusal to renew the franchise, except upon payment of such rent, that is the wrongful act at issue in Count II. That wrongful act occurs at the time of the alleged refusal to renew, since plaintiffs' real complaint concerns what Dunkin' allegedly did, that is, demanded, at the time of renewal. *Accord Simmons v. Mobil Oil Corp., 9th Cir., 29 F.3d 505, 511 (1994)* (holding "it is the nonrenewal of [the franchise agreement] that [plaintiff] complains of, because his claim arises from what he alleges Mobil did at the time of renewal," and rejecting as time-barred [*24] the franchisee's excessive rent claim). Consequently, under the Court of Chancery's decision in *Kahn*, and consistent with the law of this case, the Court rules that the wrongs alleged here occurred at the contract formation stage. As a result, plaintiffs have failed to bring their claim within the three-year statute of limitations period of *10 Del C. § 8106*. Count II is consequently time-barred. Summary judgment is GRANTED as to Count II of the Second Amended Complaint. n5

n5 Since Dunkin' has at least tacitly accepted plaintiffs' continuing wrong theory as *conceptually* valid, the Court has proceeded to

treat it as such. There is something odd, however, with the notion that a breach of contract can constitute a continuing wrong. The theory itself is more a creature of tort law. *See* Mem. op. at 19 (Docket No. 63). It would seem to the Court that contracts are rarely, if ever, really susceptible to the continuing wrong theory. With respect to contracts, the cause of action, that is, the wrong, generally accrues at the time of the breach, not when the damage is sustained. *51 AM. JUR. 2D Limitations of Actions § 126.* Contrary to plaintiffs' assertions, here the *wrong* is the alleged refusal to renew the franchise; the *damage* is the allegedly unreasonable or excessive amount. The repeated payments of allegedly unreasonable or excessive rent are not so much continuing wrongs as they are continuing damages.

[*25]

*COUNTS III, IV, V, VII, & VIII*

Counts III, IV, V, VII, and VIII of the Second Amended Complaint allege that Dunkin' engaged in attempted and actual unjust terminations of the franchise in violation of the Franchise Security Law. Plaintiffs allege attempted unjust terminations by (1) granting nearby franchises when Dunkin' knew or should have known that granting these franchises would harm plaintiffs' business (Count III); (2) granting special incentives and exception to the O'Hanlon shop which Dunkin' knew or should have known would harm plaintiffs' business (Count V); and (3) granting nearby franchises and charging unreasonable and excessive rents, which caused a decline in business, which in turn caused plaintiffs' nonpayment, which in turn caused Dunkin's attempted termination (Count VII). Plaintiffs allege actual unjust termination by (1) granting nearby franchises and charging unreasonable and excessive rent, which caused a decline in business, which in turn caused nonpayment, which in turn caused Dunkin's unjust termination (Count IV); and (2) the same as (1), except that the downtown satellite site is included (Count VIII).

The gist of these counts concerns not so much [*26] Dunkin's actual "termination" of the franchise, but rather its actions before then. In other words, Dunkin' never actually tried to "terminate" the franchise by word, that is "officially" until August 1993, but the effect of its prior deeds was to terminate plaintiffs' franchise. This may best be described as a "constructive" or "de facto" termination.

This Court, in its earlier opinion on Dunkin's prior motion, assumed without deciding that an unjust termination could be effected constructively, finding that there was insufficient evidence in the record to decide at that time. Upon further review, the Court concludes that [HN12] the Franchise Security Law does permit a cause of action for constructive or *de facto* termination. Admittedly, *6 Del. C. §§ 2552* and *2553* appear to concern, as Dunkin' argues, only actual, attempted, or threatened termination or non-renewal of the franchise relationship. This might suggest that only an affirmative termination, such as the August 24, 1993 letter from Dunkin', qualifies, since nowhere in the Franchise Security Law is a cause of action expressly given for a constructive termination or an attempted constructive termination.

Such a position, [*27] however, exalts form over substance and in many respects does violence to the intent of the General Assembly in enacting the Franchise Security Law. The Franchise Security Law's purpose, generally speaking, is to remedy the imbalance of power in the franchise relationship by adding a few statutory pounds to the franchisee's side of the scales. To hold that only a formal termination affords a franchisee the protections of the Franchise Security Law would very well render those protections illusory. It "otherwise would allow franchisors to accomplish indirectly that which they are prohibited from doing directly." *Petereit v. S.B. Thomas, Inc., 2d Cir., 63 F.3d 1169, 1182 (1995), cert. denied, 517 U.S. 1119, 116 S. Ct. 1351, 134 L. Ed. 2d 520 (1986)* (construing Connecticut's franchise law). Actions sanctified by such a holding would "epitomize the very abuse of power which the statute seeks to prevent." *Id.*

In the Court's opinion, [HN13] the question that the Franchise Security Law really asks is whether the actions alleged are so egregious as to amount to a repudiation of the contract. This will permit a factual review of each claim on its merits, with particular attention paid both to the motivations [*28] and the actions of the franchisor. It seems to the Court that if, in fact, Dunkin' did undertake to destroy plaintiffs' franchise, causing plaintiffs to lose so much money that they were forced to default and give Dunkin' a pretext for terminating the franchise, the Franchise Security Law not only gives, but *demands* that plaintiffs be afforded a remedy.

The Court reaches this conclusion notwithstanding the holding of the Court of Chancery in *Dave Greytak Enterprises v. Mazda Motors of American, Inc., Del. Ch., 622 A.2d 14, aff'd without op., Del. Supr., 609 A.2d 668 (1992).* Since the Court of Chancery's decision concerned Delaware's Motor Vehicle Franchise Protection Act, *6 Del C.* ch. 49, its application to the Franchise Security Law is questionable. In that decision, the Court of Chancery declined to recognize a cause of action for

"effective termination" with respect to Delaware's Motor Vehicle Franchise Protection Act, 6 *Del C.* ch. 49. The Court of Chancery held that the express terms of *6 Del C. § 4906* n6 concerned only actual or express terminations or cancellations, and that the plaintiff's claim for "effective termination" was nowhere used in the statute [*29] and thus failed to state a cause of action under the section. n7 It also held that the motor vehicle franchise in question here was not a franchise within the meaning of the Franchise Security Law. This Court is not certain the extent to which the Court of Chancery sought to foreclose the possibility that an automobile manufacturer/franchisor could ever effect a constructive termination of a motor vehicle franchise, but suspects, given the short nature of the Court of Chancery's treatment of this issue and the factual context of that case, that such uniform, absolute foreclosure may not have been intended. n8

> n6 In pertinent part, *6 Del C. § 4906* states the following: (a) Notwithstanding the terms, provisions or conditions of any franchise or notwithstanding the terms or provisions of any waiver, no manufacturer shall cancel, terminate or fail to renew any franchise with a licensed new motor vehicle . . .

> n7 Of particular value to the Court in reaching its decision on that issue was the fact that the franchise agreement, like here, did not purport to give the franchisee any guaranteed territory.

[*30]

> n8 Based on the foregoing discussion, it is obvious that this Court disagrees with the general holdings of those cases cited by Dunkin' in which the courts declined to find a cause of action for constructive termination. *See Corp v. Atlantic-Richfield Co., Wash. Supr., 122 Wash. 2d 574, 860 P.2d 1015, 1020 (1993); Adolph Coors Co. v. Rodriguez, Tex. Ct. App., 780 S.W.2d 477, 480 (1989).* This disagreement is limited simply to the general issue of constructive termination. The Court, of course, takes no position regarding the interpretation of the franchise laws at issue there.

That being said, the Court has grave doubts concerning whether plaintiffs will in fact be able to recover. There are a fair number of anomalies in plaintiffs' position. For example, if Dunkin' were indeed

perpetrating a "scheme to obtain Plaintiffs' business" n9 by charging excessive rent and granting competing franchises, then why would Dunkin' grant plaintiffs the opportunity to open a satellite franchise in downtown Wilmington? Why would Dunkin' tell O'Connor to pay himself a more generous salary as a reward for his hard work [*31] if Dunkin' was trying to drive him out of business? If the impact of the other shops' openings was, as O'Connor testified, "dramatic and immediate," then why did plaintiffs not attempt to invoke the adverse impact procedures Dunkin' had in place? If plaintiffs are convinced that Dunkin' had a scheme to force them into default, then why did O'Connor answer "no" when asked if he had any evidence to suggest that Dunkin' was, in fact, attempting to perpetrate just such a scheme? n10 How could a *national* plan to convert all Mr. Donut franchises to Dunkin' franchises be undertaken with the purpose of destroying plaintiffs' franchise? Plaintiffs may have a tough row to hoe, but they will get their chance. Summary judgment with respect to each of the unjust attempted and actual termination claims in Counts III, IV, V, VII, and VIII of the Second Amended Complaint is hereby DENIED.

> n9 Plaintiff Opp. to Mot. for Summ. J. at 1 (Docket No. 120).

> n10 Consider the following colloquy:

>> Q: Do you have any fact[s] to substantiate that Dunkin' had some intention to harm your business?

>> A: No facts that I am aware of.

> O'Connor Dep. at 338, Ex. 1G, Dunkin' Mot. for Summ. J. (Docket No. 115).

[*32]

COUNT VI

Plaintiffs allege in Count VI of the Second Amended Complaint that Dunkin' engaged in an "unjust refusal to deal" with them in violation of *6 Del. C. § 2552(i)* of the Franchise Security Law. Specifically, plaintiffs allege that O'Connor requested a meeting with Dunkin' to discuss and resolve the rent and competing shop problems plaintiffs were experiencing, but Dunkin' allegedly refused to meet with plaintiffs and instead terminated the franchise agreements, brought the termination actions, and refused to allow plaintiffs to sell all or part of the business.

[HN14] Section 2552(i) states that "no franchisor may unjustly refuse to deal with a franchised distributor with whom the franchisor has been dealing for at least 2 years." The Court of Chancery has interpreted [HN15] this subsection to "cover a situation where the franchisor has not taken specific action to terminate the franchise but is attempting to purge itself of the relationship simply by refusing to deal with the franchise distributor any longer." *Del-Way Petroleum Co. v. Phillips Petroleum Co., Del. Ch., 1977 Del. Ch. LEXIS 187, *11, C.A. No. 4802, Brown, V.C., 3 Del. J. Corp. L. 565, 1977 WL 2568 at *4 (Mar. 10, 1977).* This reasoning comports [*33] with the title to § 2552: "Unjust termination of, or failure to renew, a franchise." It also makes sense as a practical matter, since it would seem pointless to require a franchisor to continue to deal with a franchisee against whom it has already chosen to pursue the ultimate remedy of terminating the franchise.

A review of this case indicates that Dunkin' did not, in fact, refuse to deal with plaintiffs within the meaning of the Franchise Security Law. O'Connor himself testifies by affidavit that he did not contact Tom McHugh, his representative at Dunkin', to discuss and resolve the rent and competing shop issues until *after* he had received Dunkin's termination notices in August 1993. *See* O'Connor Aff. at 13 (Docket No. 123). Since this section is meant to cover situations where Dunkin' has *not* taken specific action to terminate a franchise, the fact that the actions alleged here all occurred *after* that specific action was taken renders them insufficient to support a cause of action for violation of *6 Del. C. § 2552(i).* In light of plaintiffs' failure to offer any other evidence indicating that Dunkin' unjustly refused to deal with plaintiffs prior to its [*34] taking specific action to terminate the franchises, they have failed to state a claim under § 2552(i). Summary judgment as to Count VI of the Second Amended Complaint is GRANTED.

### COUNT IX

In Count IX of the Second Amended Complaint, plaintiffs allege that Dunkin' failed to offer plaintiffs the opportunity to mediate their dispute prior to resorting to the courts, as they were contractually obligated to do under a Mediation Agreement between Dunkin' and the Center for Public Resources, Inc. ("CPR"), to which plaintiffs are third-party beneficiaries. Pursuant to the Mediation Agreement, Dunkin' voluntarily agreed to a mediation process designed to help franchisors and franchisees resolve disputes without resorting to litigation. According to plaintiffs, Dunkin' did not inform plaintiffs of the existence of this agreement, nor did Dunkin' ever offer plaintiffs the opportunity to mediate their dispute even after O'Connor first made contact with

Tom McHugh in August 1993. As a result, plaintiffs allege that they suffered damages, including attorney's fees, costs, and expenses incurred in defending this litigation.

