1989 Del. Super. LEXIS 479, *

LEXSEE 1989 DEL.SUPER.LEXIS 479

**TANSEY-WARNER, INC., a Delaware corporation, Plaintiff v. JAMES L. HOOPER and R. A. GRANINGER, Defendants**

**Civil Action No. 80C-OC7**

**Superior Court of Delaware, Sussex**

*1989 Del. Super. LEXIS 479*

**Dated Submitted: October 13, 1989**
**November 15, 1989, Decided**

**DISPOSITION:** [*1]

Motion to Dismiss - Denied, Motion for Summary Judgment - Denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff real estate agent (agent) brought an action against defendants, seller and purchaser, to recover a commission from the sale of certain real estate. The agent's action asserted that the purchaser intentionally and deliberately interfered with the contractual relationship and with the agent's prospective economic advantage. The purchaser filed a motion to dismiss and, alternatively, for summary judgment.

**OVERVIEW:** The seller and the agent entered into an exclusive listing agreement the sale of a condominium unit. The purchaser made an offer to buy the unit, but the seller rejected the offer because the purchaser had not given the agent earnest money. Subsequently, the seller called the agent and said that he had rented the property to the purchaser. The seller conveyed the unit to the purchaser. In support of his motion, the purchaser argued that the agent failed to timely prosecute the case. The court found that the delay was the result of the purchaser's failure to timely file a reply brief. The court also found that there was sufficient evidence to support the agent's claims. The listing agreement was one of an exclusive right to sell coupled with an agreement by the seller that the agent shall be entitled to its full commission no matter who sells the property. Therefore, the agent was entitled to its full commission. Thus, the evidence viewed in the agent's favor established the existence of a contract or a prospective business opportunity with the seller. The purchaser was aware of the contract and understood that the agent was entitled to the commission.

**OUTCOME:** The purchaser's motion to dismiss and for summary judgment was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN1] It is within the Superior Court's discretion not to grant a motion to dismiss for want of prosecution if plaintiff is diligently prosecuting his claim at the time of the Super. Ct. Civ. R. 41(b) motion even though at some prior period of time he was guilty of grossly neglecting the case.

*Torts > Business & Employment Torts > Interference With a Contract*
[HN2] The elements establishing the tort of intentional interference with contract are: 1. A contract; 2. About which defendant knew; 3. An intentional act that is a significant factor in causing the breach of such contract; 4. Without justification; and 5. Which causes injury.

*Torts > Business & Employment Torts > Interference With Prospective Advantage*
[HN3] The elements of a cause of action for tortious interference with prospective business opportunity are: A showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c)

A 119

1989 Del. Super. LEXIS 479, *

proximate causation, and (d) damages.

*Torts > Multiple Defendants > Conspiracy*
[HN4] In order to prove a civil conspiracy, the plaintiff will have to show:(1) A confederation or combination of two or more persons;(2) An unlawful act done in furtherance of the conspiracy; and(3) Actual damage. There must be an independent tort to support conspiracy liability. Civil conspiracy is not an independent cause of action; its purpose is to implicate others and to increase the measure of damages. A conspirator is jointly and severally liable for the acts of his co-conspirator committed in furtherance of the conspiracy. A conspiracy may be proved by circumstantial evidence as well as direct evidence. Thus, a reasonable latitude may be permitted in establishing facts from which the conspiracy may be inferred.

**COUNSEL:**

Michael F. McGroerty, Esquire, Seaford, Delaware, Attorney for Plaintiff.

Lawrence B. Steele III, Esquire, Georgetown, Delaware, Attorney for Defendant James L. Hooper.

Richard K. Goll, Esquire, Goll & Tomasetti, Newport, Delaware, Attorney for Defendant R. A. Graninger.

**JUDGES:**

Before LEE, Judge

**OPINIONBY:**

LEE

**OPINION:**

MEMORANDUM OPINION

LEE, Judge

This action involves an attempt by plaintiff Tansey-Warner, Inc. ("Tansey-Warner") to recover a commission from the sale of certain real estate. Plaintiff alleges that defendants James L. Hooper ("Hooper") and R. A. Graninger ("Graninger") conspired to defraud it of its commission, and that Graninger intentionally and deliberately interfered with the contractual relationship between it and Hooper and with plaintiff's prospective economic advantage.

Defendant Graninger has moved to dismiss the case against him pursuant to Super. Ct. Civ. R. 41(b) for failure to timely prosecute, and alternatively, has moved

for summary judgment on the ground no cause of action is stated against him.

This is the Court's decision on the pending motions.

FACTS n1

n1 The Court sets forth the facts in a light most favorable to the plaintiff, the nonmoving party. See *Sweetman v. Strescon Industries Inc., Del. Super., 389 A.2d 1319 (1978).* Additionally, although certain facts are in dispute, defendant Graninger, apparently for purposes of this summary judgment motion only, has set forth in his brief these disputed facts in a light most favorable to plaintiff.

[*2]

Substantive History.

On August 21, 1979, Hooper and plaintiff entered into an exclusive listing agreement ("listing agreement") for the sale of PEO6-South, Sea Colony, Bethany Beach, Delaware ("unit") which Hooper owned. n2 This listing agreement provided in pertinent part:

"I/we agree to pay Broker 6 per cent of the selling price during the period of this Agreement when Broker secured a purchaser ready, able, and willing to purchase said property on the above terms, or at any other price or terms acceptable to me/us, or said property is sold or exchanged by said Broker or any other person, including ourselves. I/we agree to pay Broker said per cent of the listing price if I/we withdraw said property from sale or exchange, or otherwise prevent performance hereunder by Broker during the terms of this listing. This sum shall also be payable if said property is sold within twelve (12) months from the termination of this agreement to a purchaser obtained through Broker's efforts during the continuance of such agency.

Said agency shall continue until terminated by either party upon and after thirty (30) days' notice in writing of the intention to so terminate, it being agreed [*3] that in no event shall said agency be terminated within four (4) months from the date hereof."

n2 Defendant Hooper claims he never entered into this listing agreement, and maintains someone altered a document to make it appear Hooper and plaintiff entered into this listing agreement on August 21, 1979. This is a disputed fact Graninger sets forth in plaintiff's favor.

On October 23, 1979, Tansey-Warner showed

1989 Del. Super. LEXIS 479, *

Graninger the unit. Graninger, a real estate broker licensed in Virginia, Maryland and the District of Columbia, was looking for a unit on behalf of his mother, Emily A. Neuhaus ("Neuhaus"). On that same afternoon, Graninger, as trustee for Neuhaus, made an offer to purchase the unit in the amount of $ 95,000. This offer to purchase was contained in an Agreement of Purchase and Sale ("Agreement of Sale"). In that Agreement of Sale, Graninger recognized Tansey-Warner as acting as agent in connection with the sale of this unit from Hooper to Graninger.

Hooper rejected the offer because Graninger had not given Tansey-Warner the $ 5,000 in earnest money as the Agreement of Sale claimed. Graninger attempted to talk with Joseph Tansey, an agent of plaintiff, but could not contact [*4] him. When he had not heard from Tansey-Warner for a week to ten days, he called Hooper directly, and Hooper told Graninger he had refused the offer. Thereafter, Graninger received a letter from Tansey-Warner stating the offer had been refused.

Within a week or two thereafter, Graninger again telephoned Hooper, and Hooper indicated he wanted to reach an agreement. Thereafter, Graninger met with Hooper at Hooper's residence, and they came to price, terms and conditions that Neuhaus found favorable.

Hooper sent a letter dated November 26, 1979 to Tansey-Warner therein he stated:

"I am writing in order to remove the exclusive listing for the sale of PHO6, Edgewater, in Sea Colony. This is a 30 day notice required under the listing agreement. In the event you are able to sell this property in the next 30 days I will honor the provisions under this exclusive listing. After the 26th of December, 1979, the property will no longer be for sale." n3

n3 Hooper maintains he sent this letter because he was under the mistaken impression that a listing agreement existed for this unit. Only later did he determine that none existed for this unit although listing agreements with Tansey-Warner existed at that time for other properties he owned.

[*5]

Tansey-Warner received this letter November 29, 1979.

On December 7, 1979, Hooper called Tansey-Warner and told Joseph Tansey that he had rented the property to Graninger.

On December 26, 1979, Neuhaus executed and

acknowledged a Leasehold Interest Assignment for the unit, which was recorded on March 28, 1980 in the Office of the Recorder of Deeds in and for Sussex County. By deed dated December 28, 1979, Hooper conveyed the unit to Neuhaus, and this deed was recorded March 28, 1980.

The Hoopers and Neuhaus additionally entered into an Agreement of Sale dated December 28, 1979 ("Agreement"). That Agreement indicates Neuhaus purchased the unit itself for $ 75,000 and additionally, all the furnishings therein for $ 9,000, for a total purchase price of $ 84,000. Neuhaus paid this purchase price by executing and delivering to Hooper a purchase money bond and mortgage in the amount of $ 84,000. The Agreement was contingent upon Graninger's unconditionally guaranteeing the purchase money obligation, which he did.

Paragraph 19 of that Agreement provides:

"The parties mutually represent that no real estate commission has been earned as a result of this sale. In the event a claim for a real [*6] estate commission is made as a result of this sale, PURCHASER covenants and agrees to indemnify SELLER for one-half (1/2) of any commissions deemed to be earned as a result of this transaction."

In a letter dated October 13, 1989 from Hooper's attorney, it is explained that this paragraph dealt with the possibility of plaintiff's position after the defendants recognized plaintiff's potential claim because of its introduction of Graninger to the unit.

Procedural History.

Plaintiff filed this action on October 14, 1980. In its complaint, plaintiff alleges Graninger conspired with Hooper to avoid the real estate commission Hooper owed Tansey-Warner, thus reducing the purchase price which Graninger would have to pay for the unit; Graninger and Hooper deliberately and maliciously, with intent to defraud plaintiff of commissions lawfully due it, conspired with each other to defraud plaintiff of commissions due it; and Graninger deliberately and intentionally interfered with the contractual and agency relationship between Hooper and plaintiff, and deliberately and intentionally interfered with plaintiff's prospective economic advantage.