The Court dealt with this claim in its June 30, 1995 opinion. In [*35] that opinion, the Court noted that Dunkin' own evidence indicated that Dunkin' did not notify plaintiffs of the possibility of mediation through the CPR program until the time when this litigation was filed. The Court assumed without deciding that Dunkin' did not notify plaintiffs of the opportunity to mediate in a timely fashion, but ruled nevertheless that summary judgment was appropriate with respect to that claim:

> [HN16]
> This count} essentially is a damage claim for Plaintiffs' having lost an opportunity to mediate certain complaints before they filed suit. Only through speculation could damages be awarded on that basis. Specifically, for Plaintiffs to recover, the fact-finder would have to conclude that Plaintiffs would have succeeded in mediation, Dunkin' would have accepted the result and would not have exercised its appeal rights, or [if it did] that such an appeal would have failed, since the mediation process contemplated by the CPR program is non-binding. . . Damage claims cannot rest on such a tenuous foundation. *See, e.g, American Gen. Corp. v. Continental Airlines Corp., Del. Ch., 622 A.2d 1, 7 (1992), aff'd, [Del. Supr.,] 620 A.2d 856 (1992).* Moreover, [*36] while the Court will not weigh the evidence now, Dunkin's contention that the parties eventually tried mediation without success lends support to the notion that Plaintiffs cannot establish a claim in [this count].

Mem. op. at 10-11 (Docket No. 63). In light of the fact that no additional evidence has been presented with respect to this claim, the Court has no reason to depart from its prior holding. For the same reasons expressed in that opinion, summary judgment is GRANTED with respect to Count IX of the Second Amended Complaint.

### COUNT X

Count X of the Second Amended Complaint alleges a claim of fraudulent misrepresentation against Dunkin'. Plaintiffs claim that Dunkin' fraudulently misrepresented

1997 Del. Super. LEXIS 30, *

to them that it would help them "promote and further the business and profitability of Kirkwood" and also "not take any action detrimental to Kirkwood's business interests." At deposition, O'Connor was asked to describe these alleged representations with more specificity and replied with the following.

> I remember sitting down in my living room with Allen Lauer, who the title then was district sales manager. . . . I was very apprehensive over the extent to which I [*37] could remodel, the impact of this percentage rent. . . . He took my sales up to that point and with a modest percent increase each year, which I had been more than doing to that point, he extrapolated on up past $ 2,000 [A.D. 2000] and said, I can remember the quotes, Look at where you will be so many years down the road. And the other comment I can remember hearing was you were the only one on Kirkwood Highway. Really trying to reassure me that I could handle both of these.

O'Connor Dep. of July 18, 1996 at 29, Ex. 1F, Dunkin' Mot. for Summ. J. (Docket No. 115).

> But they had advice for you. They can give you help while you are working for them. So I felt secure in that. That was the first of what I would consider representations. And the second one was when Allen Lauer gave me his projection and I can still hear the words, it will be on my gravestone: You will be the only one on Kirkwood Highway.

O'Connor Dep. of July 18, 1996 at 461, Ex. 1G, Dunkin' Mot. for Summ. J. (Docket No. 115).

In response to a question asking for every representation, especially by a Dunkin' employee, that plaintiffs' business would grow and continue to be profitable, O'Connor stated [*38] the following:

> I can't give times, dates, and places. But there were times when every district sales manager I had was optimistic about with hard work and honesty that you can make a business really grow into

something and make it a family business. . . . Rich Markell, totally forgot that he was one of the early characters back in '84. Might have been my first district sales manager. . . . Then there was John Campbell before it from Concord Pike, Allen Lauer, Tom McHugh, Bob Nelson. I could be leaving somebody else out I mean, there were times when they all talked about being a Dunkin' Donut franchisee. I mean you go to ad committees meetings. This is what you can do. This what you can do to be profitable and all of that. We are here to help you. Other than that, I can't give specifics on it.

O'Connor Dep. of July 18, 1996 at 463-64, Ex. 1G, Dunkin' Mot. for Summ. J. (Docket No. 115). Plaintiffs claim that it was the representations and assurances made by Dunkin's employees that caused them to execute the lease and franchise agreements. Additionally, plaintiffs allege that these statements were false because Dunkin' charged plaintiffs unreasonable and excessive rent, licensed [*39] two competing Dunkin' franchises, failed to consult with plaintiffs about the impact of these new franchises, failed to offer those franchises to plaintiffs, granted special concessions to O'Hanlon, and terminated plaintiffs' franchise in bad faith and without good cause.

One of Dunkin's arguments in favor of summary judgment on this claim is that the integration clauses of the franchise agreements bar the use of parol evidence regarding representations or assurances relating to the contract matter. While this general statement of the law is correct, it omits [HN17] a well-recognized exception to the parol evidence rule. When a party alleges fraud or misrepresentation, evidence of oral promises or representations made prior to the written agreement will be admitted. *Anglin v. Bergold, Del. Supr., 565 A.2d 279 (1989)* (ORDER) at 4-5 (citing *Scott-Douglas Corp. v. Greyhound Corp., 304 A.2d 309 at 317)*. Since at least some of the statements appear to have been made prior to the execution of the franchise and lease agreements, the Court will not grant summary judgment solely on the basis of the parol evidence rule and the integration clauses.

Nevertheless, the Court finds that plaintiffs fail to state a claim [*40] for fraudulent misrepresentation. The Delaware Supreme Court has repeatedly laid out [HN18] the elements of this common law cause of action:

(1) a false representation, usually one of fact, made by the defendant;

(2) the defendant's knowledge or belief that the representation was false, or made with reckless indifference as to the truth;

(3) an intent to induce the plaintiff to act or refrain from acting;

(4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

(5) damage to the plaintiff as a result of such reliance.

*Gaffin v. Teledyne, Inc., Del. Supr., 611 A.2d 467, 472 (1992).* n11 The Court has also held that [HN19] mere expressions of opinion as to probable future events cannot be deemed fraud or misrepresentation. *Consolidated Fisheries Co. v. Consolidated Solubles Co., Del. Supr., 35 Del. Ch. 125, 112 A.2d 30, 37 (1955).* Furthermore, "any complaint alleging fraud must as a consequence include the circumstances involved, i.e., the time, place, and contents of any misrepresentation made, the identity of the person making the same and the benefit sought to be obtained." *Stuchen v. Duty Free Int'l, Inc., Del. Super., C.A.* [*41] *No. 94 C-12-194, Toliver, J., 1996 Del. Super. LEXIS 187* (Apr. 22, 1996), mem. op. at 12 (citing *Nutt v. A.C. & S., Inc., Del. Super., 466 A.2d 18, 23 (1983), aff'd, Mergenthaler v. Asbestos Corp. of America, Del. Supr., 480 A.2d 647 (1984)).* This is an extension of the requirement of Superior Court Civil Rule 9(b) that "in all averments of fraud, negligence, or mistake, the circumstances constituting fraud, negligence, or mistake shall be stated with particularity."

n11 Note that the common law provides a remedy only for intentional misrepresentations. That is its great distinction from equitable fraud, which allows the Court of Chancery to provide a remedy for negligent or innocent misrepresentations. *Stephenson v. Capano Dev., Inc., Del. Supr., 462 A.2d 1069, 1074 (1983).* The Consumer Fraud Act provides similarly sweeping coverage for misrepresentations. *See 6 Del. C. §* 2513.

Count X on its face fails to satisfy the requirements

of Rule 9(b) and the Court's opinion in *Stutchen.* Plaintiffs [*42] did not allege the time or place of the misrepresentation *or* the identity of the person making it. Dunkin' did not move to strike the claim, and plaintiffs have since supplemented the claim with selections from O'Connor's deposition testimony. However, even this testimony fails to state a claim. With regard to Mr. Lauer's alleged statements, the Court does not understand exactly how Mr. Lauer could have known in 1987 that Dunkin' would purchase the Mister Donut corporation in 1990 and convert the O'Hanlon shop to a Dunkin' shop in 1993. Such knowledge is necessary in order to render knowingly false, *when made,* his alleged statement to O'Connor that plaintiffs would be the only ones on Kirkwood Highway. Additionally, the Court does not see how Lauer's calculation of the percentage rent payments, using the formulas agreed to and clearly stated in the contracts, could have been false. Finally, Lauer's projections as to the growth of plaintiffs' business clearly were nothing more than expressions of opinion as to future events based upon the extrapolation of past data.

The statements alleged to other persons are similarly non-actionable. First, O'Connor himself admits that he [*43] does not have the time, dates, or places of these alleged misrepresentations. All three are required in order to state a cause of action for fraud. While plaintiffs finally do put some names to the persons making representations, the representations O'Connor has testified to them making are nothing more than puffery, a verbal pat on the back from the franchisor meant to encourage the franchisee. *Accord W & G Milford Assocs. v. Jeffcor Inc., Del. Super., C.A. No. 89 C-JN-161, Herlihy, J., 1991 Del. Super. LEXIS 229, *6* (Apr. 12, 1991) (regarding statements made to a shopping center tenant). At best, they could perhaps be stated as opinion, which, as the Court has pointed out, is similarly non-actionable.

In conclusion, Count X fails to state a cause of action for fraudulent misrepresentation as a matter of law. Summary judgment is GRANTED as to Count X of the Second Amended Complaint.

*COUNTS XI & XII*

Counts XI and XII of the Second Amended Complaint purport to state claims for tortious interference with existing business relationships and prospective business advantage. They do not, however, identity [HN20] a specific contract or potential business opportunity allegedly [*44] compromised by Dunkin'. As the Court *explicitly* told plaintiffs in its earlier opinion, these specifics are a prerequisite to proceeding under these tort theories. *See* June 30, 1995 Mem. op. at 24-25 (Docket No. 63). The Court also told plaintiffs in

no uncertain terms that they would have to "cite to actual or potential contracts, other than between themselves, possibly affected by Dunkin's behavior." *Id. at 1995 Del. Super. LEXIS 297, *29-30.* The Court then allowed plaintiffs to amend their complaint so as to provide these specifics. *Id.*

Unfortunately, plaintiffs do not appear to have understood what the Court meant by use of the phrase "specific contract or potential business opportunity." All that plaintiffs' new but certainly not-improved tortious interference counts do is give a slightly less vague but equally uninformative general description of plaintiffs' operation of the shop. As this Court told plaintiffs, more is required under Delaware law. In another case, the Court of Chancery cogently explained it in the following manner:

> [HN21]
> Interference with an existing contract requires (a) an intent to induce a breach (b) of an existing contract, (c) proximate causation, and (d) damages [*45] . . . . [A] showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with opportunity, (c) proximate causation, and (d) damages. . . .

*DeBonaventura v. Nationwide Mut. Ins. Co., Del. Ch., 419 A.2d 942, 947 (1980), aff'd, Del. Supr., 428 A.2d 1151 (1981).*

Here, plaintiffs have failed to demonstrate to the Court the existence of one single contract or prospective business opportunity. Citations to sales records of plaintiffs' and O'Hanlon's shops are useless because, while they might show damages, they do not show the existence of the contract or prospective business opportunity. This Court told plaintiffs that they needed to provide specific examples, yet plaintiffs failed to do so. As such, plaintiffs have failed (twice) to state a cause of action for either tortious interference with existing contracts or with prospective business opportunities. Summary judgment as to Counts XI and XII of the Second Amended Complaint is GRANTED.

### COUNT XIII

Count XIII of the Second Amended Complaint alleges a veritable multitude of violations of an [*46] implied covenant of good faith and fair dealing. Plaintiffs

assert that Dunkin' violated this covenant by (1) charging unreasonably and excessive rent for the Kirkwood Highway shop, (2) awarding competitive franchises in close proximity to the Kirkwood Highway shop, (3) failing to consult with plaintiffs about the impact of those franchise prior to granting them, (4) failing to offer those franchise to plaintiffs, (5) failing to investigate whether the new franchises would have an adverse impact on plaintiffs, (6) granting special privileges and concessions to the O'Hanlon franchise, which conferred a competitive advantage on O'Hanlon to plaintiffs' detriment, (7) refusing to meet with plaintiffs to discuss and resolve plaintiffs' perceived problems, (8) terminating plaintiffs' franchise, and (9) bringing these termination actions in the courts.