Hooper and Graninger filed their answers in December, [*7] 1980. The parties conducted discovery at the first of 1983, at the end of 1984, at the end of 1986, and in May, 1987. The Court scheduled a trial for December 9, 1987. This trial was continued to allowed Mr. Goll, Graninger's new attorney, to review the file

1989 Del. Super. LEXIS 479, *

before entering his appearance. Graninger filed his Motion for Summary Judgment on April 26, 1988. A briefing schedule was entered requiring the filing of an opening brief on May 16, 1988; an answering brief on June 16, 1988; and a reply brief on July 1, 1988. Because a Reply Brief on Graninger's behalf never was filed and because Graninger did not notify the Court he intended to waive his Reply Brief, the file languished in the Prothonotary's Office until September, 1989. Only after the Court directly contacted the parties did Graninger notify the Court he waived the filing of his Reply Brief.

After the Court notified the parties of the briefing delinquency, Hooper's attorney commented upon Graninger's bases for dismissal and for summary judgment. Defendant Hooper also requested that if the Court rules in Graninger's favor, then Hooper be given the opportunity to amend the pleadings to crossclaim against Graninger based on the [*8] special relationship between defendants as defined in paragraph 19 of the Agreement of Sale dated December 28, 1979.

DISCUSSION

Motion to Dismiss.

Defendant Graninger has moved to dismiss this action, pursuant to Super. Ct. Civ. R. 41(b), for failure to timely prosecute. The decision to grant this Motion is within the Court's discretion. *Gebhart v. Ernest DiSabatino & Sons, Inc., Del. Supr., 264 A.2d 157 (1970); Ayers v. D. F. Quillen & Sons, Inc., Del. Supr., 188 A.2d 510 (1963).* The facts of this case are very similar to those in *Ayers v. D. F. Quillen & Sons, Inc., supra,* where the Supreme Court held that [HN1] it is within the Superior Court's discretion not to grant a motion to dismiss for want of prosecution if plaintiff is diligently prosecuting his claim at the time of the Rule 41(b) motion even though at some prior period of time he was guilty of grossly neglecting the case.

Here, plaintiff did not vigorously prosecute the case for many years. However, in 1986 and 1987, it took a number of depositions and had the case set for trial. The parties were preparing to go to trial when Graninger's attorney sought a continuance [*9] to enter the case. The resolution of this case has languished since that time because Graninger failed to file a Reply Brief or to notify the Court he waived his Reply Brief. Plaintiff was prosecuting this case after delay, and the subsequent delay is due to defendant Graninger; consequently, the Court denies Graninger's motion to dismiss for failure to prosecute.

Motion for Summary Judgment.

Plaintiff has claimed Graninger conspired with

Hooper to avoid the real estate commission; he did so intentionally and maliciously with intent to defraud; and Graninger intentionally and deliberately interfered with the contractual agency relationship between defendant Hooper and plaintiff, and deliberately and intentionally interfered with plaintiff's prospective economic advantage.

[HN2] The elements establishing the tort of intentional interference with contract are:

1. A contract;

2. About which defendant knew;

3. An intentional act that is a significant factor in causing the breach of such contract;

4. Without justification; and

5. Which causes injury.

*Irvin & Leighton v. W. M. Anderson Co., Del. Ch., 532 A.2d 983, 992 (1987).*

[HN3] The elements of a cause of action [*10] for tortious interference with plaintiff's prospective business opportunity are:

"'[A] showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages . . . *Bowl-Mor Company, Inc. v. Brunswick Corp., Del. Ch. [6 Terry 49], 297 A.2d 61 (1972),* and *Regal Home Distributors, Inc. v. Gordon, Del. Super., 66 A.2d 754 (1949).*' [DeBonaventura v. Nationwide Mut. Ins., Del. Ch.,] *419 A.2d [942], 947 [(1980)].*"

*DeBonaventura v. Nationwide Mut. Ins. Co., Del. Supr., 428 A.2d 1151, 1153 (1981).* The facts, viewed in a light most favorable to plaintiff, establish the existence of both torts.

A. Contract or Business Opportunity.

Plaintiff and Hooper entered into an exclusive listing agreement which required a thirty-day termination notice. Although Hooper dated his termination notice November 26, 1979, plaintiff did not receive it until November 29, 1979. Notice generally is not effective until received. *Jewell v. Unemployment Compensation Commission, Del. Supr., 183 A.2d 585 (1962);* [*11] *State ex rel. Hall v. Camper, Del. Super., 347 A.2d 137 (1975).* Accordingly, the listing agreement did not terminate until

December 29, 1979. The sale occurred on December 28, 1979, while the listing agreement was in effect.

The listing agreement is one of an exclusive right to sell coupled with an agreement by the owner that the agent shall be entitled to its full commission no matter who sells the property; accordingly, plaintiff is entitled to its full commission. *Harry H. Rosin Co. v. Eksterowicz, Del. Super., 73 A.2d 648 (1950)*. Alternatively, even if the notice was timely, plaintiff could be entitled to the commission on the ground the listing agreement was terminated in bad faith. *B-H, Inc. v. "Industrial America", Inc., Del. Supr., 253 A.2d 209 (1969); Slaughter v. Stafford, Del. Supr., 141 A.2d 141 (1958)*.

Another alternative ground for plaintiff's entitlement to the commission, assuming the listing agreement is not valid, is that plaintiff was the procuring cause of the sale. *Canady v. Brainard, Del. Supr., 144 A.2d 240 (1958); Slaughter v. Stafford, supra.* [*12]

Thus, the evidence viewed in plaintiff's favor, establishes the existence of a contract or a prospective business opportunity with Hooper.

B. Graninger's Knowledge.

The following evidence supports the inference that Graninger was aware of the contract, or in the alternative, understood plaintiff may be entitled to the commission. First, he signed the offer which stated Tansey-Warner was acting as agent for the sale of the property. Furthermore, Hooper has acknowledged he and Graninger included paragraph 19 of the Agreement for Sale because they recognized plaintiff's potential claim.

C. Intentional Interference.

That Graninger initiated discussions with Hooper which circumvented Tansey-Warner and negotiated a price which excluded the commission amount evidence intentional acts on Graninger's part to either cause Hooper to breach the contract with plaintiff or to prevent plaintiff from realizing the business opportunity to close the sale of the unit.

D. Justification.

No one offers any justification for Graninger and Hooper's actions.

E. Damages.

Because Graninger and Hooper circumvented Tansey-Warner, Tansey-Warner lost its commission on the sale of this unit. [*13]

Thus, the facts viewed in a light most favorable to plaintiff support claims Graninger intentionally interfered with a contract or plaintiff's prospective business opportunity.

[HN4] In order to prove a civil conspiracy, the plaintiff will have to show:

"(1) A confederation or combination of two or more persons;

(2) An unlawful act done in furtherance of the conspiracy; and

(3) Actual damage."

*Nicolet, Inc. v. Nutt, Del. Supr., 525 A.2d 146, 149-50 (1987)*. There must be an independent tort to support conspiracy liability. Id. Civil conspiracy is not an independent cause of action; its purpose is to implicate others and to increase the measure of damages. *In Re Asbestos Litigation, Del. Super., 509 A.2d 1116 (1986)*, aff'd. sub nom., *Nicolet, Inc. v. Nutt, supra.* A conspirator is jointly and severally liable for the acts of his co-conspirator committed in furtherance of the conspiracy. *Nicolet, Inc. v. Nutt, supra.* A conspiracy may be proved by circumstantial evidence as well as direct evidence. Thus, a reasonable latitude may be permitted in establishing facts from which the conspiracy may be inferred. [*14] *Connolly v. Labowitz, Del. Super., 519 A.2d 138 (1986)*.

The underlying wrongs in this case were interference with contract and interference with plaintiff's prospective business opportunity. Evidence exists Hooper and Graninger dealt together to terminate the contract with plaintiff or preclude plaintiff from recovering his commission. Thus, the evidence also supports the claim of a conspiracy.

Neither the torts nor the conspiracy claims require that Graninger incur a personal benefit from his actions. His actions are sufficient to support causes of action against him for willful interference of contract or interference with an advantageous business opportunity and conspiracy to interfere with contract or with an advantageous business opportunity.

For the foregoing reasons, defendant Graninger's Motion for Summary Judgment is denied.

Defendant Hooper requested that if the Court dismissed defendant Graninger, it allow him to amend the complaint to state a cross-claim against Graninger. In light of the above decision, this Court need not consider defendant Hooper's request for leave to amend his answer or whether that request properly is before the Court. However, [*15] this Court notes that if Hooper or any other party anticipates making any motions to amend, he or they should do so immediately because the Court will not delay this trial which is set for May 21, 1990.

A 123

1989 Del. Super. LEXIS 479, *

IT IS SO ORDERED.

2005 U.S. Dist. LEXIS 18891, *; 151 Lab. Cas. (CCH) P10,559;
10 Wage & Hour Cas. 2d (BNA) 1633

LEXSEE 2005 U.S.DIST.LEXIS 18891

**MARLAYNA G. TILLMAN, Plaintiff, v. THE PEPSI BOTTLING GROUP, INC.
and TEAMSTERS LOCAL UNION 830, Defendants.**

**Civ. No. 04-1314-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 18891; 151 Lab. Cas. (CCH) P10,559; 10 Wage & Hour
Cas. 2d (BNA) 1633*

**August 30, 2005, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an employment discrimination action, defendant employer filed a motion to dismiss plaintiff employee's claims for sexual harassment, retaliation, breach of the covenant of good faith and fair dealing, failure to promote, and all claims under the Delaware Wage Payment and Collection Act. Defendant union filed a motion for a more definite statement.