[HN22] An implied covenant of good faith and fair dealing generally exists in every contract. *Katz v. Oak Indus., Inc., Del. Ch., 508 A.2d 873, 880 (1986).* As the Court of Chancery has held, "this obligation requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the [*47] other party to the contract from receiving the fruits of the contract." *Wilgus v. Salt Pond Inves. Co., Del. Ch., 498 A.2d 151, 159 (1985).* It is simply a reflection of the fact that in many respects the purpose of contract law is to attempt to give effect to the reasonable expectations of the parties. *See RESTATEMENT(SECOND) CONTRACTS § 205.* One common way of analyzing this covenant is to ask what the parties likely would have done if they had considered the issues involved." *E.I. DuPont de Nemours & Co. v. Pressman, Del. Supr., 679 A.2d 436, 443 (1996).* See also *Katz, 508 A.2d at 880* (asking "is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter?"). However, it is also true that "where the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty does not come into play." *Dave Greytak Enters., 622 A.2d at 23.*

After some reflection upon the issue and consideration of the actions which plaintiffs allege constitute [*48] violations of the covenant, the Court concludes that with respect to at least some of the alleged actions, the implied covenant of good faith and fair dealing does not provide a remedy independent of the Franchise Security Law. In the Court's opinion, [HN23] this *common law implied* covenant of "good faith" and "fair dealing" does not state an independent cause of action with respect to the actual, threatened, or attempted failure to renew or termination of a franchise relationship

1997 Del. Super. LEXIS 30, *

because the General Assembly *expressly* wrote that covenant into the Franchise Security Law.

[HN24] The Franchise Security Law expressly prohibits unjust terminations and failures to renew, whether actual, threatened, or attempted, as well as unjust refusals to deal. *See 6 Del. C. § § 2552(g)*, (h), (i). It defines "unjust" as being without "good cause" or in "bad faith." *See 6 Del. C. § § 2552(a)*, (b). An "unjust refusal to deal" by its very terms cannot be said to be either good faith or fair dealing. To the extent, therefore, that plaintiffs make any of these allegations as breaching an implied covenant of good faith and fair dealing, these allegations are part and parcel of the General Assembly's [*49] statutory enactment. This encompasses the second, sixth, seventh, eighth, and ninth grounds listed above. Each of these grounds is separately alleged in other counts of the Complaint dealing with the Franchise Security Law, n12 and any remedy which plaintiffs seek must be sought under that law.

> n12 The second ground appears to be covered by Count III; the sixth by Count V; the seventh by Count VI; the eighth by Counts IV and VIII; and the ninth by Count VII.

Some of the grounds alleged by plaintiffs, however, are not expressly covered by the Franchise Security Law. As such, application of the covenant as to those grounds is not precluded by the actions of the General Assembly. The Court will address each in turn.

*Ground 1. Charging Unreasonable and Excessive Rent.* Simply stated, [HN25] the Court cannot find that the mere charging of excessive and unreasonable rent violates the covenant. First, the Franchise Security Law covers all aspects of the charging of unreasonable and excessive rent once the franchise relationship [*50] exists. n13 In this respect, the Franchise Security Law covers and precludes this ground. Second, as the Court stated in its treatment of Count I, [HN26] there is no law or public policy that prevents a potential franchisor from charging whatever rent it wishes to charge, *ab initio*, that is, as a precursor to entering into the franchise relationship. And the covenant certainly cannot be said to apply here, since no contract yet exists between the two parties. The Court is of the opinion that, as a matter of law, the first alleged ground cannot state a claim for a violation of the covenant.

> n13 See the discussion with respect to Count I, *supra*.

*Ground 3. Failure to Consult Prior to Granting the Competing Franchises.* As a matter of law, the Court is unable to conclude that the parties, had they discussed this issue prior to entering into the relationship, would have agreed that Dunkin' would have to consult with plaintiffs prior to granting competing franchises. *See Pressman, 679 A.2d at 443; Katz,* [*51] *508 A.2d at 880.* First, an opposite conclusion is evident from the arguments presented by Dunkin' in this case. Second, the Franchise Agreement specifically states areas in which Dunkin' agrees to maintain an advisory relationship with the franchisee. n14 Third, even if they had consulted, the parties would have had to agree on a definition of "competing franchise." This obviously entails some notion of territoriality, and it is by no means clear that the parties would have agreed as to a specific territorial radius within which a new franchise would be deemed "competing." n15 Fourth, there is little need to consult on the granting of a competing franchise if such consultation would be of little use. If the existing franchisee has no say or "veto power" over the proposed franchise, what good would prior consultation do, other than perhaps assuage any fears the existing franchisee might have? The Court is unable to conclude that this parental "hand holding" is a requirement of the covenant. For all four reasons the Court concludes that this ground cannot state a claim for a violation of the covenant.

> n14 "[Dunkin' Donuts agrees] To maintain a continuing advisory relationship with the FRANCHISEE, including consultation in the areas of marketing, merchandising, and general business operations. . . ." Franchise Agreement at P 3A, Ex. A, Dunkin' Mot. for Summ. J. (Docket No. 115).

[*52]

> n15 Perhaps tellingly, the franchise agreement between Dunkin' and plaintiffs makes no mention of any exclusive territory for the franchisee.

*Ground 4. Failure to Offer Competing Franchises to Plaintiffs.* The Court is similarly unable to conclude, as a matter of law, that the parties, had they discussed the issue, would have agreed that Dunkin' should give plaintiffs what is effectively a right of first refusal on all competing franchises. First, the parties would have had to agree on the definition of a "competing franchise,"

which, as the Court stated above, involves other issues upon which the parties would have had to agree. Second, it would have been impossible for Dunkin' to offer the franchises to plaintiffs. The O'Hanlon shop was already owned by Sean O'Hanlon and was not a "new franchise" as the term is generally used, since it became a Dunkin' franchise through the Mr. Donut conversion program. The Pike Creek shop was similarly unavailable to plaintiffs, since the eventual franchisee already had the lease for that site before approaching Dunkin' about opening a franchise. These [*53] facts fail to state a claim under the covenant.

*Ground 5. Failure to Investigate Impact.* As a matter of law, this ground fails to constitute a violation of the covenant The Franchise Agreement contains the procedures by which Dunkin' conducts an adverse impact analysis. n16 Dunkin's adverse impact analysis cannot begin until the existing franchisee makes a call to his business consultant concerning the decline in sales. Since the issue is expressly covered by the contract, the implied duty does not come into play. *See Dave Greytak Enters.*, *622 A.2d at 23.* However, even assuming, *arguendo,* that this implied duty did come into play if Dunkin' failed to implement those procedures, the result here is not changed. Plaintiffs claim that O'Connor attempted to invoke the procedures by calling Tom McHugh in August 1993 and that Dunkin' thereafter refused to invoke the designated procedures. It is undisputed, however, that O'Connor did not make that "attempt" until after Dunkin' sent the first notice of termination to plaintiffs. Apparently plaintiffs believe that Dunkin' has a contractual duty to make an adverse impact analysis even after plaintiffs have failed to pay rent due [*54] (for whatever reason) and Dunkin' has begun termination proceedings. Suffice it to say that the Court does not share that belief.

---

n16 The Franchise Agreements themselves are silent on the issue, but the agreements clearly refer to manuals which Dunkin' is to provide the franchisee. One such manual, the Dunkin' Donuts Site Development Guidelines Summary, describes all of the procedures for investigating adverse impact claims.

---

Since the Franchise Agreement contained procedures for investigating possible adverse impact, there is no implied covenant imposing such a duty. Moreover, since plaintiffs themselves admit that they did not attempt to invoke those procedures until after termination proceedings began, Dunkin' cannot be held responsible for any failure to investigate.

*Summary.* By way of summation on this count, a review of all nine grounds alleged by plaintiffs as constituting a violation of an implied covenant of good faith and fair dealing leads the Court to the conclusion that plaintiffs have failed [*55] to state a claim for application of the covenant. Summary judgment on Count XIII of the Second Amended Complaint is GRANTED.

### COUNT XIV

In Count XIV of the Second Amended Complaint, plaintiffs allege that Dunkin's obtaining and retaining unreasonable and excessive rental fees constitutes an unjust enrichment for which plaintiffs should be compensated. However, [HN27] unjust enrichment is a quasi-contract theory of recovery meant to remedy the absence of a formal contract. *ID Biomedical Corp. v. TM Technologies, Inc., Del. Ch., C.A. No. 13269, Steele, V.C., 1995 Del. Ch. LEXIS 34, *39* (Mar. 16, 1995) (citing *Freedman v. Beneficial Corp., D. Del., 406 F. Supp. 917, 923 (1975)).* If a contract "is the measure of [the] plaintiffs' right," the parties cannot recover under a theory of unjust enrichment. *See Wood v. Coastal States Gas Corp. Del. Supr., 401 A.2d 932, 942 (1979); Chrysler Corp. v. Airtemp Corp., Del. Super., 426 A.2d 845, 854 (1980); ID Biomedical Corp.,* mem. op. at 26-27. Here we have a formal contract between Dunkin' and plaintiffs which governs the relationship between them. As such, no claim for unjust enrichment can exist. Summary judgment [*56] is GRANTED as to Count XIV of the Second Amended Complaint.

### DUNKIN'S COUNTER CLAIM

As the Court indicated in its earlier opinion, Dunkin's counterclaim essentially repudiates plaintiffs' entire complaint. The crux of Dunkin's Motion for Summary Judgment on the counterclaim is that there is no genuine issue of material fact that plaintiffs stopped making payments for rent and fees under the Franchise Agreements and subleases in 1993. This failure to pay money owed placed them in default under the franchise agreements and their failure to cure the defaults provided grounds for termination.

As Dunkin' argues, plaintiffs' first "excuse" for nonpayment, that Dunkin' breached its obligations to plaintiffs, is not a defense to termination because [HN28] "a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor." *S&R Corp. v. Jiffy Lube, Int'l, Inc., 3d Cir., 968 F.2d 371, 375 (1992).* In other words, Dunkin' argues that any breach it may have committed against plaintiffs is a separate offense that does not entitle plaintiffs to avoid their own obligations under the

A 77

1997 Del. Super. LEXIS 30, *

agreement. That is, assuming that plaintiffs were [*57] the non-breaching party, they may not stop their performance and yet continue to take advantage of the contract's benefits. *Id. at 376* (citing *Burger King, Inc. v Austin*, S.D. Fla., Bus. Fin. Guide (CCH) P 9788 at 22,089 (Dec. 26, 1990), in which the federal district court ruled against defendants on their allegation that Burger King's failure to give them required real estate assistance entitled them to stop paying royalties but continue to use the Burger King trademark).

The Court notes that both the *S&R Corp. and Burger King* cases cited here are somewhat inapposite, as each involved suits brought for trademark infringement under the Lanham Act. Furthermore, neither case appears to have presented a situation, such as the one here alleged, where the default by the franchisee was alleged to be directly due to the franchisor's breach. Consequently, while the language of these opinions could perhaps be read as widely as Dunkin' reads them, the Court doubts that they really mean to include a situation such as the one alleged by plaintiffs here. n17

> n17 Dunkin' also argues that plaintiffs' second "excuse," that they ran out of money, is similarly not a defense to nonpayment. It argues that the undisputed evidence shows that plaintiffs' inability to pay was the direct result of O'Connor's misappropriation of company funds, which is

clearly no defense to nonpayment. While the Court is mindful of this argument, it turns on the facts of this case regarding the books and records of the company and O'Connor's salary and expenditures, such as the so-called "salary supplements." Since the Court does not weigh the evidence at this stage, it is unpersuaded that no genuine issue of material fact exists regarding the reason for plaintiffs' nonpayment of fees.

[*58]

Additionally, since the counterclaim is essentially a repudiation of the complaint, summary judgment is a particularly inappropriate remedy when the Court has already denied Dunkin's Motion for Summary Judgment with respect to some of the counts of the complaint. For either reason, summary judgment on the counterclaim must be and hereby is DENIED.

## CONCLUSION

For all of the foregoing reasons, Dunkin's Motions for Summary Judgement are GRANTED with respect to Counts I, II, VI, IX, X, XI, XII, XIII, and XIV of the Second Amended Complaint; DENIED with respect to Counts III, IV, V, VII, and VIII of the Second Amended Complaint; and DENIED with respect to the counterclaim. IT IS SO ORDERED.