**OVERVIEW:** The employer argued that the employee's claims for sexual harassment and retaliation failed because the employee did not exhaust all her administrative remedies because those claims were not included in her charge of discrimination. As to the sexual harassment claim, the court agreed, noting that it was not reasonably within the scope of either the United States Equal Employment Opportunity Commission (EEOC) charge or investigation. The retaliation claim survived, however, because it was within the scope of the EEOC charge alleging denial of equal pay, benefits, and promotional opportunities. The employer sought dismissal of the failure to promote claim on the basis that the employee failed to identify whether her claim was based on racial or gender discrimination. The court concluded that the employee's statement that she was an African-American female was sufficient as it asserted factual allegations in support of the claim. Finally, the court concluded that the union was not entitled to a more definite statement because the complaint sufficiently stated the nature of the action, the general factual background, the basis for seeking relief, and the relief sought.

**OUTCOME:** The employer's motion to dismiss was granted as to the sexual harassment claim, the breach of implied covenant of good faith and fair dealing claim,

and the Delaware Wage Payment and Collection Act claim, and was denied as to all other claims. The union's motion for a more definite statement was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Objections & Demurrers > Failure to State a Cause of
Action*
*Evidence > Procedural Considerations > Burdens of
Proof*
[HN1] In analyzing a motion to dismiss pursuant to *Fed.
R. Civ. P. 12(b)(6)*, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle her to relief. The moving party has the burden of persuasion.

*Civil Procedure > Pleading & Practice > Defenses,
Objections & Demurrers > Failure to State a Cause of
Action*
[HN2] When deciding a motion to dismiss, the court also is allowed to consider any exhibits attached to the complaint as well as documents attached to the motion to dismiss which form the basis of the plaintiff's claims.

*Labor & Employment Law > Discrimination > Title VII*
*Labor & Employment Law > U.S. Equal Employment*

2005 U.S. Dist. LEXIS 18891, *; 151 Lab. Cas. (CCH) P10,559;
10 Wage & Hour Cas. 2d (BNA) 1633

Opportunity Commission > Exhaustion of Remedies
[HN3] The jurisdictional prerequisites to a suit under Title VII are the filing of charges with the United States Equal Employment Opportunity Commission (EEOC) and the receipt of a notice of right to sue. The requirement that a complainant file charges with the EEOC gives that administrative agency the opportunity to investigate, mediate and take remedial action with respect to a charge of discrimination. Although preliminary requirements for a Title VII action are to be interpreted in a non-technical fashion, nonetheless, the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of the proceedings. The relevant test for determining whether plaintiff must exhaust her administrative remedies, therefore, is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom. Claims considered within the scope of the prior EEOC complaint either arise during the pendency of the EEOC investigation, are closely related to conduct alleged in the charge, or are explanations of the original charge.

Civil Procedure > Pleading & Practice > Pleadings > Interpretation
Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action
[HN4] When deciding a motion to dismiss for failure to state a claim, one must read Fed. R. Civ. P. 12(b)(6) in conjunction with Fed. R. Civ. P. 8(a), which establishes the requirements for adequately pleading a claim in federal court.

Civil Procedure > Pleading & Practice > Pleadings > Interpretation
[HN5] Fed. R. Civ. P. 8(a) requires a short and plain statement of the claim showing that the pleader is entitled to relief. The statement need not contain detailed facts, but it requires that plaintiff give defendant fair notice of what the claim is and the grounds upon which it rests. A plaintiff is not required to state precisely each element of the claim. Despite that fact, a plaintiff must set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory. The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim upon which relief can be granted.

Labor & Employment Law > Discrimination > Disparate Treatment
Labor & Employment Law > Discrimination > Title VII
[HN6] The United States Court of Appeals for the Third Circuit has previously recognized claims for failure to promote.

Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption
[HN7] The reach of § 301 of the Labor Management Relations Act encompasses not only state-law claims that are directly based on a collective bargaining agreement but also all those that are substantially dependent upon analysis of the terms of the agreement.

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Defects of Form
[HN8] A motion under Fed. R. Civ. P. 12(e) is made to correct a pleading that is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading. The purpose, however, of Rule 12(e) is not to make it easier for the moving party to prepare its case.

Civil Procedure > Pleading & Practice > Pleadings > Interpretation
Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Defects of Form
[HN9] A complaint which states the nature of the action, the general factual background, the basis for seeking relief, and the relief sought is all that is required by notice pleading under Fed. R. Civ. P. 8. In such circumstances, a motion for a more definite statement should not be granted.

COUNSEL:  [*1]  Jeffrey K. Martin, Esquire, and Timothy J. Wilson, Esquire, of Margolis Edelstein, Wilmington, Delaware, for Plaintiff.

William M. Kelleher, Esquire, of Ballard Spahr Andrews & Ingersoll, LLP, Wilmington, Delaware, for Defendant Pepsi Bottling Group, Inc. Of Counsel: Daniel V. Johns, Esquire, and Lucretia C. cLemons, Esquire of Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania.

Clifford B. Hearn, Jr., Esquire, Wilmington, Delaware. Stephen J. Holroyd, Esquire, and Marc. L. Gelman, Esquire, of Jennings Sigmond, Philadelphia, Pennsylvania, for Defendant Teamsters Local Union 830.

2005 U.S. Dist. LEXIS 18891, *; 151 Lab. Cas. (CCH) P10,559;
10 Wage & Hour Cas. 2d (BNA) 1633

JUDGES: ROBINSON Chief Judge.

OPINIONBY: Sue L. Robinson

OPINION:

### MEMORANDUM OPINION

Dated: August 30 , 2005
Wilmington, Delaware

ROBINSON Chief Judge

## I. INTRODUCTION

On September 29, 2004, plaintiff Marlayna G. Tillman commenced this suit against defendants, Pepsi Bottling Group, Incorporated ("PBG") and Teamsters Local 830 ("Local 830"). (D.I.1) In her complaint, plaintiff asserted the following claims: (1) racial discrimination; (2) violation of *42 U.S.C. § 1981*; (3) gender discrimination; (4) sexual harassment; (5) retaliation; (6) failure [*2] to promote in violation of the *Fair Labor Standards Act* ("FLSA"); (7) violation of *Delaware's Wage Payment and Collection Act*; (8) violation of the *Equal Pay Act*; and (9) a breach of the covenant of good faith and fair dealing. (Id.) The court has jurisdiction pursuant to *28 U.S.C. § 1331*. Presently before the court is PBG's motion to dismiss plaintiff's claims for sexual harassment, retaliation, breach of the covenant of good faith and fair dealing, n1 failure to promote and all claims under the Delaware Wage Payment and Collection Act. For the reasons set forth below, the court grants in part and denies in part defendant PBG's motion. Also before the court is Local 830's motion for a more definite statement which, for the reasons set forth below, the court shall deny.

> n1 The court shall grant the motion to dismiss plaintiff's claim alleging breach of the implied covenant of good faith and fair dealing, as it is unopposed. (D.I. 11 at 2)

## II. BACKGROUND n2

> n2 Given the standard for a motion to dismiss, the court considered only those facts pled in the complaint and not those additional facts alleged in the brief answering defendant PBG's motion to dismiss.

[*3]
PBG hired plaintiff on May 8, 2001, as a merchandiser in the Merchandising/Marketing/Sales department. (Id. at P 11) Plaintiff, employed in an entry level position, was paid an hourly rate of $ 10.57 per hour. (Id.) In September 2001, plaintiff was moving pallets at work when a wood chip entered her eye. (Id. at P 13) She was taken to the hospital and missed two days of work. (Id.) Plaintiff returned to work and her supervisor, Bruce Wray, informed her that she would not be paid for the missed days. (Id.) Believing that she was entitled to six paid sick days, plaintiff discussed the situation with the Human Resources Department ("HR"). (Id.) Five months later, plaintiff was assigned to the Conventional Department by Wray; because plaintiff was maintaining her responsibilities in the Merchandising/Marketing/Sales Department, she was effectively working two jobs. (Id. at PP 14,20) Plaintiff believes that the transfer was an act of retaliation for her conversation with HR regarding the unpaid sick days. (Id.)

The Conventional Department position is union-eligible. (Id. at P 15) According to Local 830's by-laws and the defendants' collective bargaining [*4] agreement, the defendants had thirty days after transferring plaintiff to either incorporate her into Local 830 or return her to her original position in the company. n3 (Id. at P 19) This procedure was not followed by defendants. (Id.) Further, plaintiff went to HR to ask for assistance in obtaining entry to Local 830, but was not permitted to join. (Id.)

> n3 The complaint does not differentiate between the defendants and, as the court must accept the facts of the complaint as true, the court will use "defendants" to refer to both PBG and Local 830 as the complaint does.