William T. Quillen

1999 Del. Super. LEXIS 276, *

LEXSEE 1999 DEL.SUPER.LEXIS 276

**WILLIAM LLOYD, INC., OSCAR M. ZELAYA, & MARY M. ZELAYA,**
**Defendants-Below-Appellants v. WALTER HRAB & BEATRICE HRAB, Plaintiffs-**
**Below-Appellees**

**C.A. No.: 98A-07-001-HLA**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1999 Del. Super. LEXIS 276*

**December 23, 1998, Date Submitted**
**April 7, 1999, Date Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:**

APPEAL FROM THE COURT OF COMMON PLEAS.

**DISPOSITION:**

AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant buyers appealed from a judgment of the Court of Common Pleas (Delaware) that was in favor of plaintiff sellers in an action for breach of contract.

**OVERVIEW:** Defendant buyers entered into a contract with plaintiff sellers under which plaintiffs agreed to sell defendants a liquor store, including the inventory and the real estate upon which the store was located. When a dispute arose as to the value of the store's inventory, defendants stopped making payments under the agreement. Plaintiffs filed suit, and judgment was entered in their favor. Defendants appealed, and the court affirmed. The court disagreed with defendants that the agreement was not enforceable for lack of adequate consideration. There was an objective manifestation of assent contained within the agreement. There was no ambiguity in the agreement with regard to what was expected of each of the parties. Contract language that was clear was entitled to its ordinary and usual meaning. The court disagreed with the trial court that the agreement amounted to an accord and satisfaction and

reversed this finding. However, this did not affect the enforceability of the agreement.

**OUTCOME:** Judgment in favor of plaintiff sellers in breach of contract action was affirmed. Finding by trial court that agreement was enforceable was correct because the contract language clearly and unambiguously stated that there was a mutual agreement as to the parties' obligations. However, the trial court erred in finding an accord and satisfaction and this finding was reversed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence*
[HN1] Appeals in civil cases from the Court of Common Pleas to the Superior Court are on the record and not de novo. In addressing appeals from a trial court, the Superior Court is limited to correcting errors of law and determining whether substantial evidence exists to support factual findings.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence*
[HN2] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence*
[HN3] It is not the duty of the reviewing court to weigh the evidence, determine questions of credibility, or make its own factual findings.

1999 Del. Super. LEXIS 276, *

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence*
[HN4] When the determination of facts rests on a question of credibility and acceptance, or rejection by the trial judge of live testimony, the trial judge's findings will be approved on review.

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN5] Factual findings in the case will not be overturned on appeal if they are sufficiently supported by the record and are the product of an orderly and logical deductive process. However, questions of law are reviewed de novo.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN6] Interpretation of a contract is a matter of law.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN7] Contract language that is clear and unambiguous should be given its ordinary and usual meaning.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
[HN8] If an ambiguity does exist, the contra proferentum doctrine requires the contract language to be construed against the drafter.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
[HN9] A contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.

*Contracts Law > Contract Interpretation > Interpretation Generally*
[HN10] The standard of interpretation is that of a reasonable person in the position of the parties.

*Contracts Law > Formation*
[HN11] The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.

*Contracts Law > Formation > Offer*
[HN12] There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and each party knows or each party has reason to know the meaning attached by the other.

*Contracts Law > Performance > Accord & Satisfaction*
[HN13] The elements necessary for a common law accord and satisfaction are: (1) that a bona fide dispute existed as to the amount owed that was based on mutual good faith; (2) that the debtor tendered an amount to the creditor with the intent that payment would be in total satisfaction of the debt; and (3) that the creditor agreed to accept the payment in full satisfaction of the debt.

**COUNSEL:** Brian T. Murray, Esquire, Newark, DE, Attorney for Appellants.

Gary C. Linarducci, Esquire, New Castle, DE, Attorney for Appellees.

**JUDGES:** Haile Alford, Judge.

**OPINIONBY:** Haile Alford

**OPINION:**

MEMORANDUM OPINION

UPON APPEAL FROM THE COURT OF COMMON PLEAS

ALFORD, JUDGE

I. FACTS

On May 8, 1992, William Lloyd, Inc., Oscar Zelaya, and Mary Zelaya ("Appellants") and Walter Hrab and Beatrice Hrab ("Appellees") entered into a written agreement in which Appellees agreed to sell to Appellants, the real estate and business known as Ward's Fine Wines & Liquor, Inc., a Delaware Corporation at 1704 North Lincoln Street, Wilmington, Delaware ("Ward's"). Appellees were the sole shareholders of Ward's, and owned the liquor store's inventory. Appellees agreed to sell both the store's inventory and the real property on which the business was located pursuant to the Agreement of Sale dated May 8, 1992 (hereinafter "Agreement"). The record shows that Oscar Zelaya is President of William Lloyd, Inc., and Mary Zelaya is

Secretary [*2] of the corporation.

The terms of the Agreement provided that the real estate would be sold for $ 150,000; the business equipment and furnishings for $ 30,000; a covenant not to compete for $ 10,000; and an amount not to exceed $ 60,000 for the inventory. n1 The Agreement provided that final settlement would be held no later than July 30, 1992. n2 The Agreement also provided that inventory would take place one day prior to closing. n3 There is no dispute as to the terms of this contract.

n1 Agreement at P2, § A-D.

n2 Agreement at P10.

n3 Agreement at P23.

On July 26, 1992, the parties met to prepare an inventory. At this meeting it became apparent to the parties that they could not come to an agreement regarding the exact dollar amount for the liquor store's inventory. They were unable to do so because Appellees had not kept detailed written records. Moreover, a certain portion of the inventory consisted of vintage wine for which the Appellees were unable to furnish invoices. On July 27, 1992, the [*3] parties met for purposes of settlement. Since the exact cost of the inventory could not be ascertained, the parties executed a new "Agreement." n4 Under the July Agreement, Appellants paid $ 51,300, the estimated cost of the inventory.

n4 The July 27, 1992 Agreement (hereinafter "July Agreement") provided in pertinent part:

> Sellers and Buyers have made an estimate [sic] of the cost of inventory in connection with the sale of Ward's []. Within two weeks of the date of this Agreement, Sellers and Buyers will finalized [sic] the inventory and adjust the payment accordingly, i.e., if the cost is more, the Buyer will pay the difference to Seller; if the cost is less, the Seller will pay the difference to Buyer.

During the months that followed, the parties were unable to agree on the cost of the inventory. Appellees contended that the total inventory was in excess of $ 100,000, and Appellants argued that inventory cost was approximately $ 70,000. While negotiations were continuing, Appellants [*4] tendered three separate checks in the amount of $ 3,000 each bringing the total paid for the inventory to $ 60,000.

After months of continued dispute, on March 23, 1993, Appellant Oscar Zelaya executed a document which provided that Appellants would pay Appellees an additional sum of $ 22,979. n5 Appellant Oscar Zelaya was the only person to sign the document. Appellants made one payment pursuant to the March Agreement and then stopped making the agreed upon payments.

n5 The March, 23, 1993 Agreement (hereinafter "March Agreement") provided:

> William Lloyd Inc. Oscar Zelaya, Mary Zelaya hearby [sic] agree to pay Walter Hrab, Beatrice Hrab or their Heirs the sum of $ 22979.00. The no interest payment of $ 382.98 a month to be made on the 15th []of the month, beginning on the 15th [] of April 1993.

On July 20, 1995, Appellees filed an action in the Court of Chancery. On February 28, 1996, the case was transferred from the Chancery Court to the Court of Common Pleas. On May 7, 1997, a [*5] trial was conducted before the Honorable John Welch. At trial, Appellants argued that they never agreed to pay more than $ 60,000.00 for the inventory and are not liable under the original nor the March Agreement. They argued that they are not liable to Appellees for the inventory beyond $ 60,000 because Appellees failed to provide them with invoices and proof of costs. On May 12, 1998, Judge Welch issued an Order wherein he entered judgment in favor of Appellees in the amount of $ 22,979.00 for the remaining inventory, $ 4,860.00 in accounting costs, legal fees, and 10% until the judgment was paid. Judge Welch found the March Agreement to be an accord and satisfaction. n6 The trial court also determined the March Agreement to be "a binding and enforceable contract by its own terms and conditions" independent of any accord and satisfaction. n7 Buyers have appealed the court's decision in the Superior Court.

1999 Del. Super. LEXIS 276, *

n6 *See Hrab v. Lloyd, Inc. & Zelaya,* Del. CCP, C.A.No. 96-02-314, Welch, J. (May 12, 1998) (citing *Acierno v. Worthy Brothers Pipeline Corp., Del. Supr., 693 A.2d 1066 (1997)).*

[*6]

n7 *Id.* (citing *Leeds v. First Allied Connecticut Corp., Del. Ch., 521 A.2d 1095 (1986); Norse Petroleum A/S v. LVO Int'l, Inc., Del. Super., 389 A.2d 771 (1978); Equitable Trust Co. v. Gallagher, Del. Supr., 34 Del. Ch. 76, 99 A.2d 490 (1953); Hajoca Corp. v. Security Trust Co., Del. Super., 41 Del. 514, 25 A.2d 378 (1942)).*

## II. STANDARD OF REVIEW

It is well settled Delaware law that [HN1] appeals in civil cases from the Court of Common Pleas to this Court are on the record and not de novo. n8 In addressing appeals from a trial court, this Court is limited to correcting errors of law and determining whether substantial evidence exists to support factual findings. n9 [HN2] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. n10 [HN3] It is not the duty of the reviewing court to weigh the evidence, determine questions of credibility, or make its own factual findings. n11

n8 *See 10 Del. C. § 1326(c);* SUPER. CT. CIV. R. 72(g).

[*7]

n9 *See Shahan v. Landing, Del. Supr., 643 A.2d 1357 (1994).*

n10 *See Oceanport Ind. v. Wilmington Stevedores, Del. Supr., 636 A.2d 892, 899 (1994).*

n11 *See Johnson v. Chrysler Corp.,Del. Supr., 59 Del. 48, 213 A.2d 64, 66 (1965).*

Moreover, [HN4] when the determination of facts rests on a question of credibility and acceptance, or rejection by the trial judge of live testimony, the trial judge's findings will be approved on review. n12 [HN5] Factual findings in this case will not be overturned on appeal if they are "sufficiently supported by the record and are the product of an orderly and logical deductive

process." n13 However, questions of law are reviewed *de novo.* n14

n12 *See Levitt v. Bouvier, Del. Supr., 287 A.2d 671, 673 (1972).*

n13 *Id; see also State v. Cagle, Del. Supr., 332 A.2d 140, 142-43 (1974); Ensminger v. Merritt Marine Construction, Inc., Del. Supr., 597 A.2d 854, 855 (1988).*

[*8]

n14 *See Wilmington Stevedores, 636 A.2d at 899. See also Henry v. Nissan Motors Acceptance Corp., Del. Super., 1998 Del. Super. LEXIS 524, CA. No. 98A-02-023-WTQ, Quillen, J. (Oct. 21, 1998) (Mem. Op.).*

## III. DISCUSSION

Appellants make several arguments in support of their contention that the judgment of the Court of Common Pleas should be overturned. Appellants first argue that the March Agreement is unenforceable because it is not supported by adequate consideration. Second, they argue that the March Agreement is not a properly executed contract because only Oscar Zelaya signed the document. Third, they contend that Appellees are not the proper parties to bring this action because Ward's Liquor Store, Inc., and not them, owns the inventory. Appellants argue that the proper owner, Ward's, is not a party to this litigation.

Appellants argue that Appellees are not the proper parties to litigate the within action. This argument was not properly presented to the court below for consideration. Thus, Appellants are precluded from raising this issue for the first time on appeal. n15 This Court will [*9] therefore not consider the merits of this argument.

n15 *See, e.g., Jeffery v. Seven Seventeen Corp., Del. Supr., 461 A.2d 1009 (1983); Gibson v. North Delaware Realty Co., Del. Super., 1996 Del. Super. LEXIS 259, C.A. No. 95- A-08-011-JOH, 1996 WL 453414, Herlihy, J. (June 6, 1996); Gillis v. American Mirrex Corp., et al., Del. Super., 1996 Del. Super. LEXIS 198, C.A. No. 95 A-07-010-JOH, 1996 WL 280891, Herlihy, J. (May 9, 1996).*

1999 Del. Super. LEXIS 276, *

Turning to Appellants' contention that the March Agreement is unenforceable because it is not supported by adequate consideration, it is well settled that the [HN6] interpretation of a contract is a matter of law. n16 [HN7] Contract language that is clear and unambiguous should be given its ordinary and usual meaning. n17 [HN8] If an ambiguity does exist, the contra proferentum doctrine requires the contract language to be construed against the drafter. n18 However, [HN9] a contract is ambiguous only when

the provisions in controversy are reasonably or fairly susceptible of different interpretations or [*10] may have two or more different meanings... [HN10] The standard of interpretation is that of a reasonable person in the position of the parties. n19

n16 See Hudson v. State Farm Mut. Ins. Co., Del. Supr., 569 A.2d 1168, 1170 (1990).

n17 See Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co., Del. Supr., 616 A.2d 1192, 1195 (1992).

n18 Id. at 1196.

n19 Id. (internal citations omitted).