Plaintiff worked both positions for eight months, starting October 13, 2001 and ending May 28, 2002. (Id. at P 20) During this period, plaintiff did not receive overtime pay or the Union's higher weekend pay rate. (Id. at P 18) Plaintiff, an African-American female, was the only employee in the department performing union work who was not paid union wages. (Id. at P 15) Plaintiff continued to be paid at her initial hourly [*5] rate of $ 10.57 while other male employees were paid $ 16.63 per hour. (Id. at P 16) Additionally, plaintiff was supposed to be paid for a pre-determined forty hour work week but on several occasions was not compensated for the full forty

2005 U.S. Dist. LEXIS 18891, *; 151 Lab. Cas. (CCH) P10,559;
10 Wage & Hour Cas. 2d (BNA) 1633

hours. (Id. at P 25) On average, plaintiff worked approximately fifteen to twenty overtime hours per week without any overtime compensation. (Id. at P 26). In failing to pay plaintiff wages to which she was entitled, defendants are alleged to have violated the collective bargaining agreement between them. (Id. at PP 25, 31) Plaintiff requested back pay for the eight months that she had been working both positions and her request was denied by defendants. (Id. at P 37) Further, by not gaining admittance to Local 830, plaintiff was also denied union benefits and protection. (Id. at P 17)

Despite her repeated requests, plaintiff was not made a member of the Union. (Id.) In April 2002, plaintiff asked HR to transfer her to a union position. (Id. at P 35) On May 28, 2002, plaintiff was returned to her original position in the Merchandising/Marketing/Sales Department and was given a pay raise, making her hourly rate $ 10.86. [*6] (Id. at P 36) On July 22, 2002, HR transferred plaintiff to a union position in the Warehouse Department. (Id. at P 39) Prior to plaintiff's transfer, PBG hired (in the same capacity as plaintiff) three male employees who had no prior experience and had never worked for PBG. (Id. at P 40) The male employees were installed in union positions before plaintiff's transfer was finalized and, therefore, were able to surpass plaintiff in seniority. n4 (Id. at P 41) Plaintiff filed a complaint with HR and Local 830 because the hiring violated company policy to hire from within. (Id. at P 42)

n4 This hiring affected plaintiff's seniority and her ability to bid for positions. (D.I. 1 at P 43)

After being transferred to the Warehouse Department, plaintiff was paid $ 12.68 per hour. The union rate, which her male colleagues received, was between $ 15.75 and $ 16.63 per hour. (Id. at P 44) In her complaint, plaintiff also alleges that, during July [*7] 2002, her new male co-workers made comments on her breast size and other inappropriate topics. (Id. at PP 45-47) A co-worker, Howard Laws, told plaintiff that she needed "to get laid" and that "[he was] just the man to do it to [her]." (Id. at P 46) On another occasion, Laws asked plaintiff if he could borrow a pen. (Id. at P 47) When plaintiff removed the pen from her shirt pocket, Laws commented "you just want me to watch you touch your breasts." (Id.) Plaintiff filed a grievance with HR alleging sexual harassment, but no action was taken. n5 (Id. at P 48) In August 2002, plaintiff asserts that the Warehouse Department supervisors began to scrutinize her more than her co-workers by singling her out for verbal discipline and threatening to place written reprimands in her file. (Id. at PP 51, 52)

n5 Plaintiff also complained to HR and management about rumors that were circulating. (D.I. 1 at P 50) The rumors portrayed the plaintiff as sleeping with co-workers. (Id.) The complaint to HR about the rumors also went unanswered. (Id.)

[*8]

On August 28, 2002, plaintiff filed a Charge of Discrimination with the Delaware Department of Labor ("DDOL") and the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of her race and her gender. (Id. at P 53; D.I. 9, ex. 1) Plaintiff's charge states the following:

I am a black female individual who has been employed by Respondent since 5/8/01. Respondent has denied me various promotional opportunities, particularly for Driver positions. Instead, I have been assigned to work in various departments, including, currently, the Warehousing Department, where I am subjected to disparate treatment with regard to terms and conditions of my employment. My supervisors, Glen Matthew (white male) and Tom Riley (black male) hold me to a higher standard than my white male coworkers with regard to rules and regulations. As recently as 8/27/02, I was falsely accused of leaving my shift without checking with the Supervisor on Duty. Also, I am paid lower wages than my white male counterparts, although I am expected to perform the same work as they are.

I have been told that I could not get a Driver position because I am not in the Union. I [*9] believe I have been discriminated against in violated [sic] of the Civil Rights Act of 1964, as amended, and the Delaware Discrimination in Employment Act, because: I am the only female working in my classification, and I am paid lower wages than my white counterparts, denied promotional opportunities, and held to a higher standard. I have seen male coworkers who

2005 U.S. Dist. LEXIS 18891, *; 151 Lab. Cas. (CCH) P10,559;
10 Wage & Hour Cas. 2d (BNA) 1633

are not in the union, some with less tenure, obtain Driver positions and thereby become union members.

(D.I. 9, ex. 1) Shortly thereafter, plaintiff received a salary increase to $ 15.75 per hour. (D.I. 1 at P 54)

Plaintiff was fired, along with other members of her Department, on September 18, 2002. (Id. at P 55) All of plaintiff's co-workers were recalled to work two days later, but plaintiff was not recalled until October 21, 2002. n6 (Id. at PP 55-57) Upon her return to work, plaintiff's supervisors started a disciplinary file on her. (Id. at P 58) Every minor infraction was recorded and plaintiff was sometimes written up without her knowledge. (Id.) Prior to this time, plaintiff had never been issued a written reprimand. (Id.) In November 2002, plaintiff was singled out and verbally reprimanded [*10] for using a personal cell phone. (Id. at P 60) Plaintiff filed a grievance with Local 830, but no action was taken. (Id. at P 61)

> n6 Upon her return to work, plaintiff filed another grievance with the Local 830 regarding her layoff. (D.I. 1 at 58) This time, Local 830 demanded the company pay plaintiff for the four weeks she was laid off. (Id.) Plaintiff was paid these wages in December 2002. (Id.)

In April 2003, plaintiff heard a male supervisor, Joe Rizzo, make racial and derogatory comments about African-Americans, Hispanics and women. (Id. at P 63) Plaintiff complained to HR and was assured that an investigation would take place. (Id.) To the best of plaintiff's knowledge, no action was taken against Rizzo. (Id.) After filing the complaint with HR, plaintiff observed an immediate change in Rizzo's behavior towards her. (Id.) Plaintiff was then transferred to the Production Department of which Rizzo was supervisor. (Id.) Plaintiff requested a transfer from the Production [*11] Department on three occasions; all were denied. (Id.) On April 22, 2003, plaintiff filed an additional charge of discrimination with the DDOL against Local 830 alleging racial and sex discrimination and also retaliation. (Id. at P 64)

On November 6, 2003, plaintiff injured her leg while climbing out of a truck and was placed on short term disability. (Id. at P 65) Plaintiff did not receive her disability check for ten weeks because HR forgot to file the paperwork. (Id.) Plaintiff ultimately was paid in one lump sum and, therefore, was taxed heavily on the full

amount. (Id.) Plaintiff returned to work on April 19, 2004, and was assigned to the can line filler room. (Id. at P 66) This position required plaintiff to stand for prolonged periods of time. (Id.) Plaintiff went to Rizzo and asked for accommodations or to "bump" another employee for a sitting position because she was unable to stand for long periods of time. (Id.) Rizzo informed plaintiff that her only option would be to take a short term disability leave again. (Id.) Plaintiff was not paid for the second short term disability period. (Id.)

The DDOL investigated plaintiff's Charge of [*12] Discrimination and found in favor of plaintiff. (Id. at P 67) With respect to the Charge of Discrimination filed against PBG in August 2002, the DDOL characterized the disputed facts as follows:

> 1. Charging party states that she was discriminated against by Respondent because she was not afforded the same opportunities as her male counterparts in regards to promotions such as driver positions and she is subjected to disparate treatment from management in regards to the terms and conditions of her employment.    .
>
> 2. Respondent states that Ms. Tillman was treated the same as her male co-workers and afforded all the same opportunities for promotions and not treated disparately by her supervisors.

(D.I. 1, ex. A) After its investigation, the DDOL resolved these issues of facts as follows:

> 1. Charging Party was able to establish that she had been treated disparately compared to her male co-workers. This was demonstrated through the documentation provided by Respondent in regards to Charging Party's attendance records and the various documentation regarding the amount of time she was late, left work early and called off of work. The same attendance records for [*13] her co-workers do not reflect the same amount of scrutiny on a regular basis as Charging Party in regards to being less than 5 minutes late to work. . . .

2005 U.S. Dist. LEXIS 18891, *; 151 Lab. Cas. (CCH) P10,559;
10 Wage & Hour Cas. 2d (BNA) 1633

2. A review of the punch detail reports along with the timecard records reveals that male employees more frequently are receiving the standard number of hours in a week and are also more frequently receiving overtime hours than Charging Party. . . .

\* \* \* \*

4. Charging Party provided documentation, which reflects a decreased amount of hourly wage than that of her male co-workers. . . .

5. Witnesses were contacted and asked about their schedules, the number of hours they are afforded each week, the disciplinary [sic] received or not received regarding their work schedules and the use of personal cell phones on the job. The results of these interviews clearly revealed that Charging Party's male counterparts are treated more favorably than Charging Party.

(Id.) The DDOL concluded that plaintiff had "met her burden of showing that she was discriminated against based on her gender." (Id.) Plaintiff was issued two right to sue letters from the EEOC on July 1, 2004. (Id. at P68)

Plaintiff took three [*14] weeks vacation from August 8, 2004 through August 30, 2004. (Id. at P 69) Upon returning to work, plaintiff was called into HR to discuss her complaints about the sexual harassment. n7 (Id.) On August 12, 2004, the NAACP held a press conference in which plaintiff participated. (Id. at P 70) After the press conference, plaintiff was informed that she had been awarded a transfer to the Transport Department, a position she had bid on three or four times over the last few years. (Id.) Plaintiff was awarded this position on September 17, 2004. (Id.) After transferring to the Transport Department, plaintiff was warned to "watch her back" because the company wants "to get rid of [her]." (Id. at P 71)

n7 Plaintiff also gave HR a pornographic magazine which she had found on a clipboard inside a truck. (D.I. 1 at PP 49, 69)

## III. STANDARD OF REVIEW

[HN1] In analyzing a motion to dismiss pursuant to *Rule 12 (b) (6)*, the court must accept as true all material allegations of the complaint and [*15] it must construe the complaint in favor of the plaintiff. See *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a Rule 12 (b) (6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle her to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. The moving party has the burden of persuasion. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*.

[HN2] When deciding a motion to dismiss, the court also is allowed to consider any exhibits attached to the complaint as well as documents attached to the motion to dismiss which form the basis of the plaintiff's claims. See *Rossman v. Fleet Bank Nat'l Ass'n, 280 F.3d 384, 388 n.4 (3d Cir. 2002); Pryor v. NCAA, 288 F.3d 548, 559-60 (3d Cir. 2002)*; [*16] *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)* ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on that document.").