It is, of course, fundamental that [HN11] the formation of a contract requires "a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." n20 Although a comprehensive and meaningful definition of a contract is elusive, n21 at its core, however, the essence of contract law is the enforcement of promises where the parties have manifested their assent to a mutual exchange of consideration. n22 It has also been noted that

[HN12]
there is no manifestation of mutual assent to an exchange if the parties attach materially [*11] different meanings to their manifestations and

***

(b) each party knows or each party has reason to know the meaning attached by the other. n23

n20 See Acorn Constr., Ltd v. Kraus, Del. Super., 1986 Del. Super. LEXIS 1176, *3, C.A. No. 84L-JN-33, Gebelein, J. (April 25, 1986), at *1 (citing Restatement (Second) Contracts, § 17).

n21 See 1 Corbin on Contracts § 1.3 (rev.ed.1993).

n22 See Faw, Casson & Co. v. Cranston, Del. Ch., 375 A.2d 463, 466 (1977); see also Restatement (Second) of Contracts, § 17, 3 (1981); Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L. Ed. 629, 656 (1819).

n23 See Restatement (Second) Contracts, § 20.

Accordingly, this Court's inquiry is an "objective one": whether a reasonable person would, based upon the "objective manifestation of assent" can conclude that both parties intended to be bound by the Agreements they executed. n24 In the instant case, it is clear that each side had a common view of the [*12] nature of the July and March Agreements. The July Agreement provides that "if the cost of the inventory is more, the Buyer will pay the difference to Seller [and] if the cost is less, the Seller will pay the difference to Buyer." n25 Pursuant to this agreement, after several months of negotiations, having determined that "the cost of the inventory is more," the parties executed the March Agreement, which provides that Appellants will pay Appellees "or their Heirs the sum of $ 22,970.00," with monthly payments of $ 382.98 beginning on April, 1993. n26 The Court finds that the March Agreement, executed nine months after settlement, is clear and unambiguous, and that the mutual assent to pay and accept $ 22,970.00 for the inventory is sufficient consideration to enforce the March contract as written.

n24 Id.; see also Western Natural Gas Co. v. Cities Service Gas Co., Del. Supr., 223 A.2d 379, 382-83 (1966).

n25 See July Agreement, note 4.

n26 See March Agreement, note 5.

[*13]

Moreover, the March Agreement was signed by

1999 Del. Super. LEXIS 276, *

Oscar Zelaya, President of William Lloyd, Inc., therefore, Appellee's argument that the contract was not properly executed is without merit. It is clear that Zelaya, as President of William Lloyd, Inc., had apparent authority to execute the March Agreement on behalf of the corporation. n27

> n27 *See Moeller & Angiollilo v. Wilmington Savings Fund Society, Del. Supr., 723 A.2d 1177 (1999); Billops v. Magness Constr., Del. Supr., 391 A.2d 196 (1978); CBA Collection Serv., v. Roeberg & Assoc., Del. Super., 1996 Del. Super. LEXIS 330, C.A. No. 95 A-10-022-RCC, 1996 WL 527210,* Cooch, J. (Aug. 14, 1996).

However, the Court disagrees with the Court of Common Pleas' finding that the March Agreement amounts to an accord and satisfaction. As explained in *Acierno v. Worthy Brothers Pipeline Corp.,* n28 [HN13] the elements necessary for a common law accord and satisfaction are:

> (1) that a bona fide dispute existed as to the amount owed that was [*14] based on mutual good faith; (2) that the debtor tendered an amount to the creditor with the intent that payment would be in total satisfaction of the debt; and (3) that the creditor agreed to accept the payment in full satisfaction of the debt. n29

> n28 *Del. Supr., 693 A.2d 1066 (1997).*
>
> n29 *Id. at 1068.*

In the case at bar, while it is clear that a bona fide dispute did exist as to the amount owed that was based on mutual good faith, n30 the second and third elements ) necessary for accord and satisfaction are not present. Appellants did not tender any payment that would be in total satisfaction of the debt, nor did Appellees receive and/or accept such payment. Because the two essential elements for a common law accord and satisfaction are nonexistent in this case, the Court of Common Pleas' finding that the March Agreement amounted to an accord and satisfaction is reversed. However, the Court of Common Pleas' conclusion that the March Agreement is an enforceable contract [*15] by its own terms and conditions, and the decision awarding judgment to Appellees in the amount of $ 22,979.00 for the remaining inventory, and $ 4,860 for accounting costs, plus interest, is AFFIRMED.

> n30 The *Acierno* Court also discusses the two elements which render a dispute bona fide: (1) honest and advanced in good faith, and (2) founded on some reasonable, tenable or plausible ground. *Id. at 1069.*

IT IS SO ORDERED.

Haile Alford

J.

1981 Del. Super. LEXIS 693, *

LEXSEE 1981 DEL.SUPER.LEXIS 693

**Derrick MacInnis and Nancy MacInnis vs. Charles F. Hill Construction, Inc.**

**Nos. 80C-MY-63; 80C-MY-93 (Consolidated)**

**Superior Court of Delaware**

*1981 Del. Super. LEXIS 693*

**November 17, 1981, Submitted
December 18, 1981, Decided**

COUNSEL: [*1]

William H. Uffelman, Esquire, Biggs & Battaglia, 1206 Farmers Bank Building, P. O. Box 1489, Wilmington, DE 19899; Thomas J. Healy, Jr., Esquire, Healy & Collins, 1116 King Street, Wilmington, DE 19801

OPINIONBY:

CHRISTIE

OPINION:

ANDREW D. CHRISTIE, JUDGE

UNREPORTED OPINION

The purpose of this letter is to announce the Court's decision on the defendant's motion to dismiss specified portions of the complaint. The motion will be treated as if it were a motion for summary judgment as to limited issues since the parties and the Court have looked beyond the mere pleadings in order to ascertain the facts upon which the claim based.

On June 9, 1978 defendant, Charles F. Hill Construction, Inc. (hereafter "Hill"), entered into a contract to build a house for plaintiffs, Derrick and Nancy MacInnis, at 6 Rockford Road, Wilmington, Delaware. When Hill said the house was completed, the MacInnises refused to pay the balance of the contract price, alleging that there were may respects in which the house failed to meet contract requirements. Plaintiffs then instituted this action in which they claim, among other things, a right to recover for psychological and emotional damage due to Hill's alleged [*2] breach of various contract warranties, express and implied, and for Hill's alleged "negligent performances of the construction contract." n1 Hill has moved to dismiss this portion of the complaint on the ground that Delaware law does not permit recovery for psychological and emotional damage under facts such as those which give rise to this case. I agree with defendant's position.

> n1 Hill has filed a counterclaim in which Hill seeks payment of the balance of the contract price.

I

Preliminarily, the Court faces the question of whether this is an action brought only on a contract, or is this an instance where the law might give the plaintiff a right to recover under both negligence and contract theories. Cf. *Clements vs. Western Union Telegraph Co., Del.Supr. 28 A.2d 889 (1942)*. In a general sense, a breach of a contract often includes both an agreed upon contractual duty. This does not, however, mean that all such suits which would ordinarily be suits on contracts may also be regarded as negligence suits as well. In appropriate cases a Court may look through a complaint's allegations of negligence and find the suit to be basically an action in contract. [*3] *Clendaniel vs. Samuels, Del. Ch., 156 A. 198 (1931)*. In the Clendaniel case the Court stated:

The real grievance of the Complainants is that the plant did not come up to what it was warranted to do. The case therefore is not a fraud case but one for breach of warranty of fitness. *Id., at 198*.

The principle has also been stated thus:

If the action is not maintainable without pleading and proving the contract, where the gist of the action is the breach of the contract, either by malfeasance or nonfeasance, it is, in substance, an action on the contract, whatever may be the form of the pleading. If the plaintiff states a cause of action for breach of contract, additional

1981 Del. Super. LEXIS 693, *

averments appropriate to a cause of action into one for tort, and the part of his pleading appropriate to an action in tort will be considered surplusage. *1 Am.Jur.2d, Actions,§ 8*, p. 550.

In the present case, where the MacInnises seek to recover because of the provisions of a contract and also because Hill was negligent in its alleged breaches of the contract, I find that the suit is in substance a contract action, and plaintiff's basic rights are governed by contract law. n2

> n2 Nothing herein said is meant to imply that the same factual allegations would state a claim under tort law in which the damages are under discussion could be recovered.

[*4]

II

The MacInnises argue that under the circumstances they are entitled to recover damages for psychological and emotional harm even under contract law. The general rule, however, is that damages for mental anguish are not recoverable in an ordinary breach of contract action. *Richard F. Vilone, Inc. v. Cecil*, Del Super., 79C-JL-65 (unreported decision, Judge Christie, Superior Court, Delaware, July 7, 1980); *McClain v. Faraone, Del. Super., 369 A.2d 1090 (1977)*. An exception to the rule may be recognized in some jurisdictions where there has been an intentional or wanton breach of a contract of such a character that the breach would cause mental anguish, for reasons other than mere pecuniary loss. 25 C.J.S., Damages, § 68, pp.828, 829; *Zeigler v. F Street Corp., Md. App., 255 A.2d 703 (1967)*. Under the law of

some jurisdictions, the breach need not be shown to have been intentional or wanton. 5 Corbin on Contracts, § 1076, p. 429; *Jankowski v. Mazzatta, Mich, App., 152 N.W. 2d 49 (1967)*. This exception seems to have been limited, however, to cases involving contracts as to matters highly emotional or sentimental in nature and does not usually extend [*5] to building contract cases. n3 *Jankowski, supra; McClain, supra*.

> n3 Plaintiff have cited two cases for the position that damages for mental anguish might be recovered in an ordinary, as opposed to highly personalized, type of contract situation. *Bertozzi v. McCarthy, Conn. Supr., 323 A.2d 553 (1973); B & M Homes, Inc. v. Hogan, Ala.Supr., 376 So.2d 667 (1979)*. It is the law in this jurisdiction that damages of this sort may not be recovered in action of this type. *McClain, supra*.

The present case involves what may be termed an ordinary building contract and an alleged breach thereof. The MacInnises suggest that they should be given the opportunity to prove that the defendant's breach was intentional and that there was reason to know when the contract was made that a breach would cause mental anguish.

It is clear from the record, however, that under Delaware law the contract there involved is not within any class of contracts, a breach of which would be the basis for the recovery based on consequential mental anguish. Underthe circumstances, it is appropriate to grant defendant's motion for summary judgment as to this aspect of plaintiff's [*6] claim at this time. Cf. *Jankowski, supra*. IT IS SO ORDERED.

2001 U.S. Dist. LEXIS 25556, *

LEXSEE 2001 U.S.DIST.LEXIS 25556

**NIELSEN ELECTRONICS INSTITUTE, Plaintiff, v. STUDENT FINANCE CORPORATION and ANDREW YAO, Defendants.**

**Civil Action No. 99-285-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2001 U.S. Dist. LEXIS 25556*

**January 16, 2001, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, Motion denied by *Nielsen Elecs. Inst. v. Student Fin. Corp., 2001 U.S. Dist. LEXIS 25553 (D. Del., Jan. 18, 2001)*

**DISPOSITION:** [*1] Defendants' motion to dismiss denied. Paragraph 1 of September 29, 2000 court order vacated.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant, a student loan corporation and it president, brought a motion under *Fed. R. Civ. P. 12(b)(6)* to dismiss claims against them by plaintiff private vocational training school alleging violations of the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C.S. § 1962(c)* (RICO), and fraud.