## IV. DISCUSSION

PBG makes three separate arguments for dismissal of plaintiff's claims against it. First, PBG claims that plaintiff's sexual harassment and retaliation claims fail because she did not exhaust all available administrative remedies. (D.I. 9 at 1) Second, PBG argues that there is no legal basis for plaintiff's failure to promote claim, (Id.) Finally, PBG asserts that plaintiff's claim pursuant to the Delaware Wage Payment and Collection Act is preempted by *§ 301* of the Labor Management Relations Act. (Id.)

### A. Sexual Harassment and Retaliation Claims

PBG seeks dismissal of plaintiff's claims for sexual harassment and retaliation because she did not exhaust all her administrative remedies. (D.I. 9 at 4) Specifically, PBG contends that plaintiff's claims fail because her allegations of sexual harassment and retaliation were not included in her Charge of Discrimination. [*17] (Id.)

[HN3] The jurisdictional prerequisites to a suit under

2005 U.S. Dist. LEXIS 18891, *; 151 Lab. Cas. (CCH) P10,559;
10 Wage & Hour Cas. 2d (BNA) 1633

Title VII are the filing of charges with the EEOC and the receipt of a Notice of Right to Sue. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* The requirement that a complainant file charges with the EEOC gives that administrative agency the opportunity to investigate, mediate and take remedial action with respect to a charge of discrimination. See *Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398 (3d Cir. 1976).* Although preliminary requirements for a Title VII action are to be interpreted in a non-technical fashion, see *Love v. Pullman Co., 404 U.S. 522, 527, 30 L. Ed. 2d 679, 92 S. Ct. 616 (1972),* nonetheless, "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of the proceedings." *Ostapowicz, 541 F.2d at 398-99.* The relevant test for determining whether plaintiff must exhaust her administrative remedies, therefore, is "whether the acts alleged in the subsequent Title VII suit are fairly [*18] within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996)* (quoting *Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)).* Claims considered within the scope of the prior EEOC complaint either arise during the pendency of the EEOC investigation, are closely related to conduct alleged in the charge, or are explanations of the original charge. See *Waiters v. Parsons, 729 F.2d 233 (3d Cir. 1984); Ostapowicz, 541 F.2d at 398-99; Flesch v. E. Pa. Psychiatric Inst., 434 F. Supp. 963, 970 (E.D. Pa. 1977); Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984).*

As evidenced by plaintiff's Charge of Discrimination filed with the DDOL and the EEOC, and the Notice of Reasonable Cause Finding issued by the DDOL, plaintiff's sexual harassment claim is not reasonably within the scope of either the claim or the investigation. The sexual harassment claim arises from a set of facts wholly distinct from plaintiff's contention of disparate treatment with respect to the terms and conditions of her employment, [*19] i.e., wages, promotional opportunities, and disciplinary record. See, e.g., *Sandom v. Travelers Mortgage Servs., Inc., 752 F. Supp. 1240, 1248 (D.N.J. 1990).* Because neither plaintiff nor the DDOL ever mentioned any of the incidents about inappropriate comments as described in plaintiff's complaint at bar, "the sexual harassment claim would, most likely, not have arisen out of a reasonable EEOC investigation of the filed claim absent a specific allegation in the charge." *Id.* The sexual harassment claim cannot be said to closely relate to the conduct

alleged in the charge nor is it an explanation of the conduct in the charge. Additionally, the conduct did not occur during the pendency of the EEOC investigation, as the alleged sexual harassment occurred in July 2002, at least one month prior to plaintiff filing her Charge of Discrimination. (D.I. 1 at PP 45, 53) Therefore, plaintiff failed to exhaust her administrative remedies as to this claim and the motion to dismiss shall be granted in this regard.

Retaliation claims have been considered within the scope of a prior charge. See *Molthan v. Temple Univ., 778 F.2d 955, 960 (3d Cir. 1985)* (finding [*20] a retaliation claim within the scope of a prior claim filed with the EEOC alleging sexual discrimination); *Howze, 750 F.2d at 1212 (3d Cir. 1984)* (allowing a retaliation claim for failure to promote allegation within race discrimination). In this case, plaintiff's Charge of Discrimination sets forth three allegations: 1) plaintiff is paid lower wages than her male counterparts; 2) plaintiff is denied promotional opportunities; and 3) there is disparate treatment between plaintiff and her white male counterparts. (D.I. 9, ex. 1) Plaintiff filed a charge of discrimination on August 28, 2002. (D.I. 1 at P 53) Plaintiff was fired on September 18, 2002, and returned to work on October 21, 2002. (Id. at PP 55, 57) After plaintiff returned to work, her supervisors began creating a disciplinary file on her based on conduct for which other employees received no discipline. (D.I. 1 at PP 59-60) Additionally, plaintiff alleges that she was denied equal pay, benefits, and promotional opportunities in retaliation for filing her Charge of Discrimination. (D.I. 1 at PP 62, 65-66, 88(b)) Accepting the allegations contained in the administrative record as true, the motion to dismiss [*21] the retaliation claim shall be denied.

**B. Failure to Promote**

PBG argues that plaintiff's failure to promote claim is not sufficiently pled because plaintiff failed to identify whether her claim was based on racial or gender discrimination or both. (D.I. 9 at 5; D.I. 13 at 3) [HN4] "When deciding a motion to dismiss for failure to state a claim, 'one must read *Fed. R. Civ. P. 12(b) (6)* in conjunction with *Fed. R. Civ. P. 8(a),* which establishes the requirements for adequately pleading a claim in federal court.'" *Relational Funding Corp. v. TCIM Servs., 2002 U.S. Dist. LEXIS 7298, No. Civ. A. 01-821-SLR, 2002 WL 655479, at *3 (D. Del. Apr. 18, 2002)* (quoting *Brunetti v. Rubin, 999 F. Supp. 1408, 1409 (D. Col. 1998)).* [HN5] *Rule 8 (a)* requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* The statement need not contain detailed facts, but it requires that plaintiff give defendant fair notice of what the claim is and the grounds upon which it

Case 1:05-cv-00872-SLR    Document 11-5    Filed 12/30/2005    Page 14 of 23

Page 8

2005 U.S. Dist. LEXIS 18891, *; 151 Lab. Cas. (CCH) P10,559;
10 Wage & Hour Cas. 2d (BNA) 1633

rests. *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. A plaintiff is not required to state precisely [*22] each element of the claim. *Relational Funding Corp., 2002 U.S. Dist. LEXIS 7298, 2002 WL 655479, at *3* (discussing 5 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1216 (2d ed. 1990)). "Despite that fact, a plaintiff must 'set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" id. (quoting *Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)*). The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim upon which relief can be granted. See *Gould Elecs. v. United States, 220 F.3d 169, 178 (3d Cir. 2000)*.

In her complaint, plaintiff states that she is an African-American female. (D.I. 1 at P 2) As an African-American female, plaintiff is clearly a member of a protected class. *Bradley v. United States, 299 F.3d 197, 206 (3d Cir. 2002)*. Given the liberal pleading requirements of *Rule 8*, the court concludes that plaintiff's statement that she is an African-American female is sufficient as it asserts factual allegations that support her claim.

Additionally, PBG's [*23] inference that there is no statutory or common law basis for a failure to promote claim is without merit, as [HN6] the Third Circuit has previously recognized such claims. See, e.g., *Young v. Pennsauken Township Sch. Dist., 47 Fed. Appx. 160, 161 (3d Cir. 2002)* ("Such failure-to-promote claims are analyzed under the well known burden-shifting framework as set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*."). The court concludes that plaintiff's failure to promote claim meets the requirements of *Rule 8* and the motion to dismiss shall be denied.

C. Delaware Wage Payment and Collection Act

Plaintiff asserts that her claim under the Delaware Wage Payment and Collection Act is not dependant upon, or inextricably intertwined with, the collective bargaining agreement because her claim for lost wages is only for the time period when plaintiff was not a member of the Union. (D.I. 11 at 17) In the same paragraph, plaintiff claims that the collective bargaining agreement has "nothing to do" with her claim other than the fact that she "rightly should have been paid at the same rate of pay as those other individuals, [*24] similarly situated, who were being paid in accordance with that agreement." (Id.)

[HN7] The reach of *Section 301* of the Labor Management Relations Act ("LMRA") "encompasses not only state-law claims that are directly based on a collective bargaining agreement but also all those that are 'substantially dependent upon analysis of the terms' of the agreement." *Wheller v. Graco Trucking Corp., 985 F.2d 108, 113 (3d Cir. 1993)* (quoting *Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 85 L. Ed. 2d 206, 105 S. Ct. 1904 (1985)*); see also *id. at 112* (holding that state law claims for wages allegedly due under a collective bargaining agreement are preempted by *§ 301 of the LMRA*) ; Phillips v. United Parcel Serv., Inc., No. 01-22-GMS, *2001 WL 694535*, at *2-3 (D. Del. Jun. 20, 2001) (holding that claims brought pursuant to the Delaware Wage Payment and Collection Act for wages under a collective bargaining agreement are preempted by the LMRA).

Plaintiff claims that she is entitled to liquidated damages in an amount equal to unpaid overtime and wage differences pursuant to Delaware's Wage Payment and Collection Act. (D.I. 1 at P 104) Specifically, plaintiff asserts that PBG [*25] "refused to pay [her] for overtime for weeks in which she worked in excess of forty hours, as well as time and a half for Saturday hours worked and double-time for Sunday hours worked per the terms of the collective bargaining agreement." (D.I. 1 at P 31) Additionally, plaintiff asserts the collective bargaining agreement was violated when she was not admitted to Local 830 in November 2001. (Id. at P 19) To determine whether the collective bargaining agreement was violated, whether plaintiff is entitled to the higher Union wages, and whether plaintiff is entitled to overtime, the court will have to interpret the collective bargaining agreement. The court finds that this interpretation of the collective bargaining agreement will be substantially dependent upon analysis of the terms of the agreement and, therefore, plaintiff's state wage claims are preempted by the LMRA. The motion to dismiss this claim shall be granted.