**OVERVIEW:** The student loan company was engaged in the business of originating student loans for post-secondary education, and had arranged such loans for student at the vocational school. The school asserted a federal cause of action against the president under RICO, and it asserted claims against both the president and the loan company under state law, including claims for breach of contract and fraud. The school and the president sought dismissal of the fraud and the RICO claims. Their main contention was that the school failed to adequately plead a pattern of racketeering activity, and failed to plead with sufficient particularity required under *Fed. R. Civ. P. 9(b)*. The court found that. taken as a whole, the school alleged sufficient facts to plead the RICO predicate acts of mail and/or wire fraud. It also found that the allegations pled a scheme by the president to defraud the school. Finally, the court found that the complaint alleged that the president, through the company, used the mail and wires to further the scheme, thus satisfying the necessary elements of pleading either a federal RICO or a state fraud claim.

**OUTCOME:** The court vacated an earlier order granting dismissal and instead denied the motion to dismiss the complaint.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] Pursuant to *Fed. R. Civ. P. 12(b)(6)*, a court may dismiss a complaint for failure to state a claim upon which relief may be granted. The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff. The court is not required to accept legal conclusions either alleged or inferred from the pleaded facts. Dismissal is only appropriate when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN2] The burden of demonstrating that the plaintiff has failed to state a claim upon which relief may be granted rests on the movant.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*

2001 U.S. Dist. LEXIS 25556, *

[HN3] The Racketeer Influenced and Corrupt Organizations Act statute authorizes civil suits by any person injured in his business or property by reason of a violation of *18 U.S.C.S. § 1962. 18 U.S.C.S. § 1964*(c). A plaintiff seeking recovery under § 1964(c) must plead two elements: (1) a § 1962 violation; and (2) an injury to business or property by reason of such violation.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
[HN4] See *18 U.S.C.S. § 1962*(c).

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN5] To establish a claim under *18 U.S.C.S. § 1962*(c), a plaintiff must show: (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that the defendant participated through a pattern of racketeering activity that included at least two racketeering acts.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
[HN6] A "pattern of racketeering activity" requires the commission of at least two predicate offenses, including mail and wire fraud. *18 U.S.C.S. §§ 1961*(1) (B) & 1961(5). To establish a "pattern of racketeering activity," two critical factors must be present: (1) a relationship between the acts of racketeering charged; and (2) a threat of continuing activity, or continuity.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
*Evidence > Procedural Considerations > Burdens of Proof*
[HN7] In determining whether an entity has committed the predicate acts of mail fraud and wire fraud, courts have traditionally applied the same analysis for both offenses. A plaintiff raising a claim of mail or wire fraud must establish two essential elements: (1) a scheme to defraud; and (2) the use of the mails or wires for the purpose of executing the scheme.

*Antitrust & Trade Law > Private Actions > Racketeer*

*Influenced & Corrupt Organizations*
[HN8] In evaluating the requirement of "a scheme to defraud" in determining whether an entity has committed the predicate acts of mail fraud and wire fraud under the Racketeer Influenced and Corrupt Organizations Act, it is required that such a scheme need not be fraudulent on its face; rather, it must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. The words "to defraud" are defined in this requirement as wronging one in his property rights by dishonest methods or schemes, and usually signifying the deprivation of something of value by trick, deceit, chicane or overreaching.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
[HN9] The requirement of "use of the mails or wires to execute the scheme" in determining whether an entity has committed the predicate acts of mail fraud and wire fraud under the Racketeer Influenced and Corrupt Organizations Act requires that the mailings or wire communications be incident to an essential part of the scheme, or a step in the plot, although they need not contain misrepresentations. Even if a defendant does not mail or intend the mailing of such a communication, if that defendant acts with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, then that defendant "causes" the mails or wires to be used. Mailings or wire communications made after the perpetrators accomplish the scheme's goal are not for the purpose of executing a scheme, with the exception of subsequent mailings designed to lull victims into a false sense of security or otherwise make apprehension of the perpetrators less likely.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
[HN10] In addition to the existence of at least two predicate offenses, a "pattern of racketeering activity" under the Racketeer Influenced and Corrupt Organizations Act (RICO) requires "relatedness" and "continuity." To establish the continuity requirement, a RICO plaintiff must show that the predicate acts of racketeering either constitute or threaten long-term criminal activity. Continuity is centrally a temporal concept which may either refer to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition. Stated another way, continuity may be either "closed-ended" or "open-ended."

A 88

2001 U.S. Dist. LEXIS 25556, *

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
[HN11] A Racketeer Influenced and Corrupt Organizations Act (RICO) plaintiff may establish open-ended continuity in several ways. First, open ended continuity may be established by evidence that the predicate acts themselves involve a distinct threat of long-term racketeering activity either implicitly or explicitly. Second, open-ended continuity may be established by evidence that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Whether the alleged predicate acts are sufficient to establish a threat of continued racketeering activity under either of these examples depends on the specific facts of each case.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
[HN12] A party alleging a Racketeer Influenced and Corrupt Organizations Act (RICO) violation may demonstrate closed-ended continuity by proving a series of related predicate acts extending over a substantial period of time. Elaborating on what is meant by a substantial period of time, the United States Supreme Court cautions that predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: The United States Congress was concerned in RICO with long-term criminal conduct.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
[HN13] Conduct lasting less than 12 months does not meet the standard for closed-ended continuity.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
[HN14] An 11 to 14 month closed-ended period of criminal activity is simply not substantial enough to constitute long-term criminal activity.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
[HN15] Continuity for purposes of the Racketeer Influenced and Corrupt Organizations Act may be established in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity. Further, the United States Supreme Court

emphasizes that continuity is a temporal concept.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements*
[HN16] Where the predicate acts of a Racketeer Influenced and Corrupt Organizations Act claim are mail and wire fraud, *Fed. R. Civ. P. 9(b)* applies to the allegations. Rule 9(b) requires allegations of fraud to be plead with particularity. The purpose of Rule 9(b) is to provide a defendant with notice of the precise misconduct with which he or she is charged and to prevent false or unsubstantiated charges. Although allegations of "date, place or time" fulfill the purpose of Rule 9(b), such allegations are not required as long as the plaintiff uses alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*Torts > Business & Employment Torts > Deceit & Fraud*
[HN17] The elements of common law fraud under Delaware law are: (1) defendant's false representation, usually of fact, (2) made either with knowledge or belief or with reckless indifference to its falsity, (3) with an intent to induce the plaintiff to act or refrain from acting, (4) the plaintiff's action or inaction resulted from a reasonable reliance on the representation, and (5) reliance damaged the defendant.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Torts > Business & Employment Torts > Deceit & Fraud*
[HN18] Courts are generally reluctant to determine whether reliance on alleged misrepresentations is reasonable as a matter of law.

**COUNSEL:** Edward M. McNally, Esquire, Gretchen Ann Bender, Esquire, and John T. Meli, Jr., Esquire of MORRIS, JAMES, HITCHENS & WILLIAMS LLP, Wilmington, Delaware. Attorneys for Plaintiff.

M. Duncan Grant, Esquire and Andrea B. Unterberger, Esquire of PEPPER HAMILTON LLP, Wilmington, Delaware. Attorneys for Defendants.

**JUDGES:** Farnan, District Judge.

A 89

2001 U.S. Dist. LEXIS 25556, *

OPINIONBY: Farnan

OPINION:

### MEMORANDUM OPINION

Wilmington, Delaware

**Farnan, District Judge.**

Pending before the Court is a Motion To Dismiss (D.I. 60) filed by Defendants Student Finance Corporation and Andrew Yao pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. By its Amended Complaint, Plaintiff Nielsen Electronics Institute asserts one federal cause of action against Defendant Yao, specifically a claim under the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. § 1962(c)* ("RICO"). The remaining causes of action in the Amended Complaint [*2] are claims against both Defendants under state law, including claims for breach of contract and fraud.

In response to Plaintiff's Complaint, Defendants filed the instant Motion seeking to dismiss the fraud and RICO claims raised by Plaintiff. Defendants did not move to dismiss Plaintiff's breach of contract claim, but filed an Answer denying any liability to Plaintiff and a Counterclaim seeking $ 1.4 million in damages.

By Order dated September 29, 2000, the Court granted Defendants' Motion To Dismiss. However, the Court now finds that it erred and that the portion of the September 29, 2000 Order granting Defendants' Motion To Dismiss should be vacated. Accordingly, for the reasons set forth, the Court will deny Defendants' Motion To Dismiss the RICO and fraud counts of the Amended Complaint.

### BACKGROUND

Plaintiff Nielsen Electronics Institute ("Plaintiff" or "the Institute") operates a private vocational training school for adults in Charleston, South Carolina. (D.I. 63 at 4). Defendant Student Finance Corporation ("Student Finance") is an organization engaged in the business of originating student loans for post-secondary education, and Defendant Andrew Yao is the controlling [*3] owner and president of Student Finance.

The majority of the students enrolled at the Institute rely heavily on loans to finance their tuition. Prior to June 1995, the federal government guaranteed the loans of most of the Institute's students and required the Institute to process the necessary paper work and operate the Institute in accordance with various applicable federal regulations. (D.I. 63 at 24).

In June 1995, Student Finance contacted the Institute in an effort to acquire the process of loaning funds to prospective students at the Institute. The parties entered into a "Student Loan Participation Agreement" ("the First Agreement") on August 1, 1995. (D.I. 43A, Exh. C). Under the terms of the First Agreement, Student Finance agreed to implement a loan program at the Institute to finance the tuition costs of students in need of financial assistance. (D.I. 43A, Exh. C). Under the First Agreement, if a loan application was approved by Student Finance, Student Finance would disburse an initial payment consisting of a certain percentage of the face amount of the loan to Plaintiff and retain the remaining percentage as a "reserve." (D.I. 43A, Exh. C). Under the agreement, if the [*4] student loan account was current in all respects, Student Finance would disburse to the Institute, on a monthly basis, a portion of the amount held in reserve as the loan payments were received from the student. (D.I. 43A, Exh. C).

Beginning in August 1995, the Institute began sending student loan applications to Student Finance, and Student Finance began funding students in October 1995. From the Fall of 1995 to the Spring of 1996, Student Finance wired funds to the Institute on a monthly basis. However, in May 1996, Student Finance indicated that it would no longer be making the initial payments to the Institute. Alleging an excessive student default rate, Student Finance claimed that it was entitled to charge the Institute for payments not made by the students. In response to the Institute's complaints, the parties entered into a revised agreement on May 1, 1996 ("the Second Agreement"). (D.I. 43A, Exh. D). While the terms of the Second Agreement were largely the same as the First Agreement, the Second Agreement redefined the term "Defaulted Loan Agreement." (D.I. 43A Exh. D, § § 1.1.1 & 1.1.12).

In the Summer of 1996, the parties again revisited their agreement and entered into [*5] a "Memorandum of Understanding" ("the Third Agreement"). (D.I. 43A, Exh. E). Pursuant to the Third Agreement, the Institute agreed to continue financing student tuition through Student Finance, and Student Finance agreed to make certain advancements to the Institute. (D.I. 43A, Exh. E, § A). The parties further agreed that the disbursement schedule and defaulted loan provisions outlined in the Second Agreement would be reimplemented on December 1, 1996. (D.I. 43A, Exh. E, § D).

According to Plaintiff, Student Finance never advanced the sums due to the Institute under the Third Agreement. Rather, Plaintiff alleges that by December 1997, it was forced to financially restructure the Institute as a result of Student Finance's conduct.

A. The Complaint

A 90

Plaintiff filed its action against Student Finance and Defendant Yao on May 6, 1999. By its Amended Complaint, Plaintiff raises four claims. In Count I, Plaintiff contends that Student Finance breached the First, Second and Third Agreements by failing to: (1) provide Plaintiff with the money due to it; (2) provide Plaintiff with accurate accounting reports; (3) return to Plaintiff defaulted student loans which were collectable; and [*6] (4) properly review student credit applications. (D.I. 43 at P 35).

In Count II, Plaintiff alleges that Student Finance defrauded Plaintiff by making material misstatements and failing to disclose relevant facts which should have been revealed in order to avoid misleading Plaintiff. (D.I. 43 at PP 37-41). Specifically, Plaintiff alleges that as a result of these misstatements, Student Finance induced Plaintiff to enter into the First, Second, and Third Agreements and make payments to Student Finance when such payments were not due. (D.I. 43 at PP 37-41).