**D. Motion for a More Definite Statement**

Local 830 moves the court to require plaintiff to provide a more definite statement pursuant to *Fed. R. Civ. P. 12(e)*. (D.I. 10) In this case, Local 830 contends that a more [*26] definite statement is needed because the complaint fails to "specifically delineate" the conduct performed by each defendant and that the conduct of Local 830 is only alluded to, not "specifically" pled. (D.I. 10 at 2)

[HN8] A motion under *Rule 12(e)* is made to correct a pleading that is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." *Fed. R. Civ. P. 12(e)*. The purpose, however, of *Rule 12(e)* is not to make it easier for the moving party to prepare its case. n8 *Symbol Techs., Inc. v. Hand Held Prods., 2003 U.S. Dist. LEXIS 21002, No. Civ. A. 03-*

2005 U.S. Dist. LEXIS 18891, *; 151 Lab. Cas. (CCH) P10,559;
10 Wage & Hour Cas. 2d (BNA) 1633

*102-SLR, 2003 WL 22750145, at \*3 (D. Del. Nov. 14, 2003).*

n8 The advisory committee notes to *Rule 12(e)* state: "with respect to preparations for trial, the party is properly relegated to the various methods of examination and discovery provided in the rules for that purpose." See, e.g., *Campbell v. Miller, 836 F. Supp. 827, 832 (M.D. Fla. 1993)* ("A motion for a more definite statement is not a substitute for discovery.")

[*27]

Consistent with *Fed. R. Civ. P. Rule 8*, the [HN9] complaint states the nature of the action, the general factual background, the basis for seeking relief, and the relief sought. "This is all that is required by notice pleading under the [Federal Rules of Civil Procedure]. In these circumstances, a motion for a more definite statement should not be granted." *Marshall v. Local 326, No. 80-181, 1980 U.S. Dist. LEXIS 16547, at \*1 (D. Del. May 5, 1980).* Paragraph I of the complaint alleges that the action arises under Title VII. (D.I. 1 at 1) Among other things, the complaint alleges that the Union failed to respond to plaintiff's complaints, violated its collective bargaining agreement, and engaged in discrimination on the basis of race and sex. (D.I. 1 at 19, 31, 42, 61) In addition, the complaint demands various forms of compensation to be determined at trial. (D.I. 1) The complaint, therefore, complies with *Rule 8*'s liberal

pleading requirements and provides sufficient notice to Local 830 to prepare a responsive pleading. Local 830's motion for a more definite statement shall be denied.

## V. CONCLUSION

For the reasons [*28] stated above, defendant PBG's motion to dismiss is granted as to the sexual harassment claim, the breach of implied covenant and good faith and fair dealing and the Delaware Wage Payment and Collection Act, and as to all other claims denied. Defendant Local 830's motion for a more definite statement is denied. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 30th day of August, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED:

1. Defendant Pepsi Bottling Group's motion to dismiss is granted as to the sexual harassment, Delaware Wage Payment and Collection Act and the breach of implied covenant and good faith and fair dealing claims and denied as to all other claims. (D.I. 8)

2. Defendant Teamsters Union Local 830's motion for a more definite statement is denied. (D.I. 10)

Sue L. Robinson

United States District Judge

2005 U.S. Dist. LEXIS 7342, *; 177 L.R.R.M. 3283

LEXSEE 2005 U.S.DIST.LEXIS 7342

**SARAH M. WILLIAMS, Plaintiff, v. NATIONAL AMERICAN POSTAL WORKERS UNION, AFL-CIO, et al., Defendants.**

**Civ. No. 03-944-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 7342; 177 L.R.R.M. 3283*

**April 27, 2005, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former local union official sued defendant union and union officers, alleging, inter alia, that they violated the Labor-Management Reporting and Disclosure Act, *29 U.S.C.S. § 411* et seq., and the union's constitution and bylaws by placing a local union into trusteeship, denying the due process claims relating to her suspension, and failing to properly process her claims against former union officers. Defendants moved to dismiss.

**OVERVIEW:** The claims regarding the establishment of the trusteeship were dismissed as the union's constitution and bylaws clearly allowed the union president to suspend the officers of a local union and appoint a trustee and the former official failed to assert any factual basis for her allegation that the union and officers had violated those provisions. The due process claims surrounding the former official's suspension were also dismissed as the union's constitution and bylaws did not provide her with any rights or remedies with regard to the establishment of a trusteeship. The defamation claims against the union officers were barred by *Del. Code Ann. tit. 10, § 8119* (2003) as the alleged defamation occurred more than two years before the local official filed the action. Finally, the local official's free speech and assembly claims were dismissed as the complaint lacked any support for the proposition that a union officer was not authorized to make changes to the local union's constitution and bylaws without the local official's approval.

**OUTCOME:** The motion to dismiss the local official's complaint and amended complaint was granted.

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Collective Bargaining & Labor Relations > Judicial Review*
[HN1] See *29 U.S.C.S. § 412.*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN2] As is required under a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the court gathers the facts solely from the plaintiff's amended complaint.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN3] In analyzing a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief.

*Civil Procedure > Joinder of Claims & Parties > Self-Representing Parties*
[HN4] Where the plaintiff is a pro se litigant, the court has an obligation to construe the complaint liberally.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN5] The moving party has the burden of persuasion on

2005 U.S. Dist. LEXIS 7342, *; 177 L.R.R.M. 3283

a *Fed. R. Civ. P. 12(b)(6)* motion.

**Labor & Employment Law > Collective Bargaining & Labor Relations > Right to Organize**
[HN6] Section 302, *29 U.S.C.S. § 462,* of the Landrum-Griffin Act (formally, the Labor-Management Reporting and Disclosure Act of 1959, *29 U.S.C.S. § 411* et seq.) envisions a parent union imposing a trusteeship only on a subordinate body of that parent and only in conformity with the parent's constitution or bylaws.

**Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action**
[HN7] Legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.

**Civil Procedure > Pleading & Practice > Pleadings > Interpretation**
[HN8] See *Fed. R. Civ. P. 8.*

**Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action**
[HN9] The district court need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss.

**Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action**
[HN10] Claims relying on vague and conclusory allegations do not provide fair notice and will not survive a motion to dismiss.

**Governments > Legislation > Statutes of Limitations > Time Limitations**
**Torts > Defamation & Invasion of Privacy > Defamation Actions**
**Torts > Procedure > Statutes of Limitations**
[HN11] The two-year statute of limitations period proscribed by *Del. Code Ann. tit. 10, § 8119* (2003) is applicable to actions asserting claims of defamation.

**Governments > Legislation > Statutes of Limitations > Time Limitations**

**Torts > Procedure > Statutes of Limitations**
[HN12] Tort claims accrue at the time of the injury.

**Governments > Legislation > Statutes of Limitations > Time Limitations**
**Torts > Intentional Torts > Intentional Infliction of Emotional Distress**
**Torts > Procedure > Statutes of Limitations**
[HN13] The Delaware statute of limitations concerning personal injury provides that no action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of two years from the date upon which it is claimed that such alleged injuries were sustained. *Del. Code Ann. tit. 10, § 8119* (2003). Personal injuries include emotional injuries for statute of limitation purposes. Accordingly, under Delaware law, a two-year limitations period applies to claims for emotional distress.

**COUNSEL:** [*1] For Sarah M. Williams, Plaintiff, Pro se, Wilmington, Delaware.

For Perry F. Goldlust, Esquire, of Aber, Goldlust, Baker & Over, Wilmington, Delaware and Daniel B. Smith, Esquire, O'Donnell, Schwartz & Anderson, P.C., Washington, D.C., for Defendants American Postal Workers Union, AFL-CIO, William Burrus, Robert Tunstall, Greg Bell, C.J. Guffey, James Lingberg, Robert C. Pritchard, Raydell Moore, and Barbara Prothro.

**JUDGES:** ROBINSON, Chief Judge.

**OPINION:**

### MEMORANDUM OPINION

Dated: April 27, 2005
Wilmington, Delaware

**ROBINSON, Chief Judge**

## I. INTRODUCTION

Plaintiff Sarah Williams, appearing pro se, filed this action against American Postal Workers Union, AFL-CIO n1 ("APWU"), seven present and former officers of the APWU n2, and Barbara Prothro, the former trustee of the Wilmington, Delaware/Malcolm T. Smith Area Local of the APWU ("Local") (collectively "defendants"). (D.I. 2, 22, 29) Defendants filed a motion for a more definite statement and plaintiff subsequently filed a response to defendants' motion, which this court treated as an amended complaint. (D.I. 21, 22, 31) In her amended complaint, plaintiff alleges that defendants violated the

2005 U.S. Dist. LEXIS 7342, *; 177 L.R.R.M. 3283

Labor-Management [*2] Reporting and Disclosure Act of 1959 ("LMRDA"), *29 U.S.C. § § 411-531 (2003),* and various articles of the Constitution and Bylaws of the American Postal Workers Union by placing the Local into trusteeship, by denying plaintiff due process relating to her suspension from her position with the Local as Director of Industrial Relations, and by failing to properly process her claims against the former Treasurer and President of the Local. (D.I. 2, 22) Moreover, plaintiff alleges that defendants caused her extreme emotional distress and violated her right to freedom of speech and assembly under the LMRDA by amending the Local's Constitution and Bylaws without first consulting plaintiff. This court has jurisdiction over plaintiff's suit pursuant to *29 U.S.C. § 412* n3. Procedurally, the court is faced with defendants' motion to dismiss n4. (D.I. 28) For the reasons that follow, defendants' motion to dismiss is granted.

n1 According to defendants, plaintiff's complaint incorrectly names the American Postal Workers Union, AFL-CIO, as the National American Postal Workers Union, AFL-CIO. (D.I. 29)

[*3]

n2 Also named as defendants in plaintiff's amended complaint are the President of the APWU, William Burrus; former Secretary-Treasurer of the APWU, Robert Tunstall; Director of Industrial Relations of the APWU, Greg Bell; Executive Vice-President of the APWU, C.J. Guffey; former Director, APWU Maintenance Division, James Lingberg; Director of the APWU Motor Vehicle Services Division, Robert C. Pritchard; former Western Regional Coordinator, Raydell Moore; APWU Eastern Regional Coordinator, James Burke; and the late Moe Biller, former President of the APWU.

n3 *29 U.S.C. § 412* states, in relevant part, [HN1] "any person whose rights secured by the provisions of this title [*29 U.S.C. § § 411 et seq.*] have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.

n4 Defendants have also moved the court for summary judgment. Because plaintiff's complaint fails to state a claim upon which relief can be granted, this court need not address defendants'

summary judgment motion.