In Count III, Plaintiff alleges that the misrepresentations made by Student Finance were directed, ordered, ratified, and approved by Defendant Yao. (D.I. 43 at PP 42-44). In addition, Plaintiff claims that while it advised Defendant Yao, through employees of Student Finance, that it was not receiving the correct accounting reports, Defendant Yao not only failed to correct the practice of supplying false reports, but also caused Student Finance employees to fraudulently induce Plaintiff to enter into the Second and Third Agreements. (D.I. 43 at PP 42-44).

In Count IV, Plaintiff raises a claim under *18 U.S.C. § 1962* [*7] *(c)* against Defendant Yao. Specifically, Plaintiff alleges that Defendant Yao violated *section 1962(c)* by directing Student Finance and its employees to commit a series of acts that constituted mail fraud under *18 U.S.C. § 1341*, and wire fraud under *18 U.S.C. § 1343*. According to Plaintiff, these acts included: (1) inducing Plaintiff to procure student loans for Student Finance by sending the Confidentiality Agreement and First Agreement to the Plaintiff through the United States mail without intending to follow the terms of the agreements; n2 repeatedly wiring funds from Delaware to Plaintiff in South Carolina with the intent of obtaining subsequent student loans which Student Finance did not intend to fully fund in accordance with the First Agreement; (3) sending false monthly funding reports through the United States mail in furtherance of a scheme to deprive Plaintiff of the benefits of the First Agreement; and (4) sending student loan default reports to the Plaintiff through the United States mail that falsely failed to disclose payments made by students which Student Finance had appropriated to itself. (D.I. 43 at PP 45-50).

[*8] **STANDARD OF REVIEW**

[HN1] Pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, the Court may dismiss a complaint for failure to state a claim upon which relief may be granted. *Fed. R. Civ. P. 12(b)(6)*. The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)*. When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff. *Neitzke v. Williams, 490 U.S. 319, 326, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989)*; *Piecknick v. Pennsylvania, 36 F.3d 1250, 1255 (3d Cir. 1994)*. The Court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost, 1 F.3d at 183*. Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. [*9] [HN2] The burden of demonstrating that the plaintiff has failed to state a claim upon which relief may be granted rests on the movant. *Young v. West Coast Industrial Relations Assoc., Inc., 763 F. Supp. 64, 67 (D. Del. 1991)* (citations omitted).

**DISCUSSION**

By their motion, Defendants request the Court to dismiss the RICO and fraud claims raised by Plaintiff. Specifically, Defendants contend that Plaintiff has failed to plead with sufficient specificity the elements of a civil claim under RICO and the elements of fraud under Delaware law. The Court will address each of Defendants' arguments in turn.

**I. Whether Plaintiff Has Adequately Pled A RICO Violation**

[HN3] The RICO statute authorizes civil suits by "any person injured in his business or property by reason of a violation of [*18 U.S.C. § 1962*]." *18 U.S.C. § 1964(c)*. n1 A plaintiff seeking recovery under *section 1964(c)* must plead two elements: (1) a *section 1962* violation; and (2) an injury to business or property by reason of such violation. n2 *Lightning Lube, Inc. v. Witco Corporation, 4 F.3d 1153, 1187 (3d Cir. 1993)*. In this case, Plaintiff [*10] relies on *Section 1962 (c)* to establish the first element of its RICO claim.

n1 Title *18 U.S.C. § 1964(c)* provides:

Any person injured in his business or property by reason of a violation of *section 1962* of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains the cost of the suit, including a reasonable attorney's fee.

n2 By their Motion To Dismiss, Defendants do not challenge that portion of Plaintiff's complaint relating to the injury to business or property element of a RICO violation. Accordingly, the Court will direct its analysis to whether a *section 1962* violation has been adequately pled and will not consider whether there are sufficient allegations of an injury to the Plaintiff's business or property.

In pertinent part, *18 U.S.C. § 1962 (c)* provides:

[HN4] It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities [*11] of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

[HN5] To establish a claim under *section 1962(c)*, a plaintiff must show: (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that the defendant participated through a pattern of racketeering activity that included at least two racketeering acts. *Annulli v. Panikkar, 200 F.3d 189, 198 (3d Cir. 1999)*; see also *Salinas v. United States, 522 U.S. 52, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997)*; *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985)*; *Shearin, 885 F.2d 1162, 1165*.

[HN6] A "pattern of racketeering activity" requires the commission of at least two predicate offenses, including mail and wire fraud. *18 U.S.C. § § 1961(1) (B) & 1961(5)*. To establish a "pattern of racketeering [*12]

activity," two critical factors must be present: (1) a relationship between the acts of racketeering charged; and (2) a threat of continuing activity, or continuity. *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989)*; see also 31A Sheila A. Skojec, American Jurisprudence Extort § 143 (1989).

By their Motion, Defendants contend that Plaintiff has failed to adequately plead a "pattern of racketeering activity." In support of their Motion, Defendants raise three arguments. First, Defendants contend that two of the four predicate acts, as pled by Plaintiff, do not constitute federal mail fraud and wire fraud. Second, Defendants contend that Plaintiff cannot establish continuity. In this regard, Defendants raise three specific arguments: (1) Plaintiff cannot establish open-ended continuity because it has failed to plead that the alleged predicate acts are likely to continue into the future; (2) Plaintiff cannot establish closed-ended continuity because the period of alleged racketeering activity is too short in duration; and (3) Plaintiff cannot establish either open or closed continuity because Plaintiff has alleged only a single-victim, [*13] single-perpetrator scheme. Lastly, Defendants contend that all of the alleged predicate acts are not pled with sufficient particularity as required under *Rule 9(b) of the Federal Rules of Civil Procedure.*

A. Whether Plaintiff Has Alleged Predicate Acts Sufficient To Constitute Mail And/Or Wire Fraud

[HN7] In determining whether an entity has committed the predicate acts of mail fraud and wire fraud courts have traditionally applied the same analysis for both offenses. See *Carpenter v. United States, 484 U.S. 19, 25 n.6, 98 L. Ed. 2d 275, 108 S. Ct. 316 (1987)* (explaining that "the mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses"); *United States v. Frey, 42 F.3d 795, 797 n.2 (3d Cir. 1994)* (concluding that "the cases construing the mail fraud statute are applicable to the wire fraud statute as well") (citations and internal quotation marks omitted). A plaintiff raising a claim of mail or wire fraud must establish two essential elements: "(1) a scheme to defraud; and (2) the use of the mails or wires for the purpose of executing the scheme. [*14] " *Schuylkill Skyport Inn, Inc. v. Rich, 1996 U.S. Dist. LEXIS 12655, No. Civ.A. 95-3128, 1996 WL 502280, at *14* (citations omitted); see also *Pereira v. United States, 347 U.S. 1, 8, 98 L. Ed. 435, 74 S. Ct. 358 (1954)*.

[HN8] In evaluating the first requirement, "a scheme to defraud", the United States Court of Appeals for the Third Circuit has required that such a scheme "need not

A 92

be fraudulent on its face"; rather, it "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir. 1991)* (citation and internal quotation marks omitted), cert. denied, *501 U.S. 1222, 115 S. Ed. 2d 1007, 111 S. Ct. 2839 (1991).* The United States Supreme Court has defined the words "to defraud" which are present in this requirement as "wronging one in his property rights by dishonest methods or schemes, and usually signif [ing] the deprivation of something of value by trick, deceit, chicane or overreaching." *Carpenter, 484 U.S. at 27* (citation and internal quotation marks omitted).

[HN9] The second requirement, "use of the mails or wires [*15] to execute the scheme", requires that the mailings or wire communications be "incident to an essential part of the scheme," or "a step in [the] plot," although they need not contain misrepresentations. *Schmuck v. United States, 489 U.S. 705, 710-11, 103 L. Ed. 2d 734, 109 S. Ct. 1443 (1989)* (citation and internal quotation marks omitted); see also *Kehr Packages, 926 F.2d at 1413.* Even if a defendant does not mail or intend the mailing of such a communication, if that defendant "act[s] with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen," then that defendant "causes" the mails or wires to be used. *United States v. Bentz, 21 F.3d 37, 40 (3d Cir. 1994)* (quoting *Pereira, 347 U.S. at 8-9*). Mailings or wire communications made after the perpetrators accomplish the scheme's goal are not "for the purpose of executing" a scheme, with the exception of subsequent mailings designed to lull victims into a false sense of security or otherwise make apprehension of the perpetrators less likely. See *United States v. Maze, 414 U.S. 395, 403, 38 L. Ed. 2d 603, 94 S. Ct. 645 (1974)*; [*16] *United States v. Lebovitz, 669 F.2d 894, 896 (3d Cir. 1982)*.

By his Motion to Dismiss, Defendant Yao challenges two predicate acts alleged by Plaintiff in paragraphs 49(a) and 49(b) of the Amended Complaint. These two predicate acts are: (1) that "SFC induced Nielsen to procure student loans for SFC by sending the Confidentiality Agreement and First Agreement to Nielsen through the United States mail on or about August 1, 1995 while SFC did not intend to follow the terms of the First Agreement and return defaulted loans to Nielsen to collect ...." (D.I. 43 at P49(a)); and (2) "To further induce Nielsen to generate student loans for it, SFC repeatedly wired funds from Delaware to Nielsen in South Carolina as down payments on those student loans, beginning on or about December 15, 1995 and as part of the same pattern again wiring funds to Nielsen on or

about January 15, 1996; February 15, 1996; March 15, 1996; April 15, 1996 and May 15, 1996, all with the intent to obtain these and subsequent student loans which SFC did not intend to fully fund in accordance with the First Agreement ...." (D.I. 43 at P49(b)).

Defendant Yao contends that these allegations do not qualify [*17] as "predicate acts" because they fail to (1) identify a "scheme or artifice;" (2) allege that Student Finance intended to defraud Plaintiff; and (3) set forth the manner in which Student Finance intended to obtain money or property from Plaintiff "by means of false or fraudulent pretenses, representations, or promises." (D.I. 61 at 22, 23).

In response to Defendant Yao's arguments, Plaintiff contends that taken as a whole the allegations of the Amended Complaint assert Defendant Yao's scheme to defraud Plaintiff. (D.I. 63 at 23). Plaintiff further contends that Defendants have "misunderstood" the RICO count, because the count is only directed to Defendant Yao and not to Student Finance. Thus, Plaintiff contends that only Defendant Yao's intent is at issue in the RICO count.

After reviewing the Amended Complaint, the Court concludes that taken as a whole, Plaintiff has alleged sufficient facts at this juncture to plead the predicate acts of mail and/or wire fraud. Reading the Amended Complaint liberally, the Court construes the allegations pled to allege a scheme by Defendant Yao to defraud Plaintiff. The Court also concludes that the Amended Complaint alleges that Defendant Yao, [*18] through Student Finance, used the mail and wires to further the scheme. Thus, reading the Amended Complaint "generously" as the Third Circuit requires and accepting as true all the allegations in the Amended Complaint, and the reasonable inferences which can be drawn from those allegations, the Court concludes that the allegations of Plaintiff's Amended Complaint are sufficient to withstand dismissal. *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994)*.

B. Whether Plaintiff Has Alleged Sufficient Facts To Establish The Continuity Requirement

[HN10] In addition to the existence of at least two predicate offenses, a "pattern of racketeering activity" requires "relatedness" and "continuity." n3 To establish the continuity requirement, a RICO plaintiff must show that the predicate acts of racketeering either constitute or threaten long-term criminal activity. *H.J. Inc., 492 U.S. at 239*; American Jurisprudence Extort § 145. Continuity is centrally a temporal concept which may either refer to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of

2001 U.S. Dist. LEXIS 25556, *

repetition. *H.J. Inc., 492 U.S. at 241*; [*19] *Barticheck v. Fidelity Union Bank/First National State, 832 F.2d 36, 39 (3d Cir. 1987)*. Stated another way, continuity may be either "closed-ended" or "open-ended."

> n3 Defendants do not challenge the relatedness requirement and concede that the predicate acts alleged by Plaintiff are related to each other. Accordingly, the Court will not discuss the relatedness element.

1. Whether Plaintiff has sufficiently pled open-ended continuity

[HN11] A RICO plaintiff may establish open-ended continuity in several ways. First, open ended continuity may be established by evidence that the predicate acts themselves involve a distinct threat of long-term racketeering activity either implicitly or explicitly. Second, open-ended continuity may be established by evidence that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Whether the alleged predicate acts are sufficient to establish a threat of continued racketeering activity under either of these examples depends on [*20] the specific facts of each case. *H.J. Inc., 492 U.S. at 242*.