[*4]

## II. BACKGROUND

In September of 1999 n5, plaintiff was elected Director of Industrial Relations of Local 152, a local subdivision of the APWU. (D.I. 22) Along with Local President Christine Simmons and Treasurer John Melnick, plaintiff's term as a union officer was for three years. (D.I. 22)

n5 [HN2] As is required under a motion to dismiss pursuant to *Rule 12(b)(6),* the court gathers the facts solely from plaintiff's amended complaint. *Samuels v. Cunningham, 2003 U.S. Dist. LEXIS 14479 (D. Del. August 14, 2003).* While the foregoing facts were derived from the plaintiff's pro se complaint, this court was forced to rely on defendants' memorandum in support of its motion to dismiss in order to decipher plaintiff's complaint and place the relevant facts in sequential order.

Shortly after the election, plaintiff discovered several unauthorized payments made by newly elected President Simmons and Treasurer Melnick. (D.I. 22) On April 2, 2000, plaintiff and several other Local members filed 39 [*5] charges with the Local against Simmons, Melnick, Gwen Lane and Tosha Bryant. (D.I. 22) These charges included allegations that Simmons failed to file required federal reports or pay payroll taxes; failed to hold required Trustee, Executive Board and membership meetings; that she exceeded her spending authority and misused the Local's funds; that she commingled union funds with other non-union funds; that she paid Local funds into her personal account; and that she improperly spent Local funds for non-union purposes. (D.I. 22, 29, Ex. 8) The Local's Secretary, Darlene Demby, determined that a fair hearing within the Local was unlikely because most of the Local Executive Board either filed charges or were being charged with wrongdoing. (D.I. 22, 29, Ex. 8) Demby forwarded the charges to NEB Secretary-Treasurer Robert Tunstall. (D.I. 22)

The NEB appointed National Business Agent Robert Bloomer to hear the charges against Christine Simmons and the other Local members alleged to have mismanaged the Local's funds. (D.I. 22, 29) Hearings were held in the matter between December 7, 2000 and January 17, 2001. (D.I. 22, 29) Bloomer then filed a

Page 4

2005 U.S. Dist. LEXIS 7342, *; 177 L.R.R.M. 3283

report with the NEB, recommending the actions [*6] he felt the NEB should take. (D.I. 29) This report was not delivered to the charging parties, including plaintiff. (D.I. 22, 29) The NEB adopted Bloomer's recommendations and found Simmons guilty of 16 of the 39 charges filed against her and required her to repay $ 6,981.00 to the Local. (D.I. 22, 29) Plaintiff and the other charging parties appealed the Bloomer decision to the National Convention Appeals Committee n6, arguing that Simmons should be found guilty of the remaining 23 charges and that she should be forced to repay the Local $ 124,000 in misappropriated funds. (D.I. 22, 29) Simmons also appealed the decision of the NEB that required her to repay $ 6,981.00 to the Local. (D.I. 29) Although finding that Simmons breached her fiduciary duty to the Local's members by failing to "make sure that necessary reports are filed with the Department of Labor, that payroll taxes are properly deducted and paid to the government and tax returns filed" that resulted in close to $ 100,000 in penalties from state and local tax authorities, the National Convention Appeals Committee nevertheless found that Simmons' conduct was not embezzlement which would have "justified the harshest penalty. [*7]  " (D.I. 29) The appeals board issued a report, adopted by the National Convention, that sustained the decision of the NEB and rejected the appeals of plaintiff and Simmons. n7 (D.I. 22, 29)

n6 The APWU's Constitution and Bylaws, Section 4, states that:

Any person or body, against whom disciplinary action has been taken or whose charges have been dismissed in whole or in part, shall have the right to appeal as follows
. . .

(b) From the disciplinary action of or dismissal of charges by a local union, (1) to the President, (2) to the National Executive Board, and (3) to the National Convention.

(c) From the disciplinary action of or dismissal of the charges by the National Executive Board to the National Convention.

(d) From the disciplinary action of the President (1) to the National Executive Board and to the National Convention.

The National Convention Appeals Committee met during the APWU National Convention in Minneapolis, Minnesota during the week of August 12 to 16, 2002 to hear the appeal in this matter. (D.I. 29)

n7 Simmons was banned from holding a board position with the Local for three years and forced to repay $ 6,981 to the Local. (D.I. 29)

[*8]

In response to the charges brought by plaintiff against Simmons, a letter was sent on September 7, 2001 from the Local's CPA to Robert Tunstall, Secretary-Treasurer of the APWU's National Executive Board ("NEB") and a named defendant. (D.I. 22, 29) Penelope Howe, the accountant who was hired by the Local to prepare income tax and payroll returns, stated in the September 7, 2001 letter that she was terminating all of her services to the Local based on "concrete evidence" indicating that the Local's serious financial condition was based on misappropriation of funds and "severe mismanagement" by the Local's officers. (D.I. 22, 29, ex. 3) Basing his decision on Howe's letter, APWU President Moe Biller informed Robert Tunstall that Biller was suspending the Local and decided further that an "immediate imposition of a trusteeship [was] warranted." (D.I. 29, Ex. 2) Biller, in an attempt to "prevent the theft, misappropriation, or embezzlement of the funds, assets or properties of the Local" (D.I. 29, Ex. 2), referenced Article 15, Section 2(a)-(b) of the Constitution and Bylaws of the APWU in carrying out the suspension of the Local and in appointing APWU National Business Agent Barbara [*9] Prothro as the temporary trustee on October 9, 2001. n8 (D.I. 29, Ex. 2)

n8 Section 2(a)-(b) of the Constitution and Bylaws of the APWU states:

(a) Except in case of suspension or expulsion for non-payment of dues or per capita, the President may initiate suspension proceedings against a subordinate body upon a finding of: (1) a willful and substantial commission of an offense prohibited by Section 1 of this Article, and may suspend a subordinate body upon a finding; (2) that such suspension is necessary to prevent the theft, misappropriation, or embezzlement of the funds, assets

2005 U.S. Dist. LEXIS 7342, *; 177 L.R.R.M. 3283

or properties of the subordinate body. Any such finding and suspension shall be made, in writing, setting forth the basis therefor [sic], and shall be effective upon delivery to the subordinate body.

(b) Where a subordinate body is suspended under Section 2(a)(2) above, the President may appoint a trustee immediately to assume management of the affairs and business of the subordinate body.

The next day Trustee Prothro suspended [*10] all of the Local's officers, including plaintiff. In early November, a three member trial board, consisting of three of the twelve members of the APWU NEB, was appointed and a hearing was held concerning the continued validity of the trusteeship. (D.I. 22, 29) After hearing testimony from various members of the Local, including plaintiff, the three member trial board issued a report and concluded that the trusteeship should be continued. (D.I. 22, 29, Ex. 4) Christine Simmons appealed the decision of the trial board, but the NEB rejected her appeal. (D.I. 29, Ex. 5, 6) Not satisfied, Simmons appealed to the APWU National Convention Appeals Committee. (D.I. 22, 29) The National Convention Appeals Committee n9, however, issued a report that adopted the findings of the NEB trial board. (D.I. 22, 29, Ex. 7) Subsequently, the convention adopted a resolution accepting the report of the appeals committee and rejecting Simmons' appeal from the imposition of the trusteeship. (D.I. 29)

n9 The committee was composed of Paul Mendrick, Chairperson of the Denver Metro Area Local; Tyrone Hewitt of the East Bay Area Local; and Robert Mero of the Charleston, South Carolina Area Local. (D.I. 22, 29, Ex. 7)

[*11]

## III. STANDARD OF REVIEW

[HN3] In analyzing a motion to dismiss pursuant to *Rule 12(b)(6)*, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. "A complaint should be

dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. [HN4] Where the plaintiff is a pro se litigant, the court has an obligation to construe the complaint liberally. See *Haines v. Kerner, 404 U.S. 519, 520-521, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972)*; *Gibbs v. Roman, 116 F.3d 83, 86 n.6 (3d Cir. 1997)*; *Urrutia v. Harrisburg County Police Dep't., 91 F.3d 451, 456 (3d Cir. 1996)*. [HN5] The moving party [*12] has the burden of persuasion. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*.

## IV. DISCUSSION

### A. Establishment of the Trusteeship and Trial Board

The first series of allegations in plaintiff's complaint challenge the imposition of the trusteeship by the NEB of the APWU. Specifically, plaintiff alleges that the defendants "failed to follow the [LMRDA and the] Constitution and Bylaws of the American Postal Workers Union AFL-CIO as amended July 2000." (D.I. 22) Initially, [HN6] Section 302 of the Landrum-Griffin Act (formally, the Labor-Management Reporting and Disclosure Act of 1959) envisions "a parent union imposing a trusteeship only on a 'subordinate body' of that parent and only in conformity with the parent's constitution or bylaws." *Tile, Marble, etc. v. Tile, Marble, etc. Local 32, 896 F.2d 1404, 1410-1411 (3rd Cir. 1990)*; see also *29 U.S.C. § 462 (1982)*. Contrary to plaintiff's own complaint, however, the APWU's President followed the APWU's Constitution and Bylaws to the letter and, absent any facts in plaintiff's complaint that support her claim that the imposition of [*13] the trusteeship was improper, her claim must fail.