Defendant Yao maintains that the alleged predicate acts raised by Plaintiff in its Amended Complaint fail to constitute an open-ended period of racketeering activity. (D.I. 61 at 12). Specifically, Defendant Yao contends that open-ended continuity cannot be demonstrated because the Amended Complaint does not allege that the "commission of the predicate acts is indicative of the regular way that [Student Finance] conducts its business." (D.I. 61 at 12).

In response to Defendant Yao's argument, Plaintiff contends that the alleged predicate acts are indicative of the regular way in which Student Finance conducts its business. Plaintiff contends that Student Finance made false representations about its expertise and its business practice from the very beginning of its relationship with Plaintiff. (D.I. 63 at 19). Plaintiff contends that these misrepresentations continued on a monthly basis in each monthly statement regarding the student loans and continued on several other occasions through different rounds of negotiations and agreements. (D.I. 63 at 19). Plaintiff further alleges that Defendants' deceptive conduct [*21] extended to entities other than Plaintiff as evidenced by a lawsuit filed against the Defendants by the Federal Deposit Insurance Company ("FDIC") in the United States District Court for the District of Colorado.

Again, reading the allegations of the Amended Complaint in the light most favorable to the Plaintiff, the Court concludes that the Amended Complaint satisfies the requirement of open-ended continuity. In amending its Complaint, Plaintiff added the allegation that "SFC's conduct of collecting on student loans and not crediting Nielsen for those collection is ongoing." Although Defendants contend that this statement is false, on a motion to dismiss, the Court is required to accept the allegations of the pleading as true. Taking this allegation in the context of the Amended Complaint as a whole, the Court concludes that Plaintiff has alleged that Defendants' regular way of conducting business includes the commission of the predicate acts. Thus, the Court concludes that Plaintiff has sufficiently pled a threat of continued racketeering activity so as to avoid dismissal under *Rule 12(b)(6)*.

2. Whether Plaintiff has sufficiently pled closed-ended continuity

[HN12] A party alleging a [*22] RICO violation may demonstrate closed-ended continuity by proving a series of related predicate acts "extending over a substantial period of time." *H.J. Inc., 429 U.S. at 242*. Elaborating on what is meant by a substantial period of time, the Supreme Court has cautioned that "predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc., 492 U.S. at 242*.

Since the Supreme Court's decision in H.J., the Third Circuit has considered the "closed-ended continuity" prong of RICO's "pattern" requirement in several cases, each time concluding that [HN13] conduct lasting less than twelve months does not meet the standard for closed-ended continuity. *Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 611 (3d Cir. 1991)* ("twelve months is not a substantial period of time"); *Hindes, 937 F.2d 868, 873-75* (conducting extending over eight months where there is no threat of repetition is not continuous); *Kehr Packages, 926 F.2d at 1417-18* (predicate acts of fraud extending over eight months [*23] not continuous where there was no threat of repeated conduct); *Marshall-Silver II, 894 F.2d 593, 597-98* (predicate acts that extended for a period of less than seven months were not continuous where there was no threat of repeated criminal conduct); *Banks, 918 F.2d 418* (period of eight months is not continuous).

In addition, this Court has addressed the continuity prong of the RICO pattern analysis in several cases finding that [HN14] an "eleven to fourteen month closed-ended period of criminal activity is simply not substantial

A 94

enough to constitute long-term criminal activity." *Young v. West Coast Industrial Relations Association, Inc., 763 F. Supp. 64, 74 (D. Del. 1991)*; see also *Helman v. Murry's Steaks, Inc., 742 F. Supp. 860 (D. Del. 1990)* (finding that fraudulent activities extending over twelve months were not sufficient to constitute the requisite pattern); *Hindes v. Castle, 740 F. Supp. 327 (D. Del. 1990)* (concluding that eight months of alleged fraudulent activity did not satisfy the pattern requirement).

In this case, Defendant Yao contends that the predicate acts described in paragraph 49 of [*24] the Amended Complaint lasted only sixteen and a half months, from August 1, 1995 through December 18, 1996. Without the threat of continuing RICO activity, Defendant Yao contends that this period of time is insufficient to establish closed-ended continuity.

In response to Defendant Yao's argument, Plaintiff urges the Court to consider the duration of the entire alleged fraudulent scheme. According to Plaintiff this scheme began on or before June 1995, when Student Finance approached Plaintiff about taking over the process of loaning funds to prospective Institute students and continued with the mailing of false monthly reports to Plaintiff until February 1998, a period of 33 months. In support of their argument that the duration of the entire scheme should be considered, Plaintiff relies on the Third Circuit's decision in *Tabas v. Tabas, 47 F.3d 1280, 1294 (3d Cir. 1995)*.

The Tabas decision has generated much debate, as the decision of the en banc court was fragmented. However, that portion of Tabas suggesting that the continuity requirement must focus on the duration of the underlying scheme relies on the Third Circuit's previous decision in *Kehr Packages, 926 F.2d at 1414.* [*25] The circumstances in Kehr involved numerous innocent mailings, and the Third Circuit was required to determine whether such innocent mailing could create a RICO pattern. Declining to look at only the sheer number of predicate acts, which might prove continuity at first glance, the Third Circuit concluded that it was appropriate to look beyond the actual mailings to the underlying scheme.

Although the Third Circuit's decision in *Tabas* was divided, it appears to the Court that the six judges dissenting in Tabas agreed with the *Kehr* approach, and thus, a total of nine judges accepted the proposition that the underlying scheme should be evaluated. Reading Plaintiff's Amended Complaint generously and in the light most favorable to Plaintiff, the Court concludes that Plaintiff has sufficiently pled closed-ended continuity so as to withstand a motion to dismiss. Examining the underlying scheme alleged by Plaintiff, and not just the

period of the predicate acts, it appears that Plaintiff alleges a scheme extending from June 1995 until February 1999, a period of 33 months. Accordingly, at this juncture, the Court concludes that Plaintiff has sufficiently pled closed-ended continuity. [*26]

3. The Absence of Multiple Victims and Multiple Perpetrators

Defendant Yao next contends that Plaintiff's RICO count should be dismissed, because Plaintiff has alleged only a single-victim, single-perpetrator scheme. According to Defendant Yao, continuity cannot be established without multiple victims and multiple perpetrators. In support of its position, Defendant Yao relies on *Barticheck v. Fidelity Union Bank/First Nat'l State, 832 F.2d 36 (3d Cir. 1987)*.

In Barticheck, the Third Circuit set forth six-factors for determining whether a plaintiff demonstrated the existence of a pattern of racketeering activity: (1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity. However, the continued viability of the Barticheck factors is debatable since the Third Circuit's decision in Tabas. Moreover, the Court is not aware of any case law establishing a bright line rule for continuity. Indeed, as the Supreme Court has acknowledged [HN15] continuity may be established "in a variety of ways, thus [*27] making it difficult to formulate in the abstract any general test for continuity." *H.J. Inc., 492 U.S. at 241.* Further, the Supreme Court has emphasized that continuity is a "temporal" concept. *Id. at 241, 242.* As the Court has previously discussed, Plaintiff has sufficiently pled continuity as a temporal matter. Accordingly, the Court declines to dismiss Plaintiff's Amended Complaint for failure to allege multiple victims and multiple perpetrators.

4. Whether Plaintiff has Sufficiently Pled The Predicate Acts Under *Rule 9(b)*.

Defendant Yao next contends that the predicate acts alleged in the Amended Complaint fail to satisfy the requirements of *Rule 9(b) of the Federal Rules of Civil Procedure.* To this effect, Defendant Yao contends that the predicate acts are pleaded too generally to give him adequate notice of the precise misconduct of which he is accused.

[HN16] Because the predicate acts alleged by Plaintiff are mail and wire fraud, *Rule 9(b)* applies to the allegations. See e.g. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786 (3d Cir. 1984)*, cert. denied, *469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct.*

*1179 (1985).* [*28]  *Rule 9(b)* requires allegations of fraud to be plead with particularity. The purpose of *Rule 9(b)* is to provide a defendant with notice of the precise misconduct with which he or she is charged and to prevent false or unsubstantiated charges. See *Rolo v. City Investing Company Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998); Satellite Financial Planning Corp. v. First Nat'l Bank of Wilmington, 633 F. Supp. 386, 402 (D. Del. 1986).* Although allegations of "date, place or time" fulfill the purpose of *Rule 9(b)*, such allegations are not required as long as the plaintiff uses "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Rolo, 155 F.3d at 658.*

Reading the Amended Complaint as a whole, the Court concludes that Plaintiff has alleged sufficient facts to satisfy the pleading requirements of *Rule 9(b)*. While the predicate acts alleged in paragraph 49 may be unclear, they are illuminated by other paragraphs of the Amended Complaint. Thus, taken as a whole and construed in the light most favorable to Plaintiff, the Court concludes that the allegations of the Amended Complaint [*29] are sufficient to withstand a motion to dismiss at this juncture.

### 4. Summary

In sum, the Court concludes that the allegations of Plaintiff's Amended Complaint are sufficient to state a RICO claim at this juncture. Accordingly, the Court will deny Defendants' Motion To Dismiss the RICO count of Plaintiff's Amended Complaint.

## II. Whether Plaintiff Has Adequately Pled Fraud Under Delaware Law

Counts 2 and 3 of the Amended Complaint raise claims of fraud against Student Finance and Defendant Yao, respectively. [HN17] The elements of common law fraud under Delaware law are: "(1) defendant's false representation, usually of fact, (2) made either with knowledge or belief or with reckless indifference to its falsity, (3) with an intent to induce the plaintiff to act or refrain from acting, (4) the plaintiff's action or inaction resulted from a reasonable reliance on the representation, and (5) reliance damaged the defendant." *Browne v. Robb, 583 A.2d 949, 955 (Del. 1990).*

By their Motion, Defendants contend that Plaintiff has failed to plead the elements of fraud as required under Delaware law. In addition, Defendants contend that Plaintiff has failed to plead the [*30] elements of fraud with particularity as required under *Federal Rule of Civil Procedure 9(b).*

In response, Plaintiff sets forth various paragraphs of the Amended Complaint which it contends satisfy each of the required elements of common law fraud. Plaintiff further contends that the wording of these paragraphs is sufficient to satisfy the requirements of *Rule 9(b).*

After reviewing the allegations in Plaintiff's Amended Complaint in light of the elements of common law fraud and the requirements of *Rule 9(b)*, the Court concludes that Plaintiff's Amended Complaint satisfactorily pleads fraud against Student Finance and Defendant Yao. Plaintiff has alleged at least eight specific factual representations by Student Finance and/or Defendant Yao. n4 (D.I. 43, P39, 40). Plaintiff has also alleged that Student Finance and Defendant Yao knew these representations were false and intended to induce Plaintiff into acting based on them. (*D.I. 43 P 24, 43-44*). Finally, Plaintiff has alleged both reasonable reliance and harm. (D.I. 43, P38, 40-41). n5 Accordingly, at this juncture, the Court concludes that Plaintiff has sufficiently pled fraud [*31] so as to withstand a motion to dismiss.

n4 Defendants challenge whether some of these alleged misrepresentations are actionable. For example, Defendant contends that some of these misrepresentations are mere opinions which are insufficient to constitute fraud. Although Defendants may pursue these arguments at a later stage in this case, at this juncture, the Court concludes that Plaintiff has sufficiently pled factual misrepresentations so as to satisfy the requirements of *Rule 9(b)* and withstand a motion to dismiss.

n5 Defendants also contend that Plaintiff has not established that their reliance on any alleged misrepresentations was reasonable. However, [HN18] courts are generally reluctant to determine whether reliance is reasonable as a matter of law. See e.g. *Cliff House Condominium Council v. Capaldi, 1991 Del. Ch. LEXIS 146, 1991 WL 165302, *4 (Del. Ch. 1991).* Accordingly, at this juncture, the Court declines to determine as a matter of law whether Plaintiff's reliance on Defendants' alleged misrepresentations was reasonable.

[*32]

## CONCLUSION

For the reasons discussed, the Court will deny Defendants' Motion To Dismiss the RICO and fraud counts of Plaintiff's Amended Complaint. Paragraph 1 of the Order dated September 29, 2000 will be vacated and

A 96

2001 U.S. Dist. LEXIS 25556, *

an Order consistent with this Memorandum Opinion will    be entered.

A 97