The APWU's Constitution and Bylaws, referred to and relied on by plaintiff in her complaint, clearly state that the President of the APWU may suspend the officers of a Local and appoint a trustee to assume the management affairs of the Local upon a finding that the suspension "is necessary to prevent the theft, misappropriation, or embezzlement of the funds, assets or properties of the subordinate body." (D.I. 29, Ex. 1) Article 15, Section 2(b) further states that the President's finding must set forth the basis for the suspension. (D.I. 29, Ex. 1) in accordance with the APWU's Constitution

Case 1:05-cv-00872-SLR    Document 11-5    Filed 12/30/2005    Page 21 of 23

Page 6

2005 U.S. Dist. LEXIS 7342, *; 177 L.R.R.M. 3283

and Bylaws, NEB President Moe Biller sent a letter to the APWU's Secretary-Treasurer Robert Tunstall setting forth his reasons for imposing the trusteeship. n10 (D.I. 29, Ex. 2) In the absence of any factual assertion to the contrary, the letter from the Local's CPA, which alluded to "severe mismanagement" and "concrete evidence of misappropriation of funds", satisfies the notice requirements of Article 15, § 2(b) of the APWU's Constitution. Furthermore, plaintiff's assertion that the defendants established the trusteeship for "improper" or "false" [*14] reasons, is insufficient to withstand defendants' motion to dismiss. n11 [HN7] "Legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3rd Cir. 1997).*

> n10 As stated earlier, the primary reason for the imposition of the trusteeship was the letter from the Local's CPA, Penelope Howe, stating that evidence showed that the Local mishandled funds.

> n11 *Rule 8(a) of the Federal Rules of Civil Procedure* sets forth the applicable standard for analyzing plaintiff's complaint. *Rule 8* states in relevant part: [HN8] "A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends. . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." *Fed. R. Civ. P. 8.*

[*15]

Moreover, Section 2 of the APWU's Constitution and Bylaws mandates that a three-member trial board, elected by the NEB, be appointed to determine the continued validity of the trusteeship. (D.I. 29, Ex. 1) In accordance with the above provision of the APWU Constitution and Bylaws, the three-member panel held open hearings and concluded that the trusteeship should be continued. (D.I. 22, 29) Plaintiff not only acknowledges that this hearing took place, but she readily admits that she participated in the hearing. (D.I. 22 at P 69) Absent any factual assertion to the contrary, plaintiff's general averment that defendants "failed to follow the Constitution and Bylaws" is insufficient to show that plaintiff is entitled to the relief requested. (D.I. 22)

Furthermore, plaintiff alleges that defendants

improperly established the trusteeship without properly serving her or the Local with charges and without providing notice of the trusteeship. (D.I. 22 at PP 1, 75, 76, 116, 48-51, 49) Again, however, the APWU Constitution, relied on by plaintiff in her complaint, clearly sets forth the requirements for establishing a trusteeship and the serving of charges. (D.I. 29, Ex. 2) Plaintiff herself [*16] admits to being "hand deliver [sic] the notice placing Local 152 under trusteeship." (D.I. 22 at P 49) Because [HN9] this court need not credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss, *In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1429-30 (3d Cir. 1997)* (quoting *Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir. 1996)),* the plaintiff's allegations concerning service of charges and failure of proper notice must be dismissed.

Plaintiff also alleges that defendants violated the LMRDA and the APWU's Constitution and Bylaws by failing to act impartially on charges she filed against Christine Simmons and other officers in the Local. (D.I. 22 at PP 20-40, 78-80) Like the above allegations, plaintiff's own complaint belies the allegation that a hearing was not held. (D.I. 22 at PP 20-40) Further, plaintiff has failed to assert any facts that would indicate that Robert Bloomer, the hearing officer appointed by the NEB to hear the charges brought by plaintiff, was anything but impartial. In fact, apart from the plaintiff generally disagreeing with the measure of punishment levied against [*17] Christine Simmons, the end result of this hearing was the punishment of the Local's President and the establishment of the trusteeship to remedy the financial mismanagement by the Local's managing board, the very "root of plaintiff's charges against President Simmons." (D.I. 29)

Lastly, plaintiff asserts in her amended complaint that defendants "interfered in the plaintiff's re-election process of Local 152 during the 2002 election" and "caused irresistible (sic) harm to members of Local 152 when the defendants interfered in the plaintiff's re-election process." (D.I. 22 at PP 71,95) Although this assertion differs from the others in that it is not directly rebutted by the facts alleged in plaintiff's complaint or by the Constitution and Bylaws relied on by plaintiff, [HN10] claims "relying on vague and conclusory allegations do[] not provide 'fair notice' and will not survive a motion to dismiss." *United States v. City of Philadelphia, 644 F.2d 187, 204 (3rd Cir. 1980).* Without any facts relating to how the defendants might have interfered with the election process, this court cannot allow such a claim to continue.

While plaintiff's complaint routinely cites to the

2005 U.S. Dist. LEXIS 7342, *; 177 L.R.R.M. 3283

procedural [*18] requirements set forth by the APWU's Constitution and Bylaws that relate to the imposition of a trusteeship, plaintiff fails to assert any factual basis for her allegations that the defendants violated any provision of the APWU's Constitution or Bylaws. Nor does plaintiff cite to any specific provision in the APWU's Constitution or Bylaws which were allegedly violated. Even in light of the liberal reading pro se complaints are afforded, the court concludes that plaintiff has failed to carry her burden of alleging any set of facts that entitle her to any of the relief requested. Accordingly, plaintiff's allegation that the defendants improperly appointed a trustee to oversee the Local and failed to act on plaintiff's charges must be dismissed.

**B. Suspension of Plaintiff from Local's Board**

Plaintiff's complaint also alleges that defendants violated her "due process rights" in suspending her from her office because: (1) she was denied a hearing or appeal rights (D.I. 22 at PP 66, 98); (2) she was denied notice on the "charges" against her and a subsequent opportunity to prepare defenses (D.I. 22 at PP 97, 98); (3) she was denied the case number in the letter that informed her [*19] of the suspension from office (D.I. 22 at PP 51, 53); and (4) defendants interfered with the grievance process by denying plaintiff due process under the collective bargaining agreement (D.I. 22 at P 87).

Plaintiff's allegations with regard to her suspension are without merit. Nothing in the APWU's Constitution or Bylaws provides plaintiff with any rights or remedies with regard to the establishment of a trusteeship. In fact, Article 15, Section 2(e) of the APWU Constitution provides that "the trustee, so appointed, shall be authorized and empowered to suspend any or all the officers from office . . . for the duration of his/her trusteeship, and to take such other actions as in his/her judgment are necessary for the preservation of the subordinate body, all subject to the direction, instructions and approval of the National Executive Board." The APWU's Constitution and Bylaws have no provision that allows a Local Board member to appeal a suspension in the event the imposition of a trusteeship is approved by the NEB. In this case, the NEB trial board approved the imposition of Barbara Prothro as trustee of the Local in question. (D.I. 29, Ex. 7) There is no requirement that the charging [*20] parties be provided a "case number" along with notice of suspension. Accordingly, plaintiff's complaint with respect to her assertion that she was denied due process must be dismissed.

**C. Defamatory Statements Allegedly Made by Defendants**

Plaintiff's claims of defamation are barred by the

applicable statute of limitations. Because plaintiff alleges that the defamation occurred in and around October 2001, the defendants are correct in noting that any claim of defamation stemming from posted notices from October of 2001 would in fact be time barred under Delaware law. See *Shearin v. E.F. Hutton Group, Inc., 652 A.2d 578 (Del. Ch. 1994)*[HN11] (2-year statute of limitations period proscribed by *Section 8119 of Title 10 of the Delaware Code* is applicable to actions asserting claims of defamation); n12 see also *Carr v. Town of Dewey Beach, 730 F.Supp. 591, 599 (D. Del. 1990)*. Plaintiff does state, in P 124 of her amended complaint, that the defendants defamed the plaintiff "in October 2001, and in the months thereafter." [HN12] Tort claims, however, accrue at the time of the injury. *Nardo v. Guido DeAscanis & Sons, Inc., Del.Super., 254 A.2d 254 (1969)*. [*21] Accordingly, because plaintiff brought this suit on July 26, 2004, and the accrual date for the statute of limitations is October of 2001, plaintiff's claims of defamation by defendant Prothro must be dismissed.

n12 Plaintiff also claims defendants intentionally inflicted emotional distress by posting the defamatory statements. Like the claims for defamation, [HN13] the Delaware statute of limitations concerning personal injury provides that "no action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of [two] years from the date upon which it is claimed that such alleged injuries were sustained." *10 Del. C. § 8119* (2003). "Personal injuries" include emotional injuries for statute of limitation purposes. See *Wright v. ICI Americas, Inc., 813 F. Supp. 1083 (D. Del. 1993)*. Accordingly, under Delaware law, a two-year limitations period applies to claims for emotional distress and plaintiff's claims for intentional infliction of emotional distress must be dismissed.

[*22]

**D. Violation of Freedom of Speech and Assembly Under LMRDA**

Lastly, plaintiff claims that defendants violated her right to freedom of speech and assembly by adopting an amended version of the Local's Constitution and Bylaws without first seeking her counsel. (D.I. 22 at PP 130-34) Echoing earlier statements made concerning the authority of the appointed trustee under the APWU Constitution and Bylaws to "take such other actions as in his/her judgment are necessary for the preservation of the subordinate body, all subject to the direction, instructions

2005 U.S. Dist. LEXIS 7342, *; 177 L.R.R.M. 3283

and approval of the National Executive Board" (D.I. 29, Ex. 1), plaintiff's complaint and amended complaint lack any support for the proposition that Barbara Prothro was not authorized to make such changes to the Local's Constitution and Bylaws without plaintiff's approval.

### V. CONCLUSION

For the reasons set forth above, the court grants defendants' motion to dismiss plaintiff's complaint and amended complaint. An appropriate order shall issue.

A 